| | |
|---|---|
| INTERSECTIONS INC.<br>and<br>NET ENFORCERS, INC.,<br><br>        Plaintiffs,<br><br>v.<br><br>JOSEPH C. LOOMIS<br>and<br>JENNI M. LOOMIS,<br><br>        Defendants. | Civil Action No. 1:09CV597<br>LMB/TCB |

## ANSWER, GROUNDS OF DEFENSE AND COUNTERCLAIM OF DEFENDANT JOSEPH C. LOOMIS

In response to the Complaint Defendant Joseph C. Loomis says as follows:

### Answer and Grounds of Defense

### First Defense

The Complaint fails to state a claim upon which relief may be granted.

Without limiting the generality of this defense, Defendant moves simultaneously herewith for dismissal of Courts I (Securities Fraud), III (Fraud), IV (Tortious Interference), VII (Conspiracy), and the prayer for a "judgment of rescission," and the request for damages arising from the tax provisions of the stock purchase agreement.

### Second Defense

The allegations of diversity of citizenship are denied; this court does not have subject matter jurisdiction over this dispute on that basis.

## Third Defense

With regard to the specific allegations of the Complaint, Defendant Joseph C. Loomis says as follows:

1. Admitted.

2. Admits that there is an SPA in November 2007 by which Defendant sold the stock of NEI to Intersections; admits that the acquisition of NEI followed several months of due diligence by Intersections, and admits that Jenni M. Loomis was the bookkeeper for NEI. The remaining allegations are denied because they are characterizations of the SPA, which speaks for itself, or characterizations of Intersection's own intent, which Defendant cannot ascertain. It is specifically denied that any representations were made outside of the SPA relating to "a trend" in revenue.

3. Admitted that there is an Employment Agreement. The document speaks for itself, and characterizations of the Agreement are denied.

4. Admitted that Defendant and his brother have operated Loomis Enterprises LLC, but otherwise denied.

5. Admitted that Defendant was suspended in October 2008, but otherwise denied.

6. Denied.

7. Admitted that Defendant was terminated and that Defendant claims payment is owed to him, but otherwise denied.

8. Denied.

9. Denied.

10. To the extent that this allegation's summarizing the claims of Intersections requires a response, their allegations are denied in that Intersections is not entitled to relief.

11. Admitted.

12. Denied, except that Defendant admits that NEI is incorporated in Florida.

13. Admitted.

14. Admitted.

15. Denied.

16. Denied.

17. Denied, although Defendant admits that the SPA recites that Virginia shall be the venue for any legal action.

18. Denied, except that Defendant admits that an intermediary acted to locate potential buyers for NEI.

19. Admitted that Defendant entered discussions with Intersections and that Intersections conducted an extensive and costly due diligence during which time it was provided with information, but otherwise the allegations of this paragraph are denied.

20. Admitted that Intersections agreed to purchase Defendant's stock, but otherwise denied.

21. Admitted.

22. Because the document speaks for itself, the allegations are denied.

23. Because the document speaks for itself, the allegations are denied.

24. Because the document speaks for itself, the allegations are denied.

25. Because the document speaks for itself, the allegations are denied.

26. Because the document speaks for itself, the allegations are denied.

27. Because the document speaks for itself, the allegations are denied.

28. Because the document speaks for itself, the allegations are denied.

29. Because the document speaks for itself, the allegations are denied.

30. Admitted.

31. Admitted.

32. Because the document speaks for itself, the allegations are denied.

33. Because the document speaks for itself, the allegations are denied.

34. Because the document speaks for itself, the allegations are denied.

35. Because the document speaks for itself, the allegations are denied.

36. Because the document speaks for itself, the allegations are denied.

37. Denied.

38. Admitted.

39. Denied.

40. Admitted that Defendant received a letter dated October 20, 2008. Because the letter speaks for itself, the characterizations of the letter are denied.

41. Admitted.

42. Denied.

43. Denied.

44. Denied.

45. Admitted that Defendant received a letter dated November 19, 2008. Because the letter speaks for itself, the characterizations of the letter are denied.

46. Admitted.

47. Admitted that Defendant claims that he is owed at least $250,000, but otherwise denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied, except that Defendant admits challenging the valuation.

