IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| INTERSECTIONS INC.<br>   and<br>NET ENFORCERS, INC.<br><br>                    Plaintiffs,<br>     v.<br><br>JOSEPH C. LOOMIS<br>   and<br>JENNI M. LOOMIS<br><br>                    Defendants. | Case No.  1:09-cv-00597-LMB-TCB |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs Intersections Inc. ("Intersections") and Net Enforcers, Inc. ("NEI" and, together with Intersections, "Plaintiffs") respectfully submit this memorandum in opposition to the Motion to Dismiss certain counts of the Complaint filed by Defendants Joseph C. Loomis ("Loomis") and Jenni M. Loomis ("Jenni Loomis" and, together with Loomis, "Defendants"). For the reasons set forth below, Plaintiffs respectfully submit that Defendants' motion should be denied.

## I.  INTRODUCTION

This case arises out of Loomis' sale of all of the stock of NEI to Intersections in November 2007 and his subsequent employment by NEI as its Chief Executive Officer.  NEI was a closely-held corporation co-founded by Loomis.  Jenni Loomis was NEI's bookkeeper and is Loomis' sister.  Together, Defendants defrauded Intersections out of millions of dollars in connection with Intersections' acquisition of NEI's stock.  Then, instead of running the company, as promised, Loomis turned his time and energy to starting up and running other

companies – using NEI assets.  Indeed, if Loomis had not become so brazen in ignoring his responsibilities to NEI and misappropriating NEI's assets, Defendants' original multi-million dollar fraud might have gone undetected.

This was more than just a sale of securities.  This was supposed to be the beginning of a long and fruitful business relationship among Intersections, NEI, and Loomis.  Indeed, Intersections spent a significant amount of time hammering out the details of an employment agreement designed to position Loomis, NEI, and Intersections for financial success.  To ensure the success of the company after the acquisition, Loomis promised to devote his efforts exclusively to NEI and to no other company – a promise Loomis had no intention of keeping.

As it turns out, the business relationship Intersections believed it was building with Loomis was a fiction created by Loomis as part of a scheme to get more money for his NEI stock than it was worth and to provide the basis for a bonus for Jenni Loomis.  Indeed, before Closing, Loomis and his sister prepared and provided Intersections with financials that were patently false – padded with entries of fake invoices, inflated invoices, and revenue booked other than in the year it was in fact received – designed to make NEI's stock appear to Intersections as if it was worth much more than it was.  Defendants also provided Intersections with information regarding NEI's customer base, identifying the top 20 customers by revenue to further aid Intersections in valuing the company.  This too was false.  Indeed, four of the 20 customers had cancelled their contracts with NEI before Closing, and the annual revenues of the top two customers were inflated as they had been overbilled, which resulted in the overvaluation of the company.  Defendants knew they were providing false information to Intersections but *jokingly* continued the charade up through and after Closing.  At Closing, however, on November 30, 2007, Joseph Loomis represented and certified to Intersections that the financials he and Jenni

Loomis had provided and upon which Intersections had relied were complete and accurate and that the top 20 customers were in good standing – all the while knowing that they were not. It is upon these misrepresentations that Intersections bases its securities fraud and fraud claims.

Intersections paid Loomis $14 million in cash along with possible options and earnout payments, which together could total up to an additional $6 million, for NEI's stock and installed him as CEO of NEI with the intention that, with the combination of Intersections' funding and Loomis' efforts, the company would thrive. What Intersections did not know, however, was that it had grossly overpaid Loomis for his NEI stock based on false information and that while Loomis was agreeing to devote all of his time to growing NEI, he already was starting another company, Loomis Enterprises, LLC, with his brother, in violation of his employment agreement. After Closing, Loomis took his $14 million and threw it and himself into his new venture with his brother and, upon information and belief, at least one other company, devoting little or no time to NEI. In addition to abandoning NEI while continuing to collect a sizeable paycheck, Loomis diverted NEI assets for his own benefit by, for example, requiring NEI employees to work for him at Loomis Enterprises during their NEI work hours. It was not until Loomis' breach of fiduciary duty was discovered, he was suspended, and an investigation was launched, that Defendants' fraudulent scheme began to come to light.

In a last-ditch, desperate effort to conceal the fraud after NEI suspended him and denied him access to its offices and computer system, Loomis unlawfully accessed NEI's central computer server by intimidating an employee into providing him remote access and then destroyed company data. Loomis also caused his brother to steal from NEI's offices the computer tower assigned to Loomis, which contained additional company data. This prompted

not only the termination of Loomis for cause, but also a deeper investigation into the financials of the company and Loomis' conduct, and ultimately led to this lawsuit.

With their fraudulent scheme now uncovered, Defendants have moved to dismiss certain of the claims against Loomis (Counts I, III, IV, VII – Securities Fraud, Fraud, Tortious Interference, Conspiracy), and both claims against Jenni Loomis (Counts III, VII – Fraud, Conspiracy), on the ground that Plaintiffs have failed to state a claim for which relief may be granted – specifically, that Plaintiffs have failed to allege with particularity facts surrounding the fraud and tortious interference claims, and to allege conspiracy against more than one actor. This is incorrect. Plaintiffs have alleged more than sufficient facts to put Defendants on notice of the claims against them, as well as a conspiracy between two individuals – Loomis and his sister – acting beyond the scope of their employment. It is, however, ironic that Loomis would make such a claim when *he* destroyed information that likely would have further supported Plaintiffs' claims. If the claims asserted in the Complaint are lacking in some detail, this is precisely the case where a motion to dismiss warrants denial, given Loomis' actions to forever conceal the fraud.

