1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division




------------------------------:
                              :
INTERSECTIONS INC, et al.,    :
              Plaintiffs,     :
                              :
 -vs-                         :      Case No. 1:09-cv-597
                              :
                              :
JOSEPH C. LOOMIS, et al.,     :
              Defendants.     :
                              :
------------------------------:
```

HEARING ON MOTIONS

December 11, 2009

Before:  Mag. Judge Theresa C. Buchanan

APPEARANCES:

Michelle J. Dickinson, Counsel for the Plaintiffs

Thomas M. Dunlap and David Ludwig,
Counsel for the Defendants

2

<u>INDEX</u>

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| EDWARD VALIO | DIRECT | 9 |
| | CROSS | 18 |

3

1          NOTE:  The case is called to be heard at 10:32 a.m.

2     as follows:

3          THE CLERK:  Intersections Incorporated, et al.

4     versus Joseph C. Loomis, et al, civil action number 09-cv-527.

5          MS. DICKINSON:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MS. DICKINSON:  Michelle Dickinson for the

8     plaintiffs.

9          MR. DUNLAP:  Good morning, Your Honor.  Tom Dunlap

10    and David Ludwig for the defendants.

11         THE COURT:  Good morning.  All right this is on,

12    let's deal first with the plaintiffs' motion for sanctions.

13    Did you still want to pursue that?

14         MS. DICKINSON:  Yes, Your Honor, I would, please.

15         THE COURT:  I am just trying to understand.  They

16    are alleging now that there was nothing there?

17         MS. DICKINSON:  That's not correct, Your Honor.  We

18    still do not have all documents for Joe Loomis or a proper

19    production for Jenni.

20         With respect to Joe Loomis, there are 10,000 pages

21    missing in their production, in his production.  Now, the

22    defendants claim that it's the standard practice to remove

23    Bates labeled documents or Bates labeled pages from a

24    production without alerting opposing counsel as to the fact of

25    the removal or the reason for doing that.

1          They also say that the 10,000 pages that are missing

2    from their production, you can actually find them in another

3    portion of the production, but that's not actually accurate.

4          We have a declaration for the Court, if I may.

5          THE COURT:  Okay.

6          MS. DICKINSON:  This is from DLA Piper's litigation

7    support specialist.  And he would testify that this is not

8    only not the standard practice, and the defendants' expert

9    doesn't say it is as well, or their vendor, excuse me, but

10   that as well as that, there are 10,000 pages which were not

11   produced.  If you look at the Bates range--

12          THE COURT:  Okay, let me read it for just a second.

13          MS. DICKINSON:  I am sorry.

14          THE COURT:  Let me take one second and just read

15   what he says, it might help me understand your argument.

16          MS. DICKINSON:  Sure.  Sure.

17          THE COURT:  Okay, go ahead.  I am sorry.

18          MS. DICKINSON:  Your Honor, with respect to the

19   Bates range that they have identified as covering the

20   documents that have been removed from their production, as you

21   can see from Mr. O'Neal's declaration, that Bates number point

22   that they point to is not within the document production that

23   they have given us.

24          The first number, the beginning number of that Bates

25   range doesn't have enough digits in it.  And the ending number

1    of that Bates range is higher than any Bates number document

2    they have produced in this case.  So, we still don't have all

3    of Joe Loomis' documents.

4           And with respect to Jenni Loomis, we still have a

5    data dump.  The Court ordered the defendants to produce on

6    Wednesday, my understanding of the Court's order was that they

7    were to reproduce their documents in order to pull out or cull

8    out the nonresponsive documents.  And then to give us a list

9    of the Bates numbers that corresponded with the document

10   requests.

11          THE COURT:  Correct.

12          MS. DICKINSON:  We did get an over 200-page document

13   that has all of the Bates numbers corresponding to the

14   document requests, and then some ten pages or so of Bates

15   numbers that are identified as nonresponsive documents, but

16   they didn't give us new production.

17          So, what we are left to on the last day of discovery

18   here is--  Well, it was on Wednesday that we got the

19   documents, but we have been in depositions day and night.  Is

20   we have to sift through their ten pages of documents in order

21   to figure out whether the documents that we're looking at are

22   responsive or not responsive.

23          It's not a fix for us.  We still have a data dump.

24   And here we are on the last day of discovery and they have

25   again or continue to violate the Court's order.  I think at

1    this point sanctions are appropriate in this case.

2          We have absolutely taken the high road in this

3    case--

4          THE COURT:  So, are you telling me that they didn't

5    actually cull out the documents, they just gave you a list of

6    what was responsive to which interrogatory, I mean to each

7    document request?

8          MS. DICKINSON:  Yes, Your Honor, that's what they

9    have given us.  But, frankly, that's not very helpful for me

10   as I am trying to prepare exhibits for trial.

11         THE COURT:  All right.  All right.  Let me finish

12   with this motion first.  Did you have anything to add to your

13   opposition to that?

14         MR. DUNLAP:  Good morning, Your Honor.

15         THE COURT:  Good morning.

16         MR. DUNLAP:  First off, start with the Bates issue.

17   And I have Mr. Valio, our e-discovery expert, here to speak to

18   the technical issues.  I have never seen this affidavit, and I

19   don't know much about the technical aspects of e-discovery.

20         I will note that part of what they are pointing out

21   in their affidavit is a typo, and I believe in our affidavit--

22   I mean, it looks, just from looking at the affidavit in the

23   last 30 seconds, it looks like it is just a typographical

24   error in the number of digits.  I don't think the number of

25   digits is dispositive.

1          But, I mean, at the end of the day if the argument

2   is really that those 9,500 blank pages should have been

3   produced, I have Mr. Valio here who can, we can put on the

4   stand and I can certainly ask him questions about whether or

5   not he believes this is standard industry practice and how--

6   You know, why he would think these are part of an Excel

7   document.

8          I, frankly, as a nontechnical person don't know.

9   And I, this wasn't filed as a reply to our opposition, but was

10  just handed to me just now, so I don't have any--

11         THE COURT:  All right.  And what about Jenni Loomis'

12  production?

13         MR. DUNLAP:  With respect to Jenni Loomis, Your

14  Honor, my understanding of the Court's order, which we did,

15  and we hired four contract attorneys that Friday afternoon,

16  had them work through the weekend and through the night--

17         THE COURT:  She's right, you were supposed to have

18  taken out the nonresponsive documents.

19         MR. DUNLAP:  We identified every nonresponsive

20  document by Bates number.

21         THE COURT:  That's not taking them out.

22         MR. DUNLAP:  And that was my understanding of the

23  Court's order.

24         THE COURT:  Well, you were wrong, because I said you

25  are supposed to produce responsive documents and take out the

1   nonresponsive documents and then correspond them to the

2   document requests.

3           MR. DUNLAP:  But, Judge, when they produced to us,

4   they identify--

5           THE COURT:  That didn't matter what they did to you

6   because what I ordered you to do was because of your client's

7   nonresponsiveness previously.

8           MR. DUNLAP:  Right.  And we literally identified,

9   just so you understand what we did, Judge, is we identified by

10  interrogatory request Bates label ranges responsive to each

11  interrogatory request.  And then we identified by Bates label,

12  and I understand that I may have misunderstood this, but