55. Denied.

56. Denied.

57. The responses to paragraphs 1 through 56 are incorporated here by reference.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

62. Denied.

63. Denied..

64. The responses to paragraphs 1 through 63 are incorporated here by reference.

65. Admitted.

66. Denied.

67. Denied.

68. Denied.

69. The responses to paragraphs 1 through 68 are incorporated here by reference.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

75. The responses to paragraphs 1 through 74 are incorporated here by reference.

76. Admitted.

77. Admitted.

78. Denied.

79. Denied.

80. Denied.

81. The responses to paragraphs 1 through 80 are incorporated here by reference.

82. Admitted.

83. Denied.

84. Denied.

85. The responses to paragraphs 1 through 84 are incorporated here by reference.

86. Denied.

87. Denied.

88. Denied.

89. Denied.

90. The responses to paragraphs 1 through 89 are incorporated here by reference.

91. Denied.

92. Denied.

93. Denied.

94. The responses to paragraphs 1 through 93 are incorporated here by reference.

95. Denied.

96. Denied.

97. Denied.

### Fourth Defense

Plaintiffs have waived or are estopped from asserting a claim for rescission of the Stock Purchase Agreement.

### Fifth Defense

As a matter of law, there can be no conspiracy as alleged in the Complaint because Defendant Jenni M. Loomis was an agent of NEI who merely performed ministerial acts at the direction of an officer of the company, Defendant Joseph C. Loomis, and she had no independent financial interest in the transaction or matters alleged.

### Sixth Defense

To the extent that Plaintiff Intersections seeks damages with respect to Section 6.11 of the Stock Purchase Agreement, the claim is subject to a contractual requirement of arbitration, which is a predicate to any claim for damages arising therefrom.

### Seventh Defense

Plaintiff's claims for damages from breach of contracts and for a declaration enforcing contracts are barred in whole or in part by a lack of consideration of failure of consideration in that Plaintiffs breached and/or failed to perform under those contracts.

### Eighth Defense

Defendant did not act intentionally to defraud, or deceive Plaintiffs or make any untrue statement of a material fact or omit to state or material fact. Defendant did not act with malice or scienter.

### Ninth Defense

Plaintiffs conducted due diligence in the acquisition of NEI, employing outside lawyers and accountants. Any loss or damage to Plaintiffs based on the alleged discrepancy in value between the amount paid for the stock of NEI and its "true value" was not caused by Defendant and/or was the result of Plaintiff Intersection's own negligence.

### Tenth Defense

The claims made are barred by the doctrine of unclean hands.

WHEREFORE, Defendant demands that the Complaint be dismissed with prejudice and that costs of the action and attorneys fees be assessed against Plaintiffs.

### Counterclaim

For his Counterclaims against Plaintiffs, Defendant Joseph C. Loomis (hereinafter "Loomis") alleges as follows

### Jurisdiction

1.  The claims asserted here are mandatory counterclaim arising from the acquisition of Net Enforcers, Inc. (hereinafter "NEI"), of which Loomis was the sole shareholder, in November, 2007, by Intersections, Inc. (hereinafter "Intersections").

2. Loomis is a citizen and resident of Florida. The Complaint alleges that Intersections is a Delaware corporation with its principal place of business in Virginia and that NEI is a Florida corporation with its principal place of business in Florida.

3. This court has jurisdiction over the counterclaim pursuant to 28 U.S.C. 1332(a) in that the parties, as alleged in the Complaint, are citizens of different states. By affirmative defense to the Complaint, Loomis has challenged the allegation of diversity of citizenship, and the allegation in this paragraph of diversity is made in the alternative; if there is subject matter jurisdiction for the Complaint, jurisdiction will lie for this Counterclaim.

**Facts Common to All Courts**

4. Loomis was a principal and founder of NEI. NEI is a provider of online brand protection and enforcement services, and provides manufacturers, including those of electronics, pharmaceutical, automotive, and sporting goods, with monitoring of, tracking of, investigating of, and reporting on the violation and misuse of proprietary brands and products.

5. Loomis dramatically grew the revenue of NEI from nothing, at its inception, to $3.5 million per year within five years. The success of NEI depended on the unique skills and experience of Loomis in corporate intelligence activity and computer programming. By 2007, NEI was the leading entity engaged in brand protection on the internet, employed by some of the largest companies in the world.