## II.  STATEMENT OF FACTS

In or about June 2007, Joseph Loomis, the president of NEI, approached Intersections through an intermediary regarding the potential sale of NEI. Compl. ¶ 18. Intersections entered into discussions with Loomis and began conducting a due diligence review of NEI's business and financial condition. *Id.* at ¶ 19. The financial information Loomis and his sister, Defendant Jenni Loomis, NEI's bookkeeper, provided Intersections showed that NEI's revenue had increased substantially each year since its incorporation in 2003. *Id.* Defendants also provided

Intersections with a list of NEI's top customers and the amounts of revenue generated by each annually. *Id.*

Intersections prepared a valuation of NEI based on the financial and customer information prepared and provided by Defendants. *Id.* at ¶ 20. Based on this and other key information, Intersections agreed to purchase and Loomis agreed to sell all of his NEI stock. *Id.*

## The Stock Purchase Agreement

On November 9, 2007, Intersections, NEI, and Loomis entered into the Stock Purchase Agreement (the "SPA"). *Id.* at ¶ 21, Exh. 1. Intersections purchased NEI from Loomis for $14 million in cash, stock options, and up to $3.5 million in earnout payments, which together could total as much as $20 million. *Id.* at ¶ 22. The purchase price was based, in part, on financial documents, reports and forecasts prepared by Defendants. *Id.* In consideration of the payments by Intersections, Loomis represented and warranted that the financials he and Jenni Loomis provided and upon which the purchase price was in large part based were complete and correct:

> [t]he Company Financials [attached to the SPA as Schedule 2.7] are complete and correct in all material respects, are in accordance with the Books and Records of the Company and present fairly, in all material respects, the financial condition and operating results of the Company as of the dates and during the periods indicated therein.

*Id.* at ¶ 23 (SPA, § 2.7).

Loomis provided a list of NEI's top 20 customers by revenue generated and represented that none had terminated its contract with NEI or notified Loomis of its intent to terminate its contract with or materially reduce its purchases from NEI:

> (i) no such customer...has ceased its business relationship with the Company or materially reduced its purchases from or sales or provision of services to the Company since December 31, 2006, (ii) neither Seller nor the Company has received notice (written or oral) from any such customer or supplier of its intent to cease its business relationship with the Company, or to materially reduce its purchases from or sales or provision of services to the Company, after the date hereof....

*Id.* at ¶ 24 (SPA, § 2.23).

Loomis represented that Customer A,[1] NEI's top revenue generating customer, generated over $1 million in revenue between July 2006 and June 2007; Customer B, NEI's third highest, generated $100,000; Customer C generated $43,860; Customer D generated $36,850; and Customer E generated $22,645. *Id.* at ¶ 25 (SPA, Schedule 2.23). Defendants provided these amounts to Intersections before the acquisition, and Intersections relied on them in arriving at its valuation and purchase price for NEI. *Id.*

Loomis also represented that NEI had prepared and filed all tax returns:

[t]he Company has properly prepared and timely filed all Tax Returns required to be filed. All such Tax Returns are true, correct and complete in all material respects.

*Id.* at ¶ 26 (SPA, § 2.11(b)). Notwithstanding, Loomis agreed to indemnify Intersections for any NEI tax liabilities for all taxable periods ending on or before the Closing date. *Id.* (SPA, § 6.11(b)).

Loomis also agreed that he would be responsible for any taxes incurred by reason of an election under Section 338(h)(10) of the Internal Revenue Code, specifically the built-in gains tax. *Id.* at ¶ 27 (SPA, § 6.11). Intersections agreed to initially pay the tax and then seek reimbursement through any Holdback Amount (as defined below) in place at the time. *Id.* To the extent the Holdback Amount was less than the tax, Loomis agreed to pay the difference. *Id.*

---

[1] In the interest of protecting the privacy and confidential information of NEI's past and present customers, all customers are referred to in the Complaint and will be referred to herein as "Customer __". Plaintiffs will provide Defendants with the identities of the customers upon filing of a protective order providing for the filing of documents referencing such customers under seal. The parties are in the process of finalizing such a protective order.

Intersections paid $532,726 in built-in gains taxes on Loomis' behalf. *Id.* Loomis has disputed the amount, however, and has not reimbursed Intersections.[2] *Id.*

The parties agreed that Loomis would be entitled to up to $3.5 million in earnout payments if and when NEI met certain Revenue and EBITDA Margin thresholds. *Id.* at ¶ 28 (SPA, § 1.5). Intersections was to hold back the first $1.5 million in earnout payments (the "Holdback Amount") as security for any of Loomis' payment obligations for adjustments after Closing to the purchase price, payment of taxes, including the built-in gains tax, and indemnification responsibilities arising from Loomis' representations and warranties. *Id.* (SPA, § 1.6). To date, however, NEI has not met any threshold, so there is no Holdback Amount to fund any of Loomis' obligations under the SPA. *Id.*

The parties agreed that all disputes arising out of or related to the SPA would be brought in state or federal court in Virginia and that Delaware law would apply. *Id.* at ¶ 29.

The acquisition of NEI closed on November 30, 2007, and Intersections paid Loomis $14 million. *Id.* at ¶ 30.

### The Employment Agreement

On November 30, 2007, Loomis and NEI entered into a three-year Employment Agreement wherein Loomis was employed as the Chief Executive Officer of NEI. *Id.* at ¶ 31, Exh. 2. NEI agreed to pay Loomis an annual salary of $250,000. *Id.*

---

[2] The parties have agreed to submit to arbitration the dispute regarding the amount of the built-in gains tax. Loomis, however, has refused to agree to Plaintiffs' proposed arbitrator until Plaintiffs dismiss any claims regarding breach of his obligation to pay the tax. Plaintiffs' allegations regarding Loomis' misrepresentation regarding the amount of the built-in gains tax liability, however, were provided as further evidence of Loomis' fraud against Intersections, not his breach of the SPA.

Loomis agreed to "devote his entire working time to the business of the Corporation" and not to:

> …engage in any other business activities or hold any office or position, regardless of whether any such activity, office or position is pursued for profit or other pecuniary advantage, without the prior written consent of the Parent...[with the exception of] (i) personal investment activities for himself and his family and (ii) charitable and civic activities, so long as such outside interests set forth in subsections (i) and (ii) hereof do not interfere with the performance of his duties and responsibilities hereunder.

*Id.* at ¶ 32, Exh. 2, § 3.

### Suspension and Termination of Defendant Joseph C. Loomis

In or about August 2008, NEI employees complained to Intersections that Loomis was diverting company assets for his own gain by, for example, requiring certain NEI employees to devote substantial amounts of their working time to his new company, Loomis Enterprises, located in the same building as NEI. *Id.* at ¶ 37. The employees also complained that Loomis had been operating and managing Loomis Enterprises since Intersections acquired NEI and that Loomis rarely came into the office and devoted only a few hours each week to NEI. *Id.* at ¶ 39.