13  identified by Bates label what documents were missing.

14          We never got a call about it.  If they had called

15  and said, we want you to give these to us with these Bates

16  ranges extracted, we would have just created a new load file

17  and handed it to them.

18          THE COURT:  Okay.

19          MR. DUNLAP:  We would have handed it to them the

20  same day.  We didn't know about it.  There was no meet and

21  confer on this.

22          THE COURT:  Ms. Dickinson--

23          MS. HUNTER:  And, frankly, Judge, this issue with

24  Jenni Loomis was just raised now in court.  I mean, it was

25  never raised to us prior to this second.

E. Valio - Direct

9

1          THE COURT:  All right, put on your document

2     production expert.

3          MR. DUNLAP:  Okay.  I would like to call Mr. Ed

4     Valio to the stand.

5          And, Judge, can I give him a copy of this?

6          THE COURT:  Sure.  All right, Mr. Tucker, would you

7     give him that.

8          EDWARD VALIO, called by counsel for the defendants,

9     first being duly sworn, testifies and states:

10         DIRECT EXAMINATION

11    BY MR. DUNLAP:

12    Q.   Would you please state your name for the record.

13    A.   Edward Valio.  V-a-l-i-o.

14    Q.   Mr. Valio, what's your, what do you do for a living?

15    A.   I am an e-discovery project manager.

16    Q.   Okay.  Are you an attorney?

17    A.   I am not licensed to practice in Virginia.

18    Q.   Okay.  Are you licensed to practice in other states?

19    A.   Yes, I am.

20    Q.   Okay.  And have you been retained in this case as an

21    expert to assist with e-discovery?

22    A.   Not as an expert.

23    Q.   Or as an e-discovery manager?

24    A.   Yes, I have.

25    Q.   Can you tell me a little bit about your background in

1   e-discovery.

2   A.    I am an e-discovery project manager for EndSource IT, a

3   Washington, D.C. based company.  Prior to my employment with

4   them, I was a project attorney for various law firms.  Prior

5   to that, I was a litigation attorney.  Prior to that, I was an

6   extern in a legal department at DuPont dealing with

7   e-discovery issues.

8   Q.    Okay.  How long have you been involved with e-discovery?

9   A.    Approximately five years.

10  Q.    Okay.  And how many document productions have you been

11  involved with involving e-discovery?

12  A.    I couldn't tell you offhand.  A large number.

13  Q.    Is it hundreds?

14  A.    Dozens.

15  Q.    Dozens.  Okay.  And could you take a moment to look at

16  the affidavit produced by counsel in court today.

17          Judge, while he is reading that, I would move to

18  qualify him as an expert in e-discovery.

19          THE COURT:  Any objection?

20          MS. DICKINSON:  No, Your Honor.

21          THE COURT:  All right, he is qualified.

22          MR. DUNLAP:  Judge, while he is reviewing that, with

23  respect to Jenni Loomis, I will say this.  We can produce that

24  load file by tomorrow morning.  I think--

25          THE COURT:  Let me ask Ms. Dickinson a question

1    about that Jenni Loomis production because when I quit

2    practicing it was in the dark ages.

3         I am guessing though that if you have a number, if

4    he is giving you a list of responsive documents, that you can

5    look at the Bates numbers that he has given you that are

6    responsive and just put those numbers in on your computer and

7    it will pull up those documents, isn't that correct?

8         MR. DICKINSON:  Yes, but we're talking about 16,000

9    pages of documents.  And we're talking about over--

10        THE COURT:  But you wouldn't be doing the same

11   thing--

12        MS. DICKINSON:  I am sorry.

13        THE COURT:  Wouldn't you be reviewing the same

14   thing?  I mean, I am not quite understanding why it's much

15   more burdensome for you to just look at the list of, you know,

16   numbers of Bates documents and just, you know, say, oh, okay,

17   well, numbers 1005 to 1025 are responsive to request number 1

18   and type in those numbers on your computer and pull them up.

19        MR. DICKINSON:  I don't think it's quite that

20   simple, Your Honor.

21        THE COURT:  So, that's why I need you to explain it

22   to me.

23        MR. DICKINSON:  Okay.  So, what they have done is

24   they have given us ten pages or so of listed out in small

25   print of documents that are not responsive, the Bates numbers.

1          THE COURT:  That are not responsive or--

2          MS. DICKINSON:  That are not responsive.  They have

3     given us over 200 pages, an over 200-page document that

4     identifies all of the Bates numbers as they correspond with

5     the document requests, and then they have got like another--

6     Oh, gosh, sorry.

7          THE COURT:  Sorry.  That's all right.

8          MR. DICKINSON:  I talk with my hands.  The last 10

9     pages or so are the list of Bates numbers that are not

10    responsive.  So--

11         THE COURT:  So, what I guess I am trying to say is,

12    the list of documents that are responsive, in that list is it

13    including ranges that include documents that are not

14    responsive?

15         MR. DICKINSON:  Can you try that on me again?  I am

16    sorry, Your Honor, I am whispering.

17         THE COURT:  Okay.  He has got a separate number of

18    documents that are nonresponsive, list of documents that are

19    nonresponsive.  But when he gives you a list that are, that is

20    a number of say Bates range that is responsive, say 1 to 100

21    is responsive to request number 1, do you then have to go back

22    to the nonresponsive list and look for the numbers within 1 to

23    100 that are nonresponsive?  Is that what you are telling me?

24         MS. DICKINSON:  Right.  I am going to have to go in

25    there and I am going to have to look at their list of

1    nonresponsive documents, and then I am going to have to go

2    into my database and I am going to have to cull all of those

3    documents out, physically cull them out so that--

4         THE COURT:  Because they didn't, instead of saying,

5    1 to 5, 10 to 15, and 50 to 100 are responsive--

6         MS. DICKINSON:  It's like me walking into your

7    office, Your Honor, and handing you a big stack of documents

8    and saying, numbers 57, 46, 25, 117, et cetera, they are not

9    responsive, go look at the rest of them.

10        Well, now I have got to cull through each page--  I

11   mean, we don't literally do it like this, but, you know, I

12   have got to cull through each page, pull all of those out and

13   then start going through and reviewing the responsive

14   documents.

15        It's really not any different than what we had

16   before.  We've got a data dump that's going to take us an

17   enormous amount of time to get through, and we shouldn't have

18   to do that.

19        THE COURT:  Okay.

20        MS. DICKINSON:  That's the whole purpose of the

21   document request, is for them to--  You know this.

22        THE COURT:  I guess I am trying the understand then

23   why didn't you just identify the responsive documents?

24        You can sit down, Ms. Dickinson.

25        Why didn't you identify just the responsive

1    documents?

2            MR. DUNLAP:  Well, Judge, the way she describes how

3    you go through it, first, that's not actually how it works,

4    and Mr. Valio can testify to that.

5            The other thing, and I would just like to present

6    this to the Court, but part of the reason we thought that that

7    was okay was they gave us a list of documents that say, don't

8    look at these documents, these are nonresponsive on

9    November 23.

10           THE COURT:  All right.  Well, I am not going to deal

11   with that today.  Let's go ahead and question your expert--

12           MR. DUNLAP:  Perhaps Mr. Valio can explain what the

13   process is.

14           THE COURT:  Okay, let's go ahead and question your

15   expert.

16   BY MR. DUNLAP: (Continuing)

17   Q.   Mr. Valio, you heard what Ms. Dickinson said a moment ago

18   with respect to how these responsive and nonresponsive

19   documents are reviewed, is that correct?

20   A.   I did.

21   Q.   Okay.  Can you describe the process for using Concordance

22   and a load file to exclude the nonresponsive documents when