6. The success of NEI attracted the attention of Intersections, a publicly-held global provider of consumer and corporate identity risk management and identity theft protection services. In 2007, Intersections offered an arrangement to Loomis to sell the equity in his company while retaining the right to manage it.

7. Intersections proposed, specifically, that a significant portion of the consideration for the purchase of the company be paid to Loomis in the form of an "earn out" payable after the

sale. Intersections committed itself in negotiations to act in good faith in the management of NEI after the sale in order that certain targets and goals would be met for the purpose of the earn out.

8. Intersections told Loomis that it was entering into the transaction because it wanted to have a major presence in the business and corporate brand protection business as an adjunct to its individual credit and identity protection business. Intersections also claimed it would make a major investment in NEI, including aligning certain of its relationships and partnerships in expanding NEI, with Loomis as a key player in the expansion.

9. But, less than one year after he sold his equity in NEI to Intersections, Loomis was removed from his position as CEO of NEI without cause, and he has been denied the contractual considerations due to him following such a termination as well as stock options due to him, and the opportunity to guide NEI to the benchmarks set for purposes of the earn out. This case arises from the Defendants' repeated breaches of contract.

10. As alleged below, Loomis was terminated because Intersections reneged on its original promises. Intersections and its officers misjudged the economy and made acquisitions in 2007 which required investment to be successful. Rather than make that investment, however, Intersections elected to cut its losses by breaching its agreements with Loomis, terminating him, and blaming him for failure to meet the promised targets.

### The Stock Purchase Agreement and the Employment Agreement

11. Intersections acquired NEI from Mr. Loomis pursuant to the Stock Purchase Agreement dated as of 9 November 2007, by and among Intersections, NEI, and Loomis (the "Stock Purchase Agreement"). NEI is now a wholly owned subsidiary of Intersections. A copy of the Stock Purchase Agreement is attached to the Complaint as Exhibit 1.

12. Intersections, after the closing on the acquisition of NEI, failed to fulfill its representations and responsibilities in the duties associated with the transaction. These activities include the collections of billings from NEI clients, proper turnover of NEI accounting to Intersections accounting, as well as overall management of the Human Resources of NEI.

13. After Intersections acquired NEI, Loomis was named Chief Executive Officer of NEI pursuant to the Employment Agreement dated 9 November 2007, by and between NEI and Loomis (the "Employment Agreement"). A copy of the Employment Agreement is attached to the Complaint as Exhibit 2.

14. The Employment Agreement provides that Loomis, as CEO, will operate and manage NEI. As CEO, Mr. Loomis will be paid a yearly salary of $250,000 and will be granted the option to purchase 225,000 shares of common interest stock in Intersections.

15. Exhibit A of the Employment Agreement provides, in part:

(1) Subject to sections (2) and (3) below, this Option shall be exercisable as to 25% of the Shares subject to this Option on each of the first, second, third, and fourth anniversary of the date of the grant hereunder, provided that the Holder remains employed by the Corporation or its subsidiaries from the date of grant through such anniversary date.

16. The first anniversary of the grant, at which the first installment of option was due to vest, was November 30, 2008.

17. Section 6(a)(iv) of the Employment Agreement allows NEI to terminate Loomis without cause, subject to the provisions of Section 6(d).

Section 6(d) of the Employment Agreement reads:

If the Executive's employment is terminated by the Corporation pursuant to Section 6(a)(iv) or by the Executive pursuant to Section 6(a)(v), then, unless the parties otherwise mutually agree, in full satisfaction of the Corporation's obligations under this Agreement the Executive, his beneficiaries or estate, as appropriate, shall be entitled to receive (A) the then current Salary provided for herein up to and including the effective date of termination, prorated on a daily basis; (B) medical benefit continuation at the Executive's and/or his dependent's

expense as provided by law; and (C) an amount equal to the then current Salary provided for herein for a period of twelve (12) consecutive months following the effective date of termination, which shall be paid on the same schedule, and in the same manner, as though Executive had remained employed during such period, in exchange for a general release in form and content satisfactory to the Corporation, in its sole discretion, which general release must be executed by Executive no later than thirty (30) days following such effective date of termination.

18. Under Section 1.5 of the Stock Purchase Agreement, Mr. Loomis was eligible to be paid certain earn out amounts based on NEI's net revenue and EBITDA margins, as defined in the Stock Purchase Agreement. The combined amount of these earn out payments is $3.5 million, divided into five installments.