Loomis Enterprises is a Florida limited liability company that was incorporated in or about October 2007, as the deal between Intersections, NEI and Loomis was closing. *Id.* at ¶ 38. Christopher Loomis, Joseph Loomis' brother, and RRMFA, LLC are the only members of Loomis Enterprises. *Id.* RRMFA is an Arizona limited liability company, and Joseph Loomis is RRMFA's only member. *Id.* Loomis Enterprises provides custom home building, architectural, design, financing and related services in Arizona. *Id.*

Based on the information provided by the employees, NEI suspended Loomis with pay on October 20, 2008 pending a complete investigation. Compl. ¶ 40. NEI explained in writing to Loomis that it was suspending him for breaching his fiduciary duties to NEI and violating company policies, including the code of conduct and ethics, by "actual attempted use and

diversion of company resources to another business in which you hold a position and are actively engaged, use and attempted use of company resources for personal benefit, concealment and attempted concealment of those activities." *Id.*, Exh. 4. NEI advised Loomis that he was prohibited from entering NEI's offices during the investigation, and as a precautionary measure, NEI shut off Loomis' remote access to NEI's central computer server. *Id.* at ¶ 41.

Plaintiffs began a complete investigation, interviewing employees and collecting data. *Id.* at ¶ 42. This investigation confirmed that Loomis was breaching his fiduciary duties to NEI by devoting the majority of his working time to his new company, Loomis Enterprises, and diverting NEI assets for his own personal gain by compelling NEI employees to work for Loomis Enterprises on NEI time. *Id.* Indeed, Plaintiffs discovered that Loomis was holding himself out as Chairman of the Board of Loomis Enterprises on the company's website. *Id.*

In furtherance of its investigation, Intersections sent an information technology specialist to NEI's Arizona offices to collect an image of the hard drive of the desktop computer belonging to NEI that Loomis used at NEI. *Id.* at ¶ 43. Before the IT specialist could image the hard drive, however, Loomis' personal assistant let Christopher Loomis into NEI's secured offices where he stole the computer tower containing the hard drive. *Id.* Upon information and belief, Christopher Loomis did this at Joseph Loomis' direction. *Id.* Despite repeated demands, Loomis has refused to return the computer tower. *Id.*

Plaintiffs also attempted to examine Loomis' electronic data stored on NEI's central computer server. *Id.* at ¶ 44. Plaintiffs discovered, however, that a remote user had erased large portions of Loomis' data immediately after NEI suspended Loomis. *Id.* An NEI employee admitted verbally and in writing that Loomis had forced him to give Loomis his username and password to access NEI's server remotely and delete data. *Id.* The employee advised that

Loomis had in fact accessed NEI's server remotely and deleted large amounts of data. *Id.* Based on Loomis' breaches of fiduciary duty, NEI terminated Loomis for cause by letter dated November 19, 2008. *Id.* at ¶ 45, Exh. 5.

Plaintiffs' continued investigation revealed that Loomis had started another new company called American Medical Services, LLC in September 2008, before he was suspended. *Id.* at ¶ 48. RRMFA, LLC, of which Loomis is the only member, is the sole member of IGABD, LLC, which is a member and manager of American Medical Services. *Id.* Upon information and belief, American Medical Services provides file management services to personal injury attorneys, clients, and physicians in Arizona. *Id.*

Plaintiffs also learned that Loomis had hired an "independent contractor" to work as a bookkeeper/accountant for both Loomis Enterprises and NEI in or about April 2008. *Id.* at ¶ 49. NEI and Loomis Enterprises each paid the contractor a salary, but he spent almost all of his time doing Loomis Enterprises work and did virtually no work for NEI. *Id.* Loomis knew that NEI was paying the contractor for time spent working for Loomis Enterprises but, upon information and belief, set up the arrangement so that less money would come out of his pocket, as he personally funded Loomis Enterprises. *Id.*

### The Conspiracy and Misrepresentations by Defendants

Plaintiffs thereafter broadened their investigation into NEI's finances and learned that Defendants had conspired to and did knowingly and willfully misrepresent material information regarding NEI's business and financial condition and customer base to Intersections before the Closing to induce Intersections to pay more for NEI's stock than it was worth. *Id.* at ¶ 50.

For example, four of the companies certified by Loomis in the SPA as being both among NEI's top revenue generating customers and in good standing with NEI as of Closing actually

had cancelled their contracts with NEI before Closing, reducing NEI's potential annual revenue going forward by over $200,000. *Id.* at ¶ 51. Indeed, emails between Defendants show that they knew Customer B had cancelled prior to Closing but agreed to and even joked about continuing to invoice Customer B until after Closing to increase the revenue disclosed to Intersections. *Id.* As agreed, Jenni Loomis continued billing Customer B and booking the revenue through Closing. *Id.* Further, Customer C cancelled its contract with NEI as of November 2007, but Defendants continued to bill Customer C thereafter, upon information and belief, to increase the revenue disclosed to Intersections and to give Loomis a bigger payout at Closing. *Id.* In addition, while discussing these fraudulent billings with Jenni Loomis, Loomis promised to pay Jenni Loomis a substantial bonus after Closing. *Id.*

Before and after Closing, Defendants knowingly and willfully overcharged NEI's top two revenue generating customers, Customer A and F, for services NEI did not render, making it appear as if more revenue was coming into the company. *Id.* at ¶ 52. Specifically, Defendants billed Customers A and F hundreds of thousands of dollars for intellectual property infringement letters that either were never sent at all or actually were sent out by a third party law firm that also billed the customers for the service. *Id.* Upon information and belief, Defendants double billed these customers to artificially increase NEI's revenue before the Closing for valuation purposes and after the Closing to increase Loomis' eligibility for earnout payments. *Id.* When an NEI employee confronted Loomis about overcharging Customer A, Loomis indicated that Company A was a big company with enough money to pay the bills, and as a result, Customer A would not notice the additional charges. *Id.*

Defendants booked fake invoices for Customer F and, upon information and belief, other companies. *Id.* at ¶ 53. They also moved revenue from one year to another on NEI's books

before Closing to make Intersections believe that NEI's revenue had increased smoothly and substantially over the years. *Id.*

Further, the built-in gains tax triggered by Intersections' acquisition of NEI, an S-Corp that had been converted from a C-Corp, exceeded the $350,000 maximum as represented by Loomis. *Id.* at ¶ 54. Intersections paid $532,726 in built-in gains taxes on Loomis' behalf, but Loomis has challenged the underlying valuation and has not reimbursed Intersections. *Id.*

Finally, Loomis had not filed Arizona state taxes for NEI since opening an office in Arizona despite his representations to the contrary. *Id.* at ¶ 55. To date, Plaintiffs have had to pay in excess of $92,000 in Arizona state taxes and penalties owed by Loomis. *Id.*

These misrepresentations were material to Intersections and substantially affected the valuation of NEI. *Id.* at ¶ 55. Intersections relied upon Defendants' material misrepresentations to its detriment when it entered into the SPA. *Id.* Indeed, if Intersections had known that Loomis' representations were false or that the information provided by him and Jenni Loomis was false, it would not have purchased NEI's stock. *Id.* Intersections has suffered substantial economic loss and damages as a direct result of Defendants' wrongful acts. *Id.* at ¶¶ 62, 73, 80, 93.