23   reviewing responsive versus nonresponsive documents in the

24   format that we provided them?

25   A.   The format we provided them was, as you know, a list.

E. Vallo - Direct

1   That didn't have anything to with Concordance.

2   Q.   Okay.

3   A.   However, within that response, with regard to each

4   document request, every document which was responsive to that

5   request was identified individually as in document request 1,

6   Bates range 1 to 2 of that document.  The next document covers

7   Bates range 3 to 4.

8           So, it wasn't simply a range of documents that

9   responded to that request.  It was actually each document

10  listed individually by the Bates numbers covered by that

11  document.

12          In addition, at the end each document which was

13  deemed nonresponsive was identified in the same way.

14          THE COURT:  Are you telling me then that the

15  nonresponsive numbers were not included as part of the range

16  in the first response that gave the list of responsive

17  documents?

18          THE WITNESS:  That's correct.

19          THE COURT:  Okay.  All right.  She is shaking her

20  head no, but go ahead and question him.

21          MR. DUNLAP:  Okay.  My understanding, Your Honor, is

22  that's how we produced them.

23          The other thing I will offer to the Court and I

24  would have happily offered them today or yesterday is we will

25  produce it without those documents in there, it's not a

1    technical challenge.  It is something that we can do fairly

2    easily and we would be happy to do.

3            THE COURT:  Okay.  All right.  Go ahead and question

4    him about the other thing.

5            MR. DUNLAP:  Okay.

6    BY MR. DUNLAP: (Continuing)

7    Q.   Mr. Valio, have you had a chance to review the affidavit

8    I have given you?

9    A.   I have.

10   Q.   Okay.  There are a number of things in that affidavit,

11   and unfortunately I don't have a second copy, but there are a

12   number of things in the affidavit that refer to the missing

13   pages of documents in this document request.

14           Are you familiar with those missing, with that

15   missing page issue?

16   A.   I am familiar with the missing Bates range from this

17   production, yes.

18   Q.   Okay.  Based on your review of that affidavit, can you

19   explain Mr. O'Neal's response to our assertion that those

20   missing pages were blank and part of an Excel spreadsheet?

21   A.   Yes.  Mr. Davies' affidavit laid out that there were a

22   pair of Microsoft Excel spreadsheets that had improperly

23   imaged.  And in e-discovery issues when you image

24   spreadsheets, you frequently come up with very unusable

25   thousands page long results.

1          And so, it was Mr. Davies' assertion that the

2     imaging of those particular Excel files had not been done

3     properly.  And so, they had redone it, and then the Bates

4     range containing the improperly imaged files was removed.

5     Q.   Okay.  In your experience with document production, have

6     you ever seen that before?

7     A.   I have seen the issue with large numbers of pages coming

8     out of Excel files that are unusable.

9     Q.   Okay.  So that Excel, overproduction of pages with Excel

10    TIFF files is common?

11    A.   It's common to encounter errors when attempting to image

12    Excel files, yes.

13    Q.   Okay.  With respect to the, in the affidavit it

14    identifies some Bates range numbers that seem not to

15    correspond to the production with respect to the TIFF files.

16    Can you speak to those Bates numbers.

17    A.   I can't, unfortunately.

18    Q.   Okay.  How many numbers--  It looks, it looks to me, and

19    I will just ask this, how many numbers are typically in a

20    Bates stamp in this production?

21    A.   I don't understand the question, sorry.

22    Q.   There is, Ms. Dickinson mentioned a moment ago that there

23    are a certain number of digits in a Bates range label in this

24    document production, and it looks like in the discovery

25    produced that some of the Bates range numbers are different

1    than-- And actually, frankly, I don't understand it because I

2    don't have the affidavit in front of me, so maybe I can just

3    ask you if you can take a moment to look at the affidavit and

4    tell me if you understand what the question is with respect to

5    the Bates range numbers.

6           THE COURT:  I think you're talking about paragraph

7    13, correct?

8           MR. DUNLAP:  I think so, Judge.  Thanks, Michelle.

9    A.   Yeah, the assertion in paragraph 13 regarding the

10   particular Bates number is correct.  I mean, as far as the

11   format in this case goes, you have got JL followed by looks

12   like seven digits.

13   Q.   Okay.

14   A.   And that particular Bates number that is cited contains

15   six.  So, it clearly is not one that will be associated with

16   this production.

17          What I would look at if someone presented me with

18   this, I might check to see if the zero padding was done

19   incorrectly.  So, maybe they are talking about 0031940, but

20   that's probably not the case here either.

21          MR. DUNLAP:  Okay.  I have no further questions.

22   Please answer any questions Ms. Dickinson has.

23          MS. DICKINSON:  May I, Your Honor?

24          THE COURT:  To ahead, yes.

25       CROSS-EXAMINATION

E. Valio - Cross

1   BY MS. DICKINSON:

2   Q.   Mr. Valio--

3   A.   Yes.

4   Q.   What was your role in the e-discovery in this case?

5   A.   I am the e-discovery project manager for the defense

6   attorney.

7   Q.   For the defense attorney?

8   A.   For the defendants' attorneys, yes.

9   Q.   Okay.  But particularly what is your role?  What are you

10  doing?

11  A.   Well, when I was first hired, I was loading Concordance

12  databases of the document productions in this case, which I am

13  sure you are familiar with.

14          And I was also involved in running the review of

15  Jenni Loomis' production in preparation for this, for this

16  document production, as well as an examination of the

17  Intersections database in the context of the redaction issues

18  that had come up between counsel.

19  Q.   Okay.  So, you have been involved with their document

20  review of the plaintiffs' documents, is that correct?

21  A.   No.

22  Q.   Or the loading of the documents produced by plaintiffs,

23  is that correct?

24  A.   Yes.

25  Q.   Okay.  And then you have also been involved in some way

1   with Jenni's production, is that right?

2   A.   Yes.  I helped coordinate the review in preparation for

3   the production that was made.

4   Q.   This was the review that happened within the last week or

5   so, is that correct?

6   A.   That's correct.

7   Q.   Okay.  Now, with respect to Joe Loomis' review or Joe

8   Loomis' production, have you had any involvement in that

9   production of document?

10  A.   Only in loading up databases.  I haven't, I didn't do any

11  of the data processing, if that's what you are asking.

12  Q.   Okay.  That was done by a completely different firm that

13  was hired by Joe Loomis individually, isn't that right?

14  A.   I don't know.

15  Q.   Okay, you don't know.  So, this declaration of Ken Davies

16  that is before the Court, Ken Davies is not a member of your

17  company, isn't that correct?

18  A.   That's correct.

19  Q.   Okay.  And have you had any conversation with Ken Davies?

20  A.   No.  I was on a conference call where he was on the call,

21  but he didn't say much of anything.

22  Q.   Okay.  So, you don't have any real knowledge about his

23  collection of documents for Joe Loomis or his production of

24  documents on behalf of Joe Loomis, is that correct?

25  A.   That's correct.

E. Vallo - Cross

1   Q.   Okay.  And so, you don't have any real knowledge about

2   this issue of the Bates labeling being off in this latest

3   production, isn't that correct?

4   A.   All I would add is that when I went to load up the

5   production of Joe Loomis into, into a Concordance database, I

6   encountered the exact same error.

7   Q.   You did?

8   A.   There was a gap in the production numbers.

9   Q.   Okay.  So, you will acknowledge that there was a gap in

10  the production by Joe Loomis, isn't that right?