19. Section 6.2(a) of the Stock Purchase Agreement reads, in part:

For a period commencing upon the Closing and ending on the later of (x) the third anniversary of the closing and (y) the date the final payment of the Earnout is made, Seller shall not anywhere in the United States, directly or indirectly, without the prior written consent of Purchaser: (i) engage or participate, directly or indirectly, either as principal, agent, employee, employer, consultant, stockholder, director, officer, partner or in any other individual or representative capacity whatsoever, in the conduct or management of, or own any stock or other proprietary interest in, any business or enterprise that conducts business or operations which are the same as or substantially similar to the Business unless Seller or any such Affiliate shall have obtained the prior written consent thereto of Purchaser.

20. The Stock Purchase Agreement memorialized the understanding as to the conduct of the NEI business for NEI (referred to as the "Company Business Unit") after closing. Specifically, Section 6.13 reads in part as follows:

6.13 Operations of the Company Business Unit Post Closing

(a) Purchaser acknowledges that a significant amount of the consideration for this Transaction comes through the form of an Earnout potentially payable to Seller. As such, at any time Seller has the ability to earn an Earnout payment, Purchaser shall, subject to the good faith business judgment of Purchaser's board of directors and/or management, make commercially reasonable efforts in the then circumstances to cause the Company Business Unit to act in a manner reasonably intended to enhance the profitability of the Company Business Unit …"

21. The SPA provided specifically that Intersections and NEI would be required to consult regularly with Loomis and consider in good faith any recommendations or request he might have with regard to projects or budgets of NEI. This obligation existed, however, only for so long as Loomis remained as an employee and officer of the company.

## Intersections Changes Strategy

22. Before the acquisition and in its immediate aftermath, Intersections, through its CEO Michael R. Stanfield ("Stanfield") and Chief Operating Officer John Scanlon ("Scanlon"), promised Loomis there would be significant investment in the growth of NEI. For example, Intersections saw the potential for growing NEI in international markets, and Stanfield and Scanlon encouraged Loomis to look for acquisition candidates in Europe and Asia to spread the reach of NEI's activities. Stanfield also represented that Control Risks, a strategic partner of Intersections, would assist in helping NEI and its services into the European market.

23. At the time of the acquisition of NEI, Stanfield was bullish on the financial prospects for Intersections. In public statements, he predicted significant growth in revenues and profits for the company. Even as the credit crisis began in 2007, Stanfield remained optimistic for the prospects of the companies, believing that the down turn in the economy would lead to increased demand for identity theft products of Intersections and brand monitoring capacity of NEI.

24. As late of June 10, 2008, Stanfield publicly stated that "We are not seeing any negative effects of the credit issues in the marketplace on our core consumer business," and he predicted continued growth in the consumer business.

25. At the same time, Stanfield projected that the Business Services Unit, of which NEI was now a part, would grow to $125 million in revenue by 2011 and be very profitable. He predicted additional acquisitions by Intersections, setting out a plan for "further diversity through

new products and acquisitions so we are positioned to create $150 million in revenue by 2011 from businesses or products that we do not have today."

26. In fact, the recession had a major impact on Intersections in 2008, and as the year unfolded Stanfield and Scanlon revised their strategic plan for NEI and the Business Services Unit.

27. By October 2008, Stanfield recognized that major changes in the economy would force a change in the strategic plans for Intersections and for NEI. Stanfield sent an email to management, including Loomis, on October 6, 2008, announcing that, due to economic conditions, Intersections, and its subsidiaries, needed to generate more cash and severely limit expenses. In this message, Stanfield stressed that overhead costs would need to be reduced from the year before.

28. Moreover, at least by October 2008, Intersections abandoned all plans to expand and invest in the business of NEI.

**Intersections Interferes with Management of NEI**

29. Loomis was assured on multiple occasions by Stanfield that, as CEO of NEI, he would be given the authority to manage NEI. Following the acquisition, however, Intersections, specifically Scanlon, in his role as COO, repeatedly interfered with NEI's ability to conduct business, including refusing to allow NEI to hire a public relations firm to assist in marketing efforts and interfering in the formation of new client alliances and partnerships. Furthermore, Intersections legal department on several occasions interfered with the acquisition of new NEI customers due to mismanagement of client contract negotiations.