### III.    ARGUMENT

#### A.    Standard Of Review

A motion to dismiss for failure to state a claim for which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of a claim, not the facts supporting it. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). A court must regard as true all of the factual allegations in the complaint, *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007), as well as any facts that could be

proved that are consistent with those allegations, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and view those facts in the light most favorable to the plaintiff, *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). The plaintiff does not have to show that it is likely to obtain relief. If the complaint alleges – directly or indirectly – each of the elements of some viable legal theory, the plaintiff should be given the opportunity to prove that claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 & n.8. (2007). The complaint must only "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id*. at 555 (citation and quotation omitted). That is, the plaintiff only must allege facts that show that its claim is "plausible on its face." *Id*. at 570.

**B.    The Complaint States A Claim For Securities Fraud Against Joseph Loomis**

Loomis claims that Count I (Securities Fraud) should be dismissed because the Complaint does not sufficiently plead: (1) facts surrounding his misrepresentations with particularity; (2) facts giving rise to a strong inference of scienter; and (3) loss causation. This is puzzling, as the Complaint is replete with facts describing Loomis' misrepresentations associated with his sale of NEI stock to Intersections and establishing his requisite state of mind, as well as the causal connection between Loomis' misrepresentations and Intersections' losses.

Loomis also claims that Intersections improperly employed "group pleading" rather than specifying which Defendant was responsible for the misrepresentations supporting the Securities Fraud claim. Loomis' "group pleading" argument is misplaced as Intersections properly attributed the fraudulent acts to the responsible actor(s). For the reasons set out below, Loomis' arguments lack merit and his motion to dismiss Count I (Securities Fraud) should be denied.

1. **Intersections Sufficiently Plead with Particularity Loomis'
   Misrepresentations to Intersections About NEI's Financial Condition**

To state a claim of securities fraud, a plaintiff must demonstrate "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 128 S. Ct. 761, 768 (2008).

Loomis contends that Intersections' Securities Fraud claim should be dismissed because Intersections failed to plead with particularity facts surrounding his misrepresentations regarding NEI's business and financial condition before selling NEI's stock to Intersections. Specifically, Loomis claims that Intersections failed to provide sufficient detail of his misrepresentations regarding the status of and revenue generated by NEI's top customers and his overcharging customers, booking fake invoices, and back dating of entries on Quickbooks to artificially inflate NEI's revenue on the books. Further, Loomis contends that Intersections improperly relied upon group pleading in alleging its Securities Fraud claim rather than pleading with particularity Loomis' actions. This is incorrect. Intersections properly plead Loomis' misrepresentations with particularity and sufficiently identifies the wrongful actions attributable to each Defendant.

(a)     Intersections Plead With Particularity Facts Surrounding Loomis'
        Misrepresentations

Intersections alleges in the Complaint that Loomis knowingly provided Intersections with materially false financial and business information during the due diligence period; when he executed the SPA on November 9, 2007; and at Closing on November 30, 2007, when he represented and certified the accuracy of the financial and business information. Compl. ¶¶ 8, 50-55. Specifically, Loomis represented that the list of customers appended to the SPA as Schedule 2.23 represented NEI's top 20 customers and that none had terminated its contract with

NEI or notified Loomis of its intent to terminate its contract with or materially reduce its purchases from NEI as of Closing. *Id.* at ¶ 24. Loomis' representations, however, were false. Four of NEI's top 20 customers had cancelled before Closing, reducing by over $200,000 NEI's annual revenue and causing Intersections to overvalue the company. *Id.* at ¶ 51. Loomis knew that Customers B and C cancelled before Closing but still continued to invoice them and book the revenue. *Id.*

Loomis contends that Intersections must plead the underlying details of the invoices he and his sister sent to the cancelled customers to conceal their status from Intersections before Closing. Defendants' invoicing of the cancelled customers, however, was a part of their efforts to conceal their misrepresentations, and such details are not necessary to put Loomis on notice of the misrepresentations alleged against him.

Intersections also alleges that Loomis misrepresented during due diligence and in the SPA that NEI's top customer generated over $1 million in revenue in the year ending June 2007 and that NEI's second top customer generated over $179,000 in revenue. *Id.* at ¶ 25; Exh. 1, Schedule 2.23. Before Closing, however, Defendants falsely increased the revenue booked for these customers, and NEI's apparent revenue, by overcharging these customers hundreds of thousands of dollars for intellectual property infringement letters that NEI never sent. *Id.* at ¶ 52. Loomis and his sister also booked fake invoices for Customer F and, upon information and belief, other companies to increase NEI's apparent revenue before Closing. *Id.* at ¶ 53. They also moved revenue from one year to another on NEI's books before Closing to make Intersections believe that NEI's revenue had increased smoothly and substantially over the years. *Id.* at ¶¶ 8, 53.

Loomis contends that Intersections must identify when and how much revenue he moved around on NEI's books; for what companies other than Company F he did so; and the number and amounts of invoices backdated. Further, Loomis claims that Intersections must identify the dates and amounts of the inflated invoices; whether the customers paid the invoices; how the billings were classified on the books; and, astonishingly, whether the customers' contracts permitted overcharging for services not rendered. Loomis claims that Intersections should provide more detail since it had full access to NEI's financial books and records since acquiring NEI in 2007. This contention is ironic considering the fact that Loomis continued to control NEI after the acquisition and then intentionally destroyed NEI data to conceal his fraud.

At this stage of the pleadings, however, Intersections is not required to allege the number and amount of the fake invoices, as Intersections has alleged that the misrepresentations were material and substantially affected its valuation of NEI. Compl. ¶ 56. Further, Intersections is not required to identify other companies for which Defendants booked fake invoices, as it has already identified Company F. Intersections has properly plead with particularity facts surrounding Loomis' misrepresentations regarding NEI's business and financial condition.