11  A.   There was a gap in the production numbers.

12  Q.   In the production numbers.  Now, you testified, I

13  believe, or would you agree with me that it is not common to

14  remove Bates numbers from a production without letting

15  opposing counsel know?

16  A.   I would agree it is not common to remove Bates numbers

17  from production.

18  Q.   At all, right?

19          THE COURT:  Say that again.  I am sorry.  Could you

20  just pull that microphone a little closer.  I couldn't hear

21  you.

22          THE WITNESS:  I am sorry.  I would agree that it is

23  not common to have a gap in those production numbers like

24  that.

25          THE COURT:  So, can I ask a question because I think

1    I misunderstood.  You were not in charge of Joe Loomis'

2    production at all?

3           THE WITNESS:  I did not do any of the data

4    processing.

5           THE COURT:  So, when you saw the gap in the

6    documents, you really have no idea why there is a gap either,

7    do you?

8           THE WITNESS:  No, but when I--

9           THE COURT:  I mean, you can't, you have no way of

10   looking back and seeing what those 10,000 pages actually were,

11   whether they were blanks or not, is that correct?

12          THE WITNESS:  That is correct.

13          THE COURT:  Okay.  Anything else, Ms. Dickinson?

14          MS. DICKINSON:  Not particularly on that issue, but,

15   Your Honor, they have been referring to these documents as

16   blank, but as the witness here has acknowledged, I don't think

17   anybody knows whether they are blank or not because we haven't

18   looked at them yet.  And they are not in that other portion of

19   the production because the Bates numbers don't sync up with

20   what we have been given.

21          But if I may, with respect to this issue with Jenni

22   Loomis, the documents that, the document that they produced

23   does not provide a Bates range for each one.  They provided

24   each individual Bates number.

25          THE COURT:  So, you are having to pull up each

E. Vallo - Cross

23

1    number?

2            MS. DICKINSON:  Exactly.

3            THE COURT:  Is that what you are saying?

4            MS. DICKINSON:  We would have to input into the

5    computer each individual Bates number.

6            THE COURT:  Okay.

7            MS. DICKINSON:  So, it's not quite as simple as--

8    It is more of this stacked example that I gave that wasn't

9    quite so artful.

10            THE COURT:  Did you have any more questions for this

11    witness?

12            MS. DICKINSON:  I don't think so, Your Honor.  Thank

13    you.

14            THE COURT:  Did you have any redirect for him?

15            MR. DUNLAP:  No, Your Honor.

16            THE COURT:  All right.  You can step down.  Thank

17    you.

18            NOTE:  The witness stood down.

19            THE COURT:  You know, I'm trying to--  Just give me

20    a moment here.  I wanted to go back and find your expert's--

21            MR. DUNLAP:  And, Judge, I will just mention this,

22    production was done by Mr. Loomis' e-discovery person prior to

23    our firm being primarily in the case.  So, I don't have--

24            THE COURT:  Well, which is the concern, exactly.

25            MR. DUNLAP:  I just don't have as much knowledge

1    about this production.  And we got the affidavit today, so I

2    haven't had a chance to give it, obviously, to Mr. Davies to

3    look at and say, well, here's why these problems are here.

4         We have Mr. Valio here, and, you know, that's who we

5    used.  But, unfortunately, we just--

6         THE COURT:  Wait a minute.  I am just trying to find

7    your, Mr. Davies' declaration.

8         MS. DICKINSON:  It's Exhibit A, Your Honor.  I have

9    a copy here.

10        THE COURT:  Could you.  And help me just not--  I

11   just want to look at that.  I saw it once, and I want to look

12   back at it again and read it specifically.  It will save me

13   time.  Thank you.

14        Okay.  And I can give this back to Ms. Dickinson.

15        MR. DUNLAP:  Judge, just one other thing that was

16   just pointed out to me.  In the motion, in the motion on

17   page 2 of 6 it says that the 10,000 pages missing are Bates

18   range JL0273745 through JL0283381.

19        THE COURT:  Right.

20        MR. DUNLAP:  And then in the attachment, in the

21   declaration of James O'Neal which supports that motion, there

22   are completely different Bates ranges, at least it looks like

23   it to me.  Just again, reading the numbers at the top.  It

24   says production.

25        MS. DICKINSON:  That's not right, Your Honor.

1       THE COURT:  No, you're looking at--  It's paragraph

2  8.  They have the same numbers.  You're looking at something

3  different.

4       MR. DUNLAP:  I was looking at paragraph 4, Your

5  Honor, that says--

6       THE COURT:  No, that's about, that's about other

7  missing images.  That's not this.

8       MR. DUNLAP:  This set of images.

9       THE COURT:  This set.  They are referring to other

10  sets that had doc blanks, but this is paragraph 8, they have

11  the right numbers.

12       MR. DUNLAP:  I apologize, Your Honor.

13       THE COURT:  That's okay.

14       MR. DUNLAP:  I just thought--

15       MS. DICKINSON:  Your Honor, may I add just one other

16  point.

17       THE COURT:  All right.

18       MS. DICKINSON:  Just to be clear.  We did go look to

19  see if there was a 0 missing.  There is no 0 missing.

20       THE COURT:  All right.  Well, here is what we are

21  going to do.  As far as Jenni Loomis' production is concerned,

22  I want you to produce a new load file by Monday close of

23  business with the nonresponsive documents deleted.  And make

24  it in a format very simple for plaintiffs' counsel to use.

25       As far as Mr. Loomis' production is concerned, I

1    want you to correct that by the close of business today.  You

2    either give them the right Bates numbers or figure out what

3    the problem is with this.

4         It seems to me that I don't see any reason to think

5    that Mr. Davies' declaration in this is false.  I mean, he

6    signed it under penalty of perjury.  It seems as though this

7    is probably blank pages, but I want you to give counsel a

8    letter by close of business today that corrects these

9    deficiencies or this error in the number and produce, give her

10   the Bates ranges that correspond to the reuploaded images.

11        Now--

12        MR. DUNLAP:  So, Judge, just so that I don't make a

13   mistake with this.  If we produce the blank images that

14   correspond--  If they are blank.  I mean, I honestly don't

15   know.  But if we produce--

16        THE COURT:  They better be blank.

17        MR. DUNLAP:  I understand.

18        THE COURT:  I thought he did produce the blanks and

19   he gave you numbers, but the numbers aren't right.  That's

20   what I understood him to say.

21        Here what's I want you to do then.  Produce the

22   blank pages.

23        MR. DUNLAP:  Okay.

24        THE COURT:  The original blanks pages with 0273745

25   through 0283381 on the top.

1          MR. DUNLAP:  Okay, Your Honor.

2          THE COURT:  Produce those by close of business

3    today.  Is that a problem?  Or Monday, I will give you until

4    the end of Monday.

5          MR. DUNLAP:  I think by Monday would be fine, Your

6    Honor.  He's in Canada.  I don't--

7          THE COURT:  All right.  Close of business Monday we

8    want those Bates numbers produced.  Okay.

9          MR. DUNLAP:  Yes, Your Honor.

10          THE COURT:  And then, as I said, the new load file

11    for Ms. Loomis.

12          MR. DUNLAP:  We will do that as well, Your Honor,

13    absolutely.

14          THE COURT:  Okay.  I'm going to assume that those

15    are blank pages.  We are all going to assume that they are

16    blank pages.  If they aren't blank pages, we have got a whole

17    different set of problems.

18          MR. DUNLAP:  Judge, I will hope with you.

19          THE COURT:  Okay.  So, I am going to deny the motion

20    for sanctions at this point.  And I am hoping that this is the

21    end of motions for sanctions.

22          Let's deal with your motion to compel discovery at

23    this point.

24          MR. DUNLAP:  Your Honor, Mr. Ludwig is going to

25    address that motion.