30. Scanlon did not understand the business of NEI, and he repeatedly caused disruption of client and customer relationships. Because of changes that Intersections insisted

making to the process of the work incorrect and incomplete billing statements were often sent to NEI customers, creating a reason for them to cancel services with NEI.

31. In June 2008, following a discussion regarding Intersection's lack of effort to assist NEI, Mr. Stanfield told Loomis that he should remove himself from the day-to-day activities of NEI and that he should not be "too involved" in the administration of NEI. Loomis was informed by Mr. Stanfield that John Scanlon would assume responsibility for NEI and Mr. Loomis would now report to Mr. Scanlon. Loomis and Scanlon disagreed as to the proper direction and management of NEI, and Scanlon frequently interfered in Loomis's attempts to act as CEO.

32. Loomis was notified on October 20, 2008, by Mr. Scanlon, that he was suspended from all duties as NEI's CEO pending an investigation into information obtained by Intersections suggesting Loomis had breached his fiduciary duties to NEI. In the same letter, Scanlon told Loomis that from that point forward he had no authority to act for or on behalf of NEI and that he was to no longer allowed at NEI's offices or facilities. Loomis, through counsel, responded to this letter on October 27, 2008, requesting NEI disclose any good faith basis that he had breached his fiduciary duties to NEI and agreeing to cooperate in any investigation.

33. On November 19, 2008, Loomis received a letter claiming to terminate him with cause pursuant to Sections 6(a)(iii)(b) and (c) of the Employment Agreement.

34. Loomis Enterprises is a custom home builder located in Phoenix, Arizona. Loomis is the Chairman of Loomis Enterprises and has been an investor in Loomis Enterprises since its inception. Both Stanfield and Scanlon, as well as others, knew of Mr. Loomis's relationship with Loomis Enterprises prior to the execution of the Employment Agreement and the Stock Purchase Agreement. Loomis also was having his personal home built by Loomis Enterprises,

15

information known to Intersections and its management. Loomis was never told that he may not participate in the management of companies, with which he was invested, that are not in competition with NEI.

35. As Scanlon pushed Loomis further from the management of NEI, he or others acting on his behalf began to search for information to use against Loomis. On information and belief, Scanlon began in the summer of 2008 to compile information on Loomis to use as a pretext for termination of the Employment Agreement.

36. One such pretext was the existence of Loomis Enterprises. Other allegations were generated later to justify, *ex post facto*, the decision that had been made to push Loomis out of the company, end the employment relationship, and cut off the exposure of Intersections to both the exercise of stock options by Loomis and payment of any earn outs.

37. On information and belief, Plaintiffs have conspired with others to obtain personal information about Loomis, including information on his bank accounts, the contents of his home safe, his investments, his travel plans and his personal friendships. This conspiracy began before Loomis was terminated but has continued since then and is ongoing. Plaintiffs have aligned themselves with others who have personal disagreements or business disputes with Loomis. Plaintiffs have solicited information and have "traded information" about Loomis. The common goal of the conspirators is to harm Loomis in his business relationships with Intersections and NEI, but also to interfere with his other business dealings and reputation.

### **Count 1: Breach of Contract**

38. Loomis incorporates paragraphs 1 through 37 as fully set forth herein.

39. NEI is contractually bound by the Employment Agreement.

40. NEI's notices of October 20, 2008, and November 19, 2008, purporting to terminate Loomis for cause were legally ineffective in that no cause of termination existed.

41. In fact, Loomis was terminated without cause and for reasons that related to Stanfield's and Scanlon's change of strategy rooted in their fear of changes in the economy, resulting in the selection of a route of false economy in eliminating Loomis's role and scaling back the growth of NEI.

42. NEI's failed to pay the consideration for termination without cause as provided in the Employment Contract, and its claim that there was termination for cause is intended to mask its true motives.

43. Loomis is due the considerations agreed in paragraph 6(d) of the employment agreement, including: his current salary prorated up to and including the date of termination; medical benefit continuation as required by law; and an amount equal to his salary at the time of his termination for twelve consecutive months following the effective date of the termination.

44. NEI has failed to pay the amounts due following the termination, which failure constitutes a breach of contract. NEI is now contractually obligated to pay all amounts due to Loomis under the Employment Agreement.