(b)     The Group Pleading Doctrine Is Inapplicable Here

Loomis contends that Intersections improperly employed "group pleading" rather than specifying which of the misrepresentations alleged in the Complaint are ascribed to Loomis, as opposed to his sister. Specifically, Loomis claims that the Complaint does not sufficiently put him on notice as to the misconduct for which *he* is charged. This is incorrect.

The allegations in the Complaint are sufficiently particular with respect to each defendant to satisfy the requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"). The PSLRA merely requires securities fraud plaintiffs to "distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud." *In*

*re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 650 (E.D. Va. 2000) (*quoting Coates v. Heartland Wireless Communications, Inc.*, 26 F. Supp. 2d 910, 914 (N.D. Tex. 1998)). The Complaint specifies which actions were taken by Loomis alone, by Jenni Loomis alone, and by them together. The Securities Fraud claim at issue is against Loomis alone, and the allegations against Loomis are clear. To the extent Intersections alleges acts of fraud against "Defendants" collectively, with respect to the Fraud claim, it is because both Joseph Loomis and Jenni Loomis provided false information to Intersections. Further, the SPA was not a "group document" prepared by a committee or group of officers of a corporation such that the responsible party cannot easily be ascertained from a group pleading. Indeed, Loomis, the CEO and founder of NEI, and his sister, provided the financial and business information to Intersections during due diligence, and Loomis personally represented and certified that those facts were true and correct in the SPA while knowing that they were false. The Complaint thus properly "inform[s] each defendant of the nature of his alleged participation." *Juntti v. Prudential-Bache Sec., Inc.*, No. 92-2066, 1993 U.S. App. LEXIS 10345, at *4 (4th Cir. May 3, 1993).

### 2.     Intersections Plead with Particularity Loomis' State of Mind

The real crux of Loomis' motion appears to be that Intersections does not allege any direct evidence of Loomis' state of mind. Specifically, Loomis contends that Intersections failed to plead with particularity facts evidencing Loomis' knowledge with respect to his misrepresentations regarding (1) NEI's financial condition; (3) the status of NEI's top customers; and (3) NEI's outstanding tax liabilities. This argument lacks merit.

All that is required at this stage of the pleadings is a strong inference, but still just an *inference*, of scienter. As this Court has held, "where a complaint does not allege facts directly showing that the defendant acted with the requisite state of mind, the court must take the factual allegations in the complaint and determine, through a deductive process, if it can be strongly

inferred from them that the defendant acted with such a state of mind." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 630-631 (E.D. Va. 2000). One must undertake a "holistic examination of the interactions among all facts. . . . As a result of this holistic analysis, otherwise-unremarkable facts may take on added significance when combined with each other, having what might be termed a synergistic effect on probative value." *Id*. at 631. The Court thus must examine the "totality of the circumstances" to determine "whether, in the light of logic, common sense, and human experience," the Complaint raises a strong inference of scienter. *Id*. As summarized by this Court, "on a motion to dismiss, a court applying the 'strong inference' standard of the PSLRA must take the factual allegations in the complaint as true, draw whatever inferences regarding the defendant's state of mind are supported by these allegations, and determine whether these inferences individually or cumulatively provide a strong – or 'persuasive' and 'cogent' – inference that the defendant possessed the requisite state of mind." *Id*. If the totality of the circumstances alleged raises a "strong inference" of the requisite state of mind, it is immaterial whether plaintiffs satisfy their burden by pleading motive and opportunity, conscious misbehavior, recklessness, or by impressing upon the Court a novel legal theory. *Id*.

Further, although allegations of motive and opportunity alone are insufficient to establish a strong inference of scienter, such allegations still are relevant in determining whether the allegations of a complaint are "sufficiently concrete to contribute to a strong inference of scienter to be drawn from the totality of the circumstances." *Id*. at 642. That is, "[e]ven if the motive allegations in a complaint fail in themselves to meet the pleading burden, . . . they may still be considered along with other allegations of direct or circumstantial facts in the ultimate determination of whether the totality of the circumstances raise a 'strong inference' of scienter." *Id*. at 642 n. 44.

Intersections alleges that Loomis made misrepresentations to Intersections knowing that they were false, and Intersections pleads numerous facts surrounding his misrepresentations which, under the totality of the circumstances, raise a strong inference of scienter. Indeed, Intersections alleges that in a last-ditch, desperate effort to conceal the fraud after NEI suspended him and denied him access to its offices and computer system, Loomis unlawfully accessed NEI's central computer server by intimidating an employee into providing him remote access and then destroyed company data. Loomis also caused his brother to steal from NEI's offices the computer tower assigned to Loomis, which contained additional company data. These are the acts of a guilty person.

(a)     Loomis' Misrepresentations Regarding NEI's Financial Condition

Loomis incredibly suggests that he cannot be held accountable for misrepresentations in the SPA because of his remote position as CEO. Specifically, Loomis claims that Intersections failed to plead any "red flags" that Loomis ignored in warranting the accuracy of the financial information provided to Intersections. This argument is nonsensical because, as alleged in the Complaint, Loomis and his sister personally discussed how to rearrange data to create the false financial statements that were given to Intersections. This is not a case where a CEO relies upon an in-house accounting staff to provide financials and then certifies the accuracy without conducting a thorough review. Indeed, Intersections is not suing Loomis as the CEO of NEI; it is suing him as the seller of securities in a private transaction in which he and his sister personally provided false financial and business information with the intent that Intersections rely on the information. Intersections did need to plead any additional "red flags" because it plead that Loomis *himself* manipulated data to create the false financial statements.

Indeed, out of all the misrepresentations regarding NEI's financial condition plead in the Complaint, Loomis points to only one as lacking facts establishing an inference of scienter. Loomis contends that Intersections did not allege that Loomis knew that he was overbilling NEI's top customers for services not rendered and, specifically, that he knew before Closing.[3] This is incorrect. Intersections alleges in the Complaint that Loomis and his sister knowingly and willfully overcharged NEI's two top customers, Customers A and F, before Closing for services NEI did not render, upon information and belief, to artificially increase NEI's revenue for valuation purposes. Compl. ¶ 52. When an NEI employee confronted Loomis about overcharging Customer A, Loomis indicated that Company A was a big company with enough money to pay the bills, and as a result, would not notice the additional charges. *Id.*

(b)  Loomis' Misrepresentations Regarding NEI's Top Customers

Loomis contends that Intersections did not properly plead facts suggesting that he knew that four of NEI's 20 top customers that he represented in the SPA were in good standing had cancelled before Closing. Loomis contends that Intersections did not allege a sufficient factual basis for his knowledge regarding Customer B. Loomis further contends that Intersections alleges no facts suggesting that he knew or should have known that the other three had cancelled before Closing. This is incorrect.