1           THE COURT:  Okay.

2           MR. LUDWIG:  Good morning, Your Honor.

3           THE COURT:  I am sorry, go ahead.  Good morning.

4           MR. LUDWIG:  I assume the Court has read the papers,

5    so I will keep my comments brief.  There were three essential

6    issues raised in the motion to compel and for limited relief.

7    The first one raised is the issue of improper use of privilege

8    redactions.

9           Due to the protective order in this case, we did not

10   produce exhibits, but I have some examples if the Court would

11   like to inspect.

12          What we saw when we discovered the technical defect

13   and caught glimpses of the first couple of documents that were

14   improperly redacted was that things were being flagged as

15   redacted that were simply not privileged.

16          We also have examples of things that are still

17   currently redacted as privileged that are not listed on the

18   privilege log.  And we don't feel that the privilege log is

19   sufficient to evaluate the claims of privilege on documents

20   that we have not seen because we stopped inspecting.

21          THE COURT:  Well, I don't see--  When I looked at

22   the privilege log, because the first thing I have to do is

23   look at the log itself to see if it makes a prima facie claim,

24   and it seems to me that it does.

25          So, I am having trouble--  And I will tell you that

1    even before I saw their opposition when I read your motion to

2    compel, I was having trouble with the vagueness of your claim

3    that their, you know, privilege assertions were too broad and

4    so forth when you didn't give me any documents or point to any

5    specific examples.  And now when I am looking at their log,

6    their log to me on its face looks sufficient.

7              So, I need to have a specific example.

8              MR. LUDWIG:  Understood, Your Honor.

9              THE COURT:  Because I am not just going to tell--  I

10   mean, I don't understand what your relief is that you want me

11   to give you in any event.  You are just complaining about the

12   possibility of overbroad privilege assertions, and I don't see

13   any specific documents here that you have a problem with.

14             MR. LUDWIG:  Well, Your Honor, due to the discovery

15   deadline and the compressed briefing schedule and the parties'

16   protective order, and the fact that all documents produced by

17   plaintiffs have been stamped as confidential pursuant to the

18   protective order, we were unable to file a sealing motion, but

19   I do have examples here for the Court's review if the Court

20   would indulge us.

21             THE COURT:  Okay.

22             MR. LUDWIG:  These are just three examples we

23   initially discovered.

24             THE COURT:  So--

25             MR. LUDWIG:  And I will note that none of these

1   documents claimed as redacted are listed on the privilege log

2   at all.  And you look on each of these, I think on each of

3   them, there is, the first is the TIFF image, which is what we

4   were supposed to see, and then attached is the metadata, which

5   actually shows the text that was purportedly redacted.

6           THE COURT:  So, there is nothing on this that is

7   redacted?

8           MR. LUDWIG:  Well, the plaintiffs, I believe, have

9   produced an overlay file that purports to re-redact this.  And

10  we were instructed by--

11          THE COURT:  No, but I am what looking at here is not

12  redacted.  There are some gaps between the paragraphs, but

13  there are no redactions, is that correct?

14          MR. LUDWIG:  Your Honor, perhaps we should identify

15  which one we are looking at since there were three sets of

16  documents.

17          THE COURT:  I am sorry.  I am looking at the first

18  one you handed me, it is dated--  It says, sent from Madeline

19  Vennamin on August 4, 2008.  And it then it says Joe.  And

20  then there is a little gap.  And then there is--

21          MR. LUDWIG:  Yes, Your Honor.  There was--  This one

22  is particularly interesting.  You will see paper clipped to it

23  was another document from the same production in which the

24  portion that was redacted on the top document was actually not

25  redacted in the exact same production.  And you can see there

1    that the redacted portion says--

2            THE COURT:  Say that again.

3            MR. LUDWIG:  The two documents paper clipped

4    together, Your Honor.

5            THE COURT:  Yeah.

6            MR. LUDWIG:  These were different Bates number

7    documents in the same production.  And they contain the exact

8    same e-mail.  In one e-mail it's redacted under a privilege

9    claim, and in the other e-mail there was no redaction.  And

10   you can see the text--

11           THE COURT:  We're not talking about the same thing,

12   I don't think.

13           MR. LUDWIG:  Yes, Your Honor, I believe it is the

14   same, the same e-mail.  It is--

15           THE COURT:  I've got two paper clipped, two sets of

16   two stapled pages and they are paper clipped together, but I

17   don't see where they relate--  I thought you were saying that

18   they were the same e-mail chain.

19           MR. LUDWIG:  Yes, they are, Your Honor.  The

20   document identified as INTX54135, which was on the top--

21           THE COURT:  Okay, I see.  I am sorry.  I see beyond

22   that.

23           MR. LUDWIG:  It is the second message on the second

24   document where it says, Neal, I could remember if you wanted

25   to be object this from a legal perspective, so I did not cc

32

1    you.

2           That was redacted once in the production, not

3    redacted in the second time it appeared in the production.

4    And I don't see that as a confidential communication for

5    purposes of seeking legal device, legal advice, sorry.

6           THE COURT:  Well, what's the problem?

7           MR. LUDWIG:  Well, the problem is that we saw these

8    couple of examples, and we can look at the others as well

9    which are also not privileged, and as soon as we discovered

10   that there was a technical defect in the plaintiffs' privilege

11   redaction, we notified the plaintiffs, we contacted Bar

12   counsel and were instructed to not read any further.

13          THE COURT:  Good.  Right.

14          MR. LUDWIG:  But these raised our eyebrows as to

15   improper use of privilege redactions and the privilege log

16   because none of these items that are redacted even appear on

17   the privilege log.  So, it was, it was sort of a red flag to

18   us about what else is being withheld.  The vast majority of

19   things on the privilege log were not produced in redacted

20   form, they were not produced at all.

21          So, I agree that in several other cases this

22   privilege log does raise a prima facie claim of privilege, but

23   under these circumstances where we are seeing specific

24   examples of abuse of privilege claims, I think we have reason

25   to believe that this was a pattern and course of conduct in

1    their privilege review that ought to be addressed through more

2    specific privilege log or perhaps an in camera review or

3    independent third party review of claims of privilege.

4         THE COURT:  Okay.  Explain to me this August 4 memo

5    from Ms. Vennamin.  You got the portion of it, you got--  You

6    did have part of this produced to you and it was not claimed

7    as privileged, correct?

8         MR. LUDWIG:  The--

9         THE COURT:  Which part was it?  The second part?

10        MR. LUDWIG:  The same e-mail--  On that particular

11   one, the same e-mail was produced twice.  Well, you can see--

12        THE COURT:  The second one with the e-mail chain was

13   produced as not privileged.

14        MR. LUDWIG:  Right.  The same content was produced

15   two different times in portions of this chain.  And one time

16   it was flagged and another time it wasn't.

17        THE COURT:  Who are these people in the e-mail?

18        MR. LUDWIG:  Madeline Vennamin I believe is an

19   employee of the plaintiff.  Neal Dittersdorf is, I believe is

20   an attorney.  The two people are attorneys.  But what I think

21   we are seeing in some of these redactions is the mere fact

22   that an attorney is included on a communication is used as a