### Count 2: Breach of Contract

45. Loomis incorporates paragraphs 1 through 44 as fully set forth herein.

46. NEI is obligated under the Employment Agreement to award Loomis an option to purchase 225,000 shares of common stock of Intersections.

47. Loomis was terminated by NEI only one week before the first installment of the option was due to vest.

48. Loomis adequately fulfilled his role as CEO of NEI and was terminated without cause.

49. Loomis was terminated without cause and for the reason, *inter alia*, to avoid granting the stock options required by the Employment Agreement.

50. NEI's failure to award Loomis the option is a breach of contract, and he has been damaged in an amount equal to the value of the stock and to its anticipated future value.

### Count 3: Breach of Contract

51. Loomis incorporates paragraphs 1 through 50 as fully set forth herein.

52. The Stock Purchase Agreement provided that Loomis would have the opportunity as CEO of NEI to direct NEI in such a way as for it to be possible that NEI would meet the benchmarks set forth in the Stock Purchase Agreement and Loomis would earn the earn-out amounts tied to those benchmarks.

53. Loomis was terminated, at least in part, in order to prevent him from directing NEI in such a way as to meet the benchmarks set forth in the Stock Purchase Agreement. Intersections caused NEI to terminate Loomis in order to avoid having to pay the earn-out amounts to Loomis.

54. Intersections and its officers are managing NEI in such a way as to prevent NEI from meeting the benchmarks in the Stock Purchase Agreement, changing the business model, failing to invest in expansion, and otherwise limiting the profitability of the company.

55. Intersections failure to allow Loomis the opportunity to earn the earn out amounts listed in the Stock Purchase Agreement constitutes a breach of contract. Intersections is now contractually obligated to pay all amounts due to Loomis under the Stock Purchase Agreement.

56. Intersections termination of Loomis has not only prevented him from meeting the benchmarks set forth in the Stock Purchase Agreement, but has effectively prevented him from engaging or participating in any competing business or enterprise until the completion of the earn out period.

### Count 4: Breach of Duty of Good Faith and Fair Dealing

57. The allegations of paragraphs 1 through 56 are incorporated here by reference.

58. As a matter of law, Intersections and NEI were bound by a duty to act in good faith and to deal fairly with Loomis.

59. In fact, as alleged above, Intersections and NEI have breached both the letter and spirit of their agreements, acted unfairly to deprive Loomis of the benefit of his bargain, and damaged Loomis personally and professionally.

## **Prayer for Relief**

Wherefore, Loomis asks that this Court declare and interpret the rights of the parties pursuant to the Agreement with regard to the matters here alleged and, specifically, that this Court:

(A) Award Loomis all damages to be determined resulting from Defendants' breach of both the Employment Agreement and Stock Purchase Agreement, in an amount commensurate with the proof and evidence herein, but in any event no less than Ten Million Three hundred Fifty Thousand Dollars. Plaintiff reserves the right to amend its prayer for relief;

(B) that Loomis be awarded his costs and attorneys' fees in this action; and

(C) award such other and further relief as it deems to be just and proper.

Respectfully submitted,

**BRYAN CAVE LLP**

/s William E. Olson _____
William E. Olson (VSB #47251)
Rodney F. Page (VSB #12402)
Jennifer M. Kies (VSB #73102)
1155 F Street, NW
Washington, DC 20004
Tel.: (202) 508-6002
Fax: (202) 508-6200
weolson@bryancave.com
rfpage@bryancave.com
jennifer.kies@bryancave.com

Dated: July 2, 2009
*Counsel for Defendant and Counterclaimant Joseph C. Loomis*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of July 2009, I caused the foregoing to be served by hand and to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

>Ryan C. Berry
>Tara Lee
>DLA PIPER LLP (US)
>1775 Wiehle Avenue, Suite 400
>Reston, VA 20190
>
>*Counsel for Plaintiffs Intersections, Inc. and Net Enforcers, Inc.*
>
>
>/s William E. Olson
>William E. Olson, VA Bar. No. 47251
>Bryan Cave LLP
>1155 F Street, NW
>Washington, D.C. 20005-3960
>Telephone: (202) 508-6000
>Facsimile: (202) 508-6200
>weolson@bryancave.com
>
>*Counsel for Defendant and Counterclaimant Joseph C. Loomis*