Intersections alleges that Loomis was the CEO of NEI at the time of the sale. Compl. ¶¶ 2, 18. It certainly is reasonable to infer from this that he would have been advised immediately if one of NEI's largest customers had terminated its relationship with the company. Specifically with regard to Customer B, Intersections alleges that emails between Loomis and his sister

---

[3] Loomis does not take issue with Intersections' pleading of facts establishing a strong inference of scienter with respect to his continuing to bill certain customers and booking the revenue after they cancelled.

before Closing show that they knew Customer B had cancelled prior to Closing but agreed to and even joked about continuing to invoice Customer B until after Closing to increase the revenue – and did so. *Id.* at ¶ 51. Under the totality of the circumstances, including (1) Loomis' motive to increase his payout; (2) the fact that Loomis was the CEO of the start-up company; (3) the fact that he personally provided the customer information to Intersections; and (4) the fact that he emailed his sister before Closing and indicated that he was going to continue invoicing at least one cancelled customer to increase the revenue, Intersections properly has plead facts giving rise to a strong inference of scienter.

(c)    <u>Loomis' Misrepresentations Regarding NEI's Tax Liabilities</u>

Loomis contends that Intersections directly must allege that Loomis knew that his representation that the built-in gains tax would not exceed $350,000 was false and that, in any event, his representation merely was an unenforceable statement of opinion. Loomis further contends that Intersections must directly allege that he knew that he was required to file an Arizona tax return for NEI. This is incorrect.

Under the totality of the circumstances alleged in the Complaint, Intersections has alleged sufficient facts to support a strong inference of scienter. With regard to the built-in gains tax, Intersections alleges in the Complaint that Loomis converted NEI from a C-Corp to an S-Corp in 2005. Compl. ¶ 27. The conversion caused NEI to incur a built-in gains tax liability based on the value of the company in 2005 that would be triggered upon the company's sale. *Id.* Loomis provided this information to Intersections and personally represented and certified in the SPA that the built-in gains tax would not exceed $350,000. *Id.* As the founder, CEO, and president of NEI, and the person responsible for the conversion from a C-Corp to an S-Corp, Loomis was in the best position to know the amount of the tax. Further, Loomis expressly represented and

21

warranted in the SPA the *fact*, not opinion, that the built-in gains tax would not exceed $350,000 when it was in reality over $500,000. Compl. ¶¶ 8, 27, 54. Loomis' representation thus was more than a statement of opinion, and under the totality of the circumstances, Intersections has plead sufficient facts establishing a strong inference of scienter.

Similarly, with respect to the Arizona state taxes, Intersections properly plead that Loomis represented in the SPA that NEI had prepared and timely filed all required tax returns despite the fact that Loomis had not filed NEI's Arizona state taxes since opening an office in Arizona. Compl. ¶¶ 8, 26. As with the built-in gains tax, Loomis was in the best position to know that the taxes should have been and were not filed. Further, Loomis' promise to indemnify Plaintiffs for any outstanding tax liability does not, as he suggests, militate against a finding of scienter where, as here, he has refused to honor his indemnity agreement. Thus, under the totality of the circumstances plead, Intersections has established a strong inference of scienter.

### 3. Intersections Adequately Plead Loss Causation

Loomis contends that Intersections failed to satisfy the pleading standard set out in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). Specifically, Loomis claims that *Dura* requires that Intersections must allege more than that Loomis' misrepresentations caused Intersections to purchase the securities at an artificially inflated price to establish loss causation. Loomis' reliance on *Dura* and its progeny is misplaced.

In *Dura*, the Supreme Court held that in fraud-on-the-market cases involving publicly traded securities, plaintiffs must plead more to establish loss causation than that they purchased the security at issue at an artificially inflated price. The Court held that the purchasers must allege a causal connection between the false statements and the decline in the security's price after the false statements were revealed. *Dura*'s holding, however, was limited to "fraud on the

marketplace" cases involving publicly traded stocks. *Id.* at 584-5; s*ee also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005) (citation omitted) (*Dura* standard for pleading loss causation does not apply to private sale of privately traded stock); *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 884-85 (3d Cir. 2000) (recognizing the difference between a "usual securities action" and one involving a private sale of securities and holding plaintiff adequately plead loss causation to survive a motion to dismiss). Further, the Supreme Court made clear that its holding in *Dura* was "not meant to impose a great burden on a plaintiff" at the pleading stage, but that a plaintiff must in a complaint "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 582. At issue here is a private sale of privately traded stock, not a public sale of publicly traded stock where a misrepresentation caused a fraud on the marketplace. *Dura* thus is not controlling.

To establish causation under Section 10(b)-5, a plaintiff must allege that the misrepresentation caused the plaintiff to engage in the transaction and that the misrepresentation caused the harm. *Livid*, 416 F.3d at 949. Intersections alleges that Loomis and his sister provided Intersections with material information about NEI's financial and business condition that was false, and Loomis then represented and certified that the information was accurate. Compl. ¶¶ 2, 8, 19, 23-27, 50. Intersections relied upon and based its valuation and purchase price, in large part, on the false information. *Id.* at ¶¶ 2, 20, 25. Based on this and other key information, Intersections agreed to purchase the stock. *Id. at* ¶ 20. The misrepresentations were material to Intersections and substantially affected the value of NEI to Intersections. *Id.* at ¶ 9. If Intersections had known that the representations were false, it would not have purchased NEI. *Id.* at ¶¶ 9, 56, 61. Intersections suffered substantial economic loss as a direct result of the misrepresentations. *Id.* at ¶ 62. These allegations sufficiently indicate the causal connection

between Intersections' loss and Loomis' misrepresentations.   Accordingly, Joseph Loomis'

motion as to Count I (Securities Fraud) is without basis and should be denied.