23   basis for a claim of privilege, which--

24        MS. DICKINSON:  How do we know that?

25        MR. LUDWIG:  Well, we can certainly see it in some

1   of the other documents as well as this.

2          THE COURT:  Well, I know, but I am saying--  Okay.

3   This is a communication between two attorneys.

4          MR. LUDWIG:  I am sorry, not correct.  It's from,

5   from an employee to two attorneys.  Ms. Vennamin is not an

6   attorney, but Mr. Dittersdorf and Mr. Dworak are attorneys, I

7   believe.

8          THE COURT:  Okay.  Why is this not pertaining to

9   legal advice?

10         MR. LUDWIG:  Well, it's, it doesn't--  Well, for one

11  thing, this example was really meant to highlight the

12  inconsistencies in the redaction.

13         THE COURT:  Okay.  So, they made a mistake.  I think

14  your client made a bunch of them.

15         MR. LUDWIG:  That it was in once and not in once.

16  Arguably--

17         THE COURT:  All right, let's go to the next one.

18  Why is that--  You know, I guess what I am getting around to

19  here is they may have made some mistakes in identification, I

20  understand your concern with that, and I appreciate you not

21  looking at documents further that apparently were produced in

22  their entirety when they should not have been or were supposed

23  to be privileged.

24         What specifically in these documents do you believe

25  was not privileged that should have been produced?  Because I

1   am not seeing it yet.

2           MR. LUDWIG:  Your Honor, if we look at the one

3   document that printed without a Bates number, to Chris

4   Quelena, date of May 18, 2009--

5           THE COURT:  Okay.

6           MR. LUDWIG:  You will see this was one that we

7   discovered before we stopped reading.  And the last two pages

8   of this printout contain the metadata that exists behind the

9   redaction.  And the sentence that is redacted says in its

10  entirety, Joe being Joe Flack.  I have a hard time believing

11  that that is a confidential communication sent for the

12  purposes of seeking legal advice.

13          THE COURT:  Is this some real concern though?

14          MR. LUDWIG:  Well, the concern is the global problem

15  because it appears that what was done was a key word search

16  for attorneys names and everything was redacted thereunder

17  without any meaningful review.

18          THE COURT:  What do you want me to have them do?

19          MR. LUDWIG:  We would like--

20          THE COURT:  Review it again?

21          MR. LUDWIG:  We would like a meaningful review,

22  document by document of privilege.  I think we would also like

23  a privilege log that sets forth the elements of the privilege

24  in greater detail so we can evaluate.

25          These are corporate in-house counsel.  So, a lot of

1  material being sent to in-house counsel is not necessarily

2  privileged under Upjohn.  And the corporate in-house counsel

3  situation makes it a little bit harder to evaluate privilege

4  in this context.  And we have none of that information of the

5  relationship between the parties, how they are in the

6  corporate control group or relevant to the subject matter at

7  the legal advice being sought.

8         We simply can't evaluate the claims of privilege.

9  And again, this type of log may have been acceptable in

10  another case where we didn't have these red flags, but we do

11  know clearly that things are being overredacted, and that's a

12  cause for concern.

13         THE COURT:  Okay.  And what about the rest of your

14  motion?

15         MR. LUDWIG:  We had an issue about a third round of

16  discovery requests.  The central request there was a motion to

17  compel copies of the corporation, the plaintiff corporation's

18  e-mail servers.  What happened here is that there was an

19  expert report filed by the plaintiffs that stated that a

20  certain e-mail or that implied that a certain e-mail did not

21  exist based on that expert's examination of the sender's

22  laptop and the recipient's laptop as I understand it.

23         It came out on Wednesday at the expert's deposition

24  that the recipient's laptop, I believe, had been restored to

25  factory condition.  So, it would not and could not have had

1    any evidence of this allegedly forged e-mail.  And we also, it

2    also I believe came out at the expert's deposition that Mr.

3    Loomis' e-mails when he was an employee of the plaintiff

4    corporation were no longer in existence on the plaintiffs'

5    corporation's servers.

6          We have an e-mail from the corporation to Mr. Loomis

7    dated in October of 2008 specifically stating that they would

8    preserve his e-mails.  And the plaintiffs were actually

9    claiming work product protection of the investigation of Mr.

10   Loomis going back before October 2008, which implies there was

11   an anticipation of litigation prior to the time when these

12   e-mails must have been removed or deleted from the servers.

13         THE COURT:  Well, my question is though, didn't you

14   know all along or at least for quite a long period of time

15   that there was an issue about this e-mail being forged?

16         MR. LUDWIG:  We were copied, the last exhibit to

17   plaintiffs' opposition is an e-mail that we were copied on

18   dated September 4, and we had just entered our appearance on

19   October, I am sorry, on August 25.  And we, you know, we

20   reviewed that e-mail.

21         We, not being privy to the correspondences that led

22   up to that, if you look at the face of the e-mail, it's, you

23   know, to my reading and to our reading at the time, it was

24   ambiguous.  We really didn't know what e-mail was allegedly

25   forged.  It just says generally, we believe Mr. Loomis has

38

1    forged documents.

2           And then the reply from his former counsel says, we

3    would like to see some metadata.  We didn't really know what

4    the issue was until the expert reports started coming out more

5    recently.

6           THE COURT:  Well, that was kind of a risk that you

7    ran by agreeing to represent this client so late directly,

8    isn't it?

9           MR. LUDWIG:  Well, Your Honor, I suppose it is a

10   risk we ran.  I don't feel the Court gave us all that much

11   choice in the matter, but--

12          THE COURT:  Oh, no, I thought you were going to

13   withdraw.

14          MR. LUDWIG:  We intended to and then the Court's

15   order saying that we had to notify any substitute counsel of

16   the Court's intention to impose sanctions on any counsel that

17   substituted in, I think was a hindrance to the client.

18          THE COURT:  Well, only if they allowed that sort of

19   conduct to continue to occur.

20          MR. LUDWIG:  Your Honor can understand the reticence

21   of other counsel to jump into something like that.

22          THE COURT:  All right.  Anything else?

23          MR. LUDWIG:  We had this third issue about the

24   November 30 deposition.

25          THE COURT:  Right.  I still don't understand why he

1   couldn't be there.  That was the Monday after Thanksgiving.

2   He knew about this deposition it sounds like for about a

3   month.

4         Why couldn't he be there?  It's his own brother.

5         MR. LUDWIG:  Yeah.  My understanding, and I wasn't

6   dealing directly with--

7         THE COURT:  I mean, the only allegation here is that

8   he had Thanksgiving plans with his family.  Most people were

9   back to work the Monday after Thanksgiving.  Why couldn't he

10  be here?

11        MR. LUDWIG:  Right.  I mean, there can be no doubt

12  that he cleared November 30.  The obligation to travel across

13  the country is a five hour flight each way, obviously.

14        THE COURT:  So--

15        MR. LUDWIG:  So, it implied the night before and the

16  day after being impaired.

17        THE COURT:  Yeah, I understand that, but why

18  couldn't he come?  I mean, my order was meant to be punitive.

19  My order was meant to impose a burden on the defendant.  I

20  would think his own brother would help him out and come here.

21  I don't understand why he is now saying he couldn't do it, not

22  wouldn't do it.

23        MR. LUDWIG:  Could I have the Court's indulgence for

24  a moment?

25        I am afraid we don't have any specific details of

40