###### C.       The Complaint States A Claim For Fraud Against Defendants

Defendants contend that Plaintiffs' fraud claim (Count III) fails to state with particularity

the circumstances constituting fraud as required by Rule 9(b).  Specifically, Defendants contend

that Plaintiffs do not allege (1) what false financial information they provided, and (2) which

defendant provided the false information.  Further, Jenni Loomis alleges that the Complaint does

not allege even a single false or misleading statement by her to Intersections or that she received

anything in return for her fraud.  A careful reading of the Complaint belies these claims.

To prevail on an actual fraud claim under Virginia law, a plaintiff must prove by clear

and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally

and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting

damage to the party misled.  *E.g., Adkins v. Crown Auto, Inc.*, 488 F.3d 225, 231 n.8 (4th Cir.

2007) (citation and quotation omitted).  A plaintiff need not allege that the defendant benefited

from the fraud.

In requiring a plaintiff to plead the "circumstances" of an alleged fraud, courts have not

required plaintiffs to plead their "evidence."  5A Charles Alan Wright & Arthur R. Miller,

*Federal Practice and Procedure* § 1298 (Civil 3d ed. 2004) (collecting cases).  The sufficiency

of a particular fraud pleading, moreover, depends upon a number of variables; for example, the

substantive context in which the fraud is alleged to have occurred, the complexity of the

transaction in question, and the relationship of the parties to the action.  *Id*.  As this Court has

recognized, the sufficiency of a complaint is based upon the determination of how much detail is

necessary to give adequate notice to an adverse party and enable that party to prepare a

responsive pleading. *See, e.g., Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

Intersections alleges that Loomis and Jenni Loomis provided Intersections with materially false financial and business information that affected the value of the company. Compl. ¶¶ 2, 8, 19, 50. Defendants overcharged certain customers for services not rendered and booked fake invoices for services on NEI's Quickbooks before providing the books to Intersections. *Id.* at ¶¶ 8, 50, 51, 53. They also moved revenue from one year to another on NEI's books before Closing to make Intersections believe that NEI's revenue had increased smoothly and substantially over the years. *Id.* at ¶ 53. Further, Intersections alleges that Loomis and Jenni Loomis provided Intersections with a list of NEI's top customers and the amounts of revenue generated by each annually, which were false. *Id.* at ¶¶ 2, 8 Although not required, Intersections does allege in the Complaint that Jenni Loomis stood to benefit from the fraud in that Loomis promised to pay her a substantial bonus if the deal went through. *Id.* at ¶¶ 8, 51. Intersections' allegations thus are sufficiently detailed to satisfy Rule 9(b)'s particularity requirement. Accordingly, Defendants' motion as to Count III (Fraud) is without basis and should be denied.

### D. The Complaint States A Claim For Tortious Interference Against Joseph Loomis

Loomis contends that NEI's claim for tortious interference with business relationships and expectancies (Count IV) fails to state a claim for which relief can be granted. Specifically, Loomis claims that NEI failed to identify: (1) the business relationships with which Loomis interfered; (2) the method by which Loomis did so; (3) when the interference occurred; and (4) to

the extent the relationships were at-will, the "improper methods" by which Loomis interfered with the relationships.[4] This is incorrect.

NEI is not required to allege facts in support of its tortious interference claim with the excessive particularity that Loomis demands. Indeed, NEI's allegations are sufficient at this early stage of the pleadings even if they do not state the particular employees with whom they had a business expectancy. *See Signature Flight Support Corp. v. Landow Aviation L.P.*, No. 1:08cv955 (JCC), 2009 U.S. Dist. LEXIS 1938, at *6-8 (E.D. Va. Jan. 13, 2009) (holding plaintiff's allegations were sufficiently specific even when plaintiff did not indentify exactly which contracts it had a reasonable expectancy because Federal Rule of Civil Procedure 8 only requires that plaintiff provide a "short and plain statement" and not detailed factual allegations).

NEI alleges in the Complaint that in or about August 2008, Loomis was requiring NEI employees to devote substantial amounts of their working time to his new company, Loomis Enterprises, in breach of their employment agreements with NEI. Compl. ¶ 37. NEI also alleges that Loomis was paying an "independent contractor" in or about April 2008 to work as a bookkeeper/accountant for both Loomis Enterprises and NEI but that, while NEI paid half his salary, he spent almost all of his time doing Loomis Enterprises work – in breach of his agreement with NEI. *Id.* at ¶ 49. NEI alleges that Loomis knew that NEI was paying the contractor for time spent working for Loomis Enterprises, but upon information and belief, set up the arrangement so that less money would come out of his pocket, as he personally funded Loomis Enterprises. *Id.* at ¶ 49.

---

[4] Although Loomis interprets the Complaint as alleging interference with NEI customer relationships, NEI actually alleges facts supporting a claim for interference with certain NEI *employee* relationships.

Assuming that all relevant contracts are "at-will",[5] NEI further alleges in the Complaint sufficient allegations of wrongful methods by Loomis. When a contract is terminable at will, the plaintiff asserting tortious interference must allege that the defendant employed "improper methods." *Id.* This Court has held that improper methods include a "broad category" of actions including "illegal or independently tortious" actions and, more specifically:

> [F]raud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship, as well as those [actions] that violate an established standard of a trade or profession, or involve unethical conduct. Sharp dealing, overreaching, or unfair competition may also constitute improper methods.

*Harrington v. Sprint Nextel Corp.*, No. 1:08cv336 (JJC), 2008 U.S. Dist. LEXIS 42071, at *17-19 (E.D. Va. May 29, 2008) (*quoting Duggin v. Adams*, 360 S.E.2d 832, 836-37 (Va. 1987)).

NEI alleges that Loomis diverted NEI assets, including the time of NEI employees, for the benefit of his own separate business. Such a diversion is a paradigmatic example of breach of fiduciary duty. Such conduct satisfies the requirement of "illegal or independently tortious" conduct as broadly defined in *Harrington*. Accordingly, NEI properly has plead tortious interference and Loomis' motion as to Count IV is without basis and should be denied.

**E.    The Complaint States A Claim For Conspiracy Against Defendants**

Defendants contend that Intersections failed to properly allege a conspiracy in Count VII because it did not allege that two or more persons acted to accomplish an unlawful act or

_____

[5] Loomis' reliance on *Nortec Communs., Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226 (E.D. Va. 2008), for the proposition that Count IV should be dismissed because NEI fails to allege whether the employment relationships at issue were at-will is misplaced. In *Nortec*, the plaintiff failed to allege whether or not the contract was at-will and also did not allege wrongful means. The court thus could not determine whether the plaintiff was required to allege wrongful means and dismissed the claim. Here, NEI alleges wrongful means and thus satisfied the additional pleading requirement.

purpose.  Specifically, Defendants contend that Intersections did not allege that Jenni Loomis acted as an individual as opposed to an agent of NEI.  This argument lacks merit.