```
1    why he couldn't come.  He said he had family obligations.

2    Apparently the two brothers aren't on good terms.  Chris

3    Loomis has independent counsel in this matter.  He is not, you

4    know, really our witness either, although we believe he has

5    relevant facts.

6             THE COURT:  Okay.  All right.

7             MR. LUDWIG:  Thank you, Your Honor.

8             THE COURT:  Anything else?  Thank you.

9             Did you have anything else you wanted to add, Ms.

10   Dickinson?

11            MS. DICKINSON:  I sure do, Your Honor.

12            If we can talk about the document production issue

13   first.  The defendants in this case up until just now have not

14   identified a single problematic document in this case.  They

15   have now provided the Court with three, I believe three

16   documents that they say were improperly redacted.

17            THE COURT:  You know, skip over the document

18   argument.  Let's go--

19            MS. DICKINSON:  Can I just make one point, please,

20   Your Honor?

21            THE COURT:  Okay.

22            MS. DICKINSON:  And that is that we reproduced these

23   documents to them in the ordinary course of our providing, or

24   producing, preparing our privilege log.

25            So, they have--  The reason why these documents
```

1  aren't on our privilege log is because when we went through,

2  painstakingly through all of the documents that we had either

3  redacted for privilege or withheld on privilege grounds, we

4  decided that these ones needed to be produced in their

5  entirety.

6          THE COURT:  Okay.  Let me just say as far as the

7  document production is concerned, what the defendants point to

8  here I don't see as major issues to begin with.  And you want

9  nothing more than, as I understand it, to make, than to make

10 the plaintiffs go back through and carefully redo this.  And I

11 don't see that there is any big problem here to begin with.

12         Even if these were, and I accept Ms. Dickinson's

13 representation that the reason the numbers aren't on the

14 privilege log is because you decided in the end that they

15 weren't privileged, these are not explosive documents, and I

16 don't think that there is anything here that would indicate

17 that they are improperly redacting documents or improperly

18 listing them as privileged.

19         The privilege log, as I said, appears to me to

20 establish a prima facie claim of privilege, and you

21 acknowledge that.  I don't think there is anything to do here.

22 And I think that that they've--  I don't see anything proper

23 that I have to compel them to do.

24         So, let's deal next with Mr. Loomis'--

25         MS. DICKINSON:  The discovery requests?