The cases relied upon by Defendants stand for the unremarkable proposition that an agent cannot conspire with its principal.  *See Perk v. Vector Resources Group*, 253 Va. 310 (1997) (holding that there could be no conspiracy where an employee allegedly conspired with a company); *Mich. Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917 (E.D. Va. 2000) (holding that an agent cannot conspire with its principal).  That is not the case here.  Intersections does not allege that Jenni Loomis or Joseph Loomis engaged in a conspiracy with NEI.  Intersections alleges that Jenni Loomis conspired with her brother, Joseph Loomis, to defraud Intersections.

Notwithstanding, under the intracorporate conspiracy doctrine, "[a] corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."  *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985).  There are exceptions to this immunity, however.  The Fourth Circuit has held that where an agent acts other than in the normal course of his or her corporate duties, thereby performing an unauthorized act in furtherance of a conspiracy, the immunity is destroyed.  *Id*. at 1252-53.  That is, "[e]ven if certain acts of officials would constitute corporate action, unauthorized acts of those officials could not avoid a conspiracy charge."  *Id*.; *see also Chavez v. McIntyre*, 424 F. Supp. 2d 858, 861 (W.D. Va. 2006) (denying motion to dismiss where plaintiff's allegations are sufficient to invoke the exception to the intracorporate conspiracy doctrine that the actions of the officers were unauthorized); *Hodgin v. Jefferson*, 447 F. Supp. 804, 807 (D. Md. 1978) (individuals employed by the same corporation could be held liable for unauthorized acts committed in furtherance of a conspiracy).  The Fourth Circuit also has held that where an agent

has an independent personal stake in achieving the objective of the conspiracy, the immunity is destroyed. *Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399-400 (4th Cir. 1974).

Applying the exceptions to the intracorporate conspiracy doctrine here, Loomis' and Jenni Loomis' acts of conspiring to defraud Intersections and then knowingly providing false financial and business information to Intersections in furtherance of that conspiracy were not within the course of their normal duties as CEO and bookkeeper, respectively. Indeed, their actions were not for the betterment of NEI but were for their own personal gain. As a company, NEI would not benefit from Defendants' misrepresentations to Intersections, its future parent company. Loomis, on the other hand, stood to gain as much as $20 million from his misrepresentations and Jenni a substantial monetary "bonus" if the deal went through. Accordingly, the intracorporate conspiracy doctrine does not apply here, and Defendants' motion to dismiss Count VII should be dismissed.

### F.     Rescission of the Stock Purchase Agreement Is A Viable Remedy

Loomis contends that rescission of the SPA is not a viable remedy and that Intersections thus should be precluded from seeking the remedy. Specifically, Loomis contends that rescission is appropriate only where each party may be substantially restored to its prior position. The rules concerning the propriety of the remedy of rescission are not as definite as Loomis suggests. Indeed, the Fourth Circuit, in *Griggs v. E. I. DuPont de Nemours & Co.*, 385 F.3d 440, 447 (4th Cir. 2004), held that "the complete-restoration requirement is a general one that is subject to certain exceptions." That is, courts are to employ a "broad" formulation in considering "the equities of the situation and apply[ing] an exception to the general rule where required." *Id.* at 448-49 (collecting cases to demonstrate that, even when the parties cannot be restored to the status quo, a court may still grant rescission, provided the equities between the

parties can be balanced; "Thus, it is clear to us that courts of equity did not automatically deny relief to a plaintiff seeking rescission in cases where complete restoration of benefits could not be accomplished.  Instead, courts of equity would order rescission where the equities of the situation so demanded.").

In any event, the motion to dismiss stage is not the appropriate time for determining whether rescission is a viable remedy.  "[A]t the pleading stage of the litigation when no evidence has been presented, such a determination [regarding status quo in the context of rescission] cannot be properly made.  Moreover, the general rule requiring a return to the status quo ante is not absolute." *Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP*, 394 F. Supp. 2d 762, 770 (M.D.N.C. 2005); *see also Moore v. Wells Fargo Bank, N.A*, 597 F. Supp. 2d 612, 615-16 (E.D. Va. 2009) (refusing to determine whether rescission is able to be performed at the motion to dismiss stage).  Accordingly, Loomis' motion to dismiss the rescission remedy should be dismissed.

## IV.       CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.  Alternatively, Plaintiffs should be granted leave to amend their Complaint as Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires."  *See, e.g., Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (stating that leave to amend should only be denied "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile").

Dated:  July 16, 2009                Respectfully submitted,

/s/ _____
Ryan C. Berry
Virginia State Bar Number 67956
DLA Piper LLP (US)
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190-5159
Phone: (703) 773-4151
Facsimile: (703) 773-5151
Ryan.Berry@dlapiper.com

Tara Lee
Virginia State Bar Number 71594
DLA Piper LLP (US)
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190-5159
Phone: (703) 773-4150
Facsimile: (703) 773-5150
Tara.Lee@dlapiper.com

David Clarke (admitted *pro hac vice*)
Michelle J. Dickinson (admitted *pro hac vice*)
Melissa R. Roth (admitted *pro hac vice*)
DLA PIPER LLP (US)
6225 Smith Avenue
Baltimore, Maryland  21209
Telephone:  410.580.3000
Facsimile:  410.580.3001

*Counsel for Intersections Inc. and*
*Net Enforcers, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of July 2009, I caused the foregoing Plaintiffs' Opposition to Defendants' Motion to Dismiss to be electronically filed with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Rodney F. Page, Esq.
William E. Olson, Esq.
Jennifer M. Kies, Esq.
BRYAN CAVE LLP
1155 F Street, NW
Washington, DC 20004

*Counsel for Defendants*
*Joseph C. Loomis*
*and Jenni M. Loomis*

/s/_____
Ryan C. Berry
Virginia State Bar Number 67956
DLA Piper LLP (US)
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190-5159
Phone: (703) 773-4151
Facsimile: (703) 773-5151
Ryan.Berry@dlapiper.com

*Counsel for Plaintiffs Intersections Inc. and*
*Net Enforcers, Inc.*

EAST\42492411.3