```
 1           THE COURT:  The discovery requests and Mr. Loomis'
 2   deposition.
 3           MS. DICKINSON:  Okay.  Your Honor, with respect to
 4   the third discovery requests or third set of discovery
 5   requests, they were untimely served on us.  Now, they say that
 6   it is manifestly impossible for them to have known about these
 7   issues in enough time to timely serve us with discovery
 8   requests, and that's just not accurate.
 9           There is nothing new that prompted these discovery
10   requests.  With respect to the forged e-mail, the issue of
11   evidence tampering and specifically that e-mail have long been
12   discussed by counsel since even before this litigation was
13   filed.
14           We served our report in accordance with the
15   scheduling order.  And counsel has told us face-to-face that
16   they know of no rule that requires advance notice of an expert
17   report or the existence of an expert.
18           So, there is no issue there with respect to this
19   forged document that would, that would require the Court to
20   extend discovery in this case so that they can get more
21   documents or ask for a copy of server logs.
22           With respect to the document production, we started
23   that document production in September, Your Honor.  So, it
24   seems to me that on the last day of discovery to be asking for
25   us to extend the discovery deadline to answer discovery
```

1    requests that were filed too late or served too late, that

2    seems inappropriate and unfair to me.

3           With respect to the employee termination issue,

4    which is one of the issues that they say prompted, prompted

5    these discovery requests, that was disclosed in a discovery

6    response on September 14.  They have had ample time to serve

7    new discovery requests in this case.  And indeed, this is

8    their third set.  They know how to do it, they just waited

9    until the last minute.

10          The issue here is that the defendants have had

11   knowledge since the beginning of the case.  They can't get a

12   mulligan every time they get new counsel and start all over

13   again.

14          Would you like me to address Christopher Loomis?

15          THE COURT:  No, that's okay.  Thank you.

16          Did you have something else you want to say?

17          MR. DUNLAP:  Just briefly, Your Honor.

18          MS. DICKINSON:  Your Honor, may I say just one last

19   thing, please?

20          THE COURT:  Okay.  If you--

21          MS. DICKINSON:  You know, we've had a great

22   relationship with counsel in this case, but, Your Honor, to be

23   honest with you, I am offended by the fact that whoever is

24   writing the briefs in that case, in this case on the other

25   side, would suggest, I find it highly ironic that they would

1    suggest that the people on this side of the table are now

2    harassing and threatening them, when I think that we all know

3    what harassment and threats are all about in this case.

4         And to accuse us of bad faith in this case, there is

5    no bad faith on this side of the table, clients or attorneys.

6    And I just find that personally offensive.

7         MR. DUNLAP:  Judge, I mean, I didn't write the

8    briefs, but I don't recall seeing that in our briefs.

9         THE COURT:  I don't remember seeing it.

10        MR. DUNLAP:  I apologize if that was in there, but I

11   don't feel that way about them.  So--

12        THE COURT:  He likes you, really.

13        MR. DUNLAP:  I do.

14        MS. DICKINSON:  We like them too.  I just don't like

15   what's being said in the briefs.

16        MR. DUNLAP:  I just don't recall reading that.

17        MS. DICKINSON:  But it's in the briefs.

18        THE COURT:  I didn't see that.

19        MS. DICKINSON:  I can show you--

20        THE COURT:  It didn't strike me that they said that.

21   You can point that out to me.  But--

22        MS. DICKINSON:  It is page 4, Your Honor, of their

23   reply to motion to compel which was filed yesterday.  The say

24   that the irony is that plaintiff now uses that same order to

25   threaten and harass defendants' current counsel with

1 unwarranted motions for severe sanctions based on minor,

2 quickly correctable issues.  I mean, come on.

3          THE COURT:  Oh, I understand what you are saying.

4 Okay.  All right, all right.

5          Well, as I said before, I am hoping that the motions

6 for sanctions are at an end here.  I think, Ms. Dickinson, we

7 have resolved it.  If there is anything else, I would like you

8 to call counsel first, opposing counsel and see what the issue

9 is before we file another motion for sanctions.  But I am

10 hoping that has all been resolved.  Unless, as I said, the

11 10,000 pages of documents actually have stuff on it.

12          But I would like you though, as I say that, to make

13 sure that you have verification from Mr. Loomis' expert, Mr.

14 Davies, that if these are blank, that he has reviewed it and

15 it is because of the Excel spreadsheets.  Okay.

16          MR. DUNLAP:  Yes, Your Honor.

17          THE COURT:  Okay.

18          MR. DUNLAP:  Your Honor, there is one more thing

19 that's not related to any of this directly, and I know--  But

20 we have to tell the Court, our client last night gave us

21 documents we have never seen before that we feel an obligation

22 to produce.

23          THE COURT:  Yeah, you better.

24          MR. DUNLAP:  We are going to.  But we saw them last

25 night for the first time.

1          THE COURT:  You got to be kidding.

2          MR. DUNLAP:  So, I wanted to let you know and let

3    Ms. Dickinson know that we are going to produce them

4    regardless of anybody else's feelings on the matter.

5          THE COURT:  What do you mean, regardless of anybody

6    else's feelings?

7          MR. DUNLAP:  Nothing, Your Honor.  I just mean that

8    we are going to produce them.  I don't mean anyone in this

9    courtroom.  I just mean that we are going to produce them

10   immediately, but we just saw them last night.  So, they are

11   coming.

12         THE COURT:  So, they should be turned over today.  I

13   wouldn't even review them.  Just turn over.

14         MR. DUNLAP:  We will turn them over today, Your

15   Honor, absolutely.  I just wanted to let the Court know that.

16         THE COURT:  This is going to be a problem, I

17   guarantee you.

18         MS. DICKINSON:  Your Honor--

19         MR. DUNLAP:  Judge, if I can just explain where they

20   are coming from and what our client has told us about these

21   documents.

22         He was a confidential informant for the FBI.  And my

23   understanding is he had a laptop that he had left in Arizona

24   and was unable to return to Arizona, and just obtained the

25   documents off of that laptop.  This is what he has told us,

1   and he has given us an affidavit to that effect.  He e-mailed

2   it as 1 a.m. last night.  I didn't want to produce it to the

3   Court this morning, but I will produce it.

4            We are going to produce the documents today.  That's

5   what he has told us, you know, again, via affidavit.  I

6   haven't spoken to him about this yet, but we will produce them

7   right away, Judge, no question without--

8            THE COURT:  All right.  Look, I am not going to deal

9   with this now.  Let me just get through these motions.  This

10  is a big problem, obviously.

11           MS. DICKINSON:  It is a huge problem, Your Honor.

12           THE COURT:  It is, I understand that, but I am not

13  going to deal with it now, Ms. Dickinson.  He is going to

14  produce them to you today.

15           MR. DUNLAP:  Absolutely, Your Honor.

16           THE COURT:  I will hear any emergency motions that

17  you need to file regarding those documents, you obviously

18  can't file it today for next Friday.  So, if you decide that

19  you need to file an emergency motion concerning those

20  documents, contact my law clerk and we will set up a special

21  date to hear it.  Okay.

22           MR. DUNLAP:  Judge, I would just ask if there is a

23  problem with the production itself from how we have given it

24  to them or something like that, to let us know.

25           MS. DICKINSON:  We will.

48

```
1              THE COURT:  Okay.  All right.

2              MR. DUNLAP:  We will absolutely do everything we can

3    to fix it on our side.

4              THE COURT:  I would like you to turn it over

5    immediately.

6              MR. DUNLAP:  We will.  We will turn--

7              THE COURT:  Without regard to that.

8              MR. DUNLAP:  It's only like 50 documents.

9              THE COURT:  And then we can fix the problem with it

10   right away.

11             MR. DUNLAP:  How many documents is it?  It's like 20

12   or 40 documents.

13             THE COURT:  Not many?  All right.

14             MR. DUNLAP:  It's not many.

15             THE COURT:  Okay.  Now, you understand what you are

16   supposed to do with regard Mr. Loomis' missing pages and Ms.

17   Loomis' new load file and Mr. Loomis' missing pages.

18             As I said, I am going to deny the motion for

19   sanctions at this time.

20             As to the motion to compel.  I think I was starting

21   to say that I don't see any real problem with their privilege

22   log.  I don't see any problem with the documents that you

23   identified.  And I am going to deny the portion of the motion

24   that deals with the, with the privilege log and the motion to

25   compel the documents.
```

1          As to the order regarding Mr. Loomis, as I said

2     before, that was meant to be punitive.  Counsel has been

3     unable to give me any good reason why he could not be here on

4     November 30 after the Thanksgiving holiday.

5          So, that still stands, my ruling that he could not

6     testify at trial.

7          As to the additional discovery--

8          MR. DUNLAP:  Judge, can I just ask you a quick

9     question on that?  Does that mean that he can't testify for

10    either side, or just if we want to call him?  It's just--

11         THE COURT:  He can't testify for you.

12         MR. DUNLAP:  Understood, Your Honor.

13         THE COURT:  As to the additional time to get

14    discovery on the alleged forged e-mail, I understand you have

15    been scrambling.  And all I can say is I hope you got a big

16    enough retainer up front to cover all your costs in this

17    litigation.

18         But this is something that was disclosed early on.

19    I understand perhaps you didn't understand it until late, but

20    that's not your fault, that's your client's fault.  So, I am

21    not going to allow additional discovery as to that, it's too

22    late.

23         So, your motion to compel is denied.

24         Oh, Lord.  I hope those 20 pages are totally

25    inconsequential.

1          Now, Ms. Dickinson, as far as the motion for

2   sanctions is concerned, I don't want to see it just because

3   you got documents late when we are talking about 20 to 40

4   pages.

5          MS. DICKINSON:  Understood.

6          THE COURT:  It has to be something substantive in

7   those documents.

8          MS. DICKINSON:  Absolutely, Your Honor.

9          THE COURT:  Okay.

10          MS. DICKINSON:  Understood.  Thank you.

11          THE COURT:  Thank you.  All right, court stands in

12   recess.

13          NOTE:  The hearing concluded at 11:29 a.m.

14   ------------------------------------------------

15          C E R T I F I C A T E  of  T R A N S C R I P T I O N

16

17          I hereby certify that the foregoing is a true and
    accurate transcript that was typed by me from the recording
18   provided by the court.  Any errors or omissions are due to the
    inability of the undersigned to hear or understand said
19   recording.

20          Further, that I am neither counsel for, related to,
    nor employed by any of the parties to the above-styled action,
21   and that I am not financially or otherwise interested in the
    outcome of the above-styled action.

22

23
                              /s/ Norman B. Linnell
24                            Norman B. Linnell
                              Court Reporter - USDC/EDVA
25