1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
INTERSECTIONS INC. and       .        Civil Action No. 1:09cv597
NET ENFORCERS, INC.,         .
                             .
             Plaintiffs,     .
                             .
    vs.                      .        Alexandria, Virginia
                             .        December 17, 2009
JOSEPH C. LOOMIS and         .        10:00 a.m.
JENNI M. LOOMIS,             .
                             .
             Defendants.     .
                             .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE PLAINTIFFS:          MICHELLE J. DICKINSON, ESQ.
                             MELISSA R. ROTH, ESQ.
                             DLA Piper LLP (US)
                             6225 Smith Avenue
                             Baltimore, MD 21209
                               and
                             RYAN C. BERRY, ESQ.
                             DLA Piper LLP (US)
                             1775 Wiehle Avenue, Suite 400
                             Reston, VA 20190

FOR THE DEFENDANTS:          THOMAS M. DUNLAP, ESQ.
                             ELLIS BENNETT, ESQ.
                             Dunlap, Grubb & Weaver P.C.
                             199 Liberty Street, S.W.
                             Leesburg, VA 20175

OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

(Pages 1 - 24)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
1              P R O C E E D I N G S

2              THE CLERK:  Civil Action 09-597, Intersections Inc., et

3    al. v. Joseph C. Loomis, et al.  Would counsel please note their

4    appearances for the record.

5              MS. DICKINSON:  Good morning, Your Honor.  Michelle

6    Dickinson, Melissa Roth, and Ryan Berry for the plaintiffs,

7    Intersections and Net Enforcers.

8              THE COURT:  Good morning.

9              MR. DUNLAP:  Good morning, Your Honor.  Tom Dunlap, and

10   Mr. Bennett, Ellis Bennett has stepped into the hallway to look

11   for some exhibit binders.  We're here for the defendants, Joseph

12   and Jenni Loomis.

13             THE COURT:  All right.  Well, this is the final

14   pretrial.  I know that you-all have been before Judge Buchanan a

15   great deal on various discovery issues.  Have those all been

16   sorted out at this point?

17             MR. DUNLAP:  Generally, we think, Your Honor.  Of

18   course, you know, things --

19             THE COURT:  Why don't you go to the lectern so we have

20   you by the microphone.

21             MR. DUNLAP:  Sorry, Your Honor.

22             THE COURT:  Yeah.

23             MR. DUNLAP:  I think they've generally been sorted out.

24   We've had a good working relationship with each other in terms of

25   calling and trying to figure things out.  We're the third counsel
```

1  in the case.

2          THE COURT:  I recognize that.

3          MR. DUNLAP:  We were just local counsel, and we've now

4  changed to counsel.  So -- but I think they're generally worked

5  out, Your Honor.  We're prepared to set a trial date.  I don't

6  think there's going to be anything that would stop us from going

7  forward today.

8          THE COURT:  Yes, ma'am.

9          MS. DICKINSON:  Good morning, Your Honor.  I think we're

10 fairly close to having things worked out.  We did receive upon the

11 Court's order a document production from opposing counsel Monday

12 night.  We determined yesterday evening that the document

13 production was corrupted somehow.

14         THE COURT:  Corrupted?

15         MS. DICKINSON:  Yes.

16         THE COURT:  Is it electronic production?

17         MS. DICKINSON:  Yes, ma'am -- or yes, Your Honor.  It

18 was two productions.  One disk was blank.  The other disk, it

19 wasn't -- can you explain to her?

20         The images didn't match up with the load file.  I'm

21 speaking Greek right now.  I hope you understand.  It's a little

22 bit beyond me, the technology.

23         So what we did was we contacted opposing counsel.  We

24 spoke with their e-discovery vendor, who actually wasn't

25 responsible for putting together the production, but we put our IT

1   people together last night around 9:30 or so, because we haven't

2   been able to look at the documents yet, and we were able to work a

3   fix, we believe, for the one set of documents that was blank.

4          With respect to the other ones, he's in the process of

5   loading all of this stuff or was doing that last night.  We were

6   in the office until one.  It wasn't done yet, and we had to come

7   down here.

8          So I can't really represent to Your Honor that

9   everything is done because I haven't seen it yet.

10          THE COURT:  Well, what are you looking for in particular

11  within the electronic records?  Are these e-mail communications,

12  receipts of information?  What are you looking for?

13          MS. DICKINSON:  We're looking for -- we expect that it

14  is e-mail communications.  With all honesty, I don't have any idea

15  what it is, because -- I'm sorry.

16          THE COURT:  Go ahead.

17          MS. DICKINSON:  Because we haven't seen them, but what

18  we did ask for were all e-mails, electronic documents, and that's

19  what they were supposed to be pulling.

20          As you've probably seen from the record, we've had great

21  difficulty getting any documents and then much less in a timely

22  manner.  I think we first got our first production about -- four

23  weeks ago?  I'm sorry, I'm not sure.  So we don't have everything,

24  but --

25          THE COURT:  What's the time period over which you were

 1   seeking these records?

 2           MS. DICKINSON:  You mean our discovery request?

 3           THE COURT:  In other words, was it one year's worth of

 4   e-mail messages?  What was the frame -- what was the time frame

 5   for the discovery?

 6           MS. DICKINSON:  It was 2007 forward.

 7           THE COURT:  So roughly two-and-a-half, almost three

 8   years of data.

 9           MS. DICKINSON:  Yes, Your Honor.

10           THE COURT:  And how big is the defendant?

11           MS. DICKINSON:  The defendant?  It's individuals.

12           THE COURT:  It's individuals.

13           MS. DICKINSON:  Right.  So it's Joe Loomis was the

14   former founder and owner of the company that we now own, and Jenni

15   Loomis was his -- is his sister and was his bookkeeper.  So we

16   have bookkeeping records from her is what we expect and e-mails

17   between the two of them.  As you know, we've alleged a conspiracy

18   and fraud in the sale of the company to us, to Intersections.

19           And then we would expect from him financial

20   documentation, e-mails, of course, and we have alleged that he

21   was -- that after he was hired as the CEO of Net Enforcers after

22   we bought the company, that he then went on and when he was

23   supposed to be doing work for us as the CEO, he started his own

24   business and was working on that business instead of ours and was

25   using our employees for his new business as well.

1           So there are a lot of e-mail communications that are

2   important in this case.

3           THE COURT:  And what about financial records?

4           MS. DICKINSON:  Financial records we would expect to see

5   there as well.

6           THE COURT:  Have you gotten those yet?

7           MS. DICKINSON:  Well, we've gotten some, but we don't --

8   because we don't know what's in there, we can't really tell you,

9   Your Honor.

10          THE COURT:  Well, you can't even download the bank

11  records?  Didn't they come from a bank?

12          MS. DICKINSON:  No.

13          MR. DUNLAP:  I think all the financial -- I think the

14  load files are from --

15          THE COURT:  You have to be at the lectern.

16          MR. DUNLAP:  Oh, sorry, Your Honor.

17          MS. DICKINSON:  Sorry.

18          MR. DUNLAP:  I think the financial records mostly are on

19  their side, but the bank records and all of those records have

20  been previously provided.

21          The second production, the production for Monday was 45

22  documents, and I think we've resolved that, but I think the only

23  records -- and correct me if I'm wrong -- I think the only records

24  production issue is the set of e-mails -- the 45 documents that we

25  produced, and we produced them also just without Bates stamps as a

1   backup copy in PDF by e-mail, but the load file for Jenni Loomis's

2   e-mails, and she was the bookkeeper, but I don't believe that the

3   e-mails that we produced contained financial records.  They were

4   produced by the accountant earlier in the case prior to the

5   depositions.

6          So I think all the financial records are in both

7   parties' hands.  I think we have everything, and we both

8   designated financial records as exhibits today.

9          THE COURT:  All right.  The issue about discovery is

10  really Judge Buchanan's bailiwick.

11         MS. DICKINSON:  Yes.

12         THE COURT:  I just -- because she and I have briefly

13  talked about this case, and I understand that there were a lot of

14  issues about potential sanctions that were floating around, and

15  this case came close at one point to being, as I understand it,

16  resolved by -- or at least a recommendation to be resolved as a

17  sanction, so I don't expect that there'll be any further discovery

18  problems, but if there are, you get them right before Judge

19  Buchanan.

20         In any case, are you prepared to exchange your exhibits

21  and witness lists today?

22         MS. DICKINSON:  Yes, Your Honor.  We have -- we have

23  both, I believe, filed witness lists this morning, and we have

24  provided them with two boxes of exhibits that are numbered, and it

25  looks like --

1          MR. DUNLAP:  We have ours right here, Michelle.

2          MS. DICKINSON:  They have theirs as well.

3          THE COURT:  All right, that's fine.  Then we need to go

4   ahead and set this case for trial, and is this case -- this is set

5   as a jury trial; is that correct?

6          MS. DICKINSON:  Well, Your Honor, the defendants have

7   requested a jury trial as to all matters or all claims so triable.

8   In the stock purchase agreement, which is the subject of several

9   of the claims, there's a jury waiver provision, so there are

10  certain claims that are appropriately tried before the jury, but

11  others are not.

12         THE COURT:  All right.  Well, the main thing is if a

13  jury is needed, then that, you know, to some degree affects how we

14  schedule the trial, so --

15         MS. DICKINSON:  And certainly in order to expedite

16  things, because I think this is going to be a little bit of a long

17  trial, we would be happy to waive the jury trial as to all claims

18  if the defendants would do so as well, but that's --

19         MR. DUNLAP:  Your Honor, our client is seeking a jury

20  trial still --

21         THE COURT:  That's fine.  Then we'll just go ahead and

22  do --

23         MR. DUNLAP:  -- on those claims triable by a jury.

24         THE COURT:  All right.  And how long does the plaintiff

25  think this case will take for trial if it's not resolved?

1        MS. DICKINSON:  Your Honor, in light of the fact that

2   there are claims and then there are counterclaims as well, we

3   would expect -- we have fourteen witnesses.  Five -- I'm sorry,

4   sixteen witnesses.  Five of those are deposition testimony.  So I

5   would expect that we could get the five in in maybe roughly a day

6   and a half or so, and then the other eleven, some of them we might

7   be able to get in in a half-day.

8        THE COURT:  Well, who -- which witnesses are by

9   deposition?

10        MS. DICKINSON:  The witnesses that are by deposition are

11   David Burns; Barbara Davis; Larry Heimer; Jenni Loomis and Joe

12   Loomis, the defendants; and Ross Volk.

13        THE COURT:  Well, don't you anticipate the defendants

14   are going to be here in person?

15        MS. DICKINSON:  I do anticipate they'll be here in

16   person.  I'm not sure exactly how Your Honor sets up the trial

17   when you have counterclaims, so we designated deposition excerpts

18   so that we could put that in our case-in-chief.

19        THE COURT:  I think you should call the witnesses.  My

20   experience --

21        MS. DICKINSON:  Okay.

22        THE COURT:  -- especially with a jury trial is there is

23   absolutely no substitution for the live witness.

24        MS. DICKINSON:  Oh.

25        THE COURT:  And therefore, you just call them, and if

1  they have to testify twice, they testify twice.

2        What about the other three witnesses?  Why are they by

3  deposition?

4        MS. DICKINSON:  We don't have jurisdiction over them

5  here, so they're all out of state.

6        THE COURT:  Do you have any reason to believe they won't

7  come?

8        MS. DICKINSON:  Yes.  They've told us they won't come.

9  That would be Ross Volk, Barbara Davis, and Larry Heimer.

10       THE COURT:  And have they advised you as to why they

11 won't come?

12       MS. DICKINSON:  Larry Heimer, what he has told us is

13 that he -- and I have no reason not to believe this -- he lives in

14 Arizona, he is a CPA, he has small children, and so we actually

15 had to do his deposition remotely because of his time constraints.

16       Barbara Davis has children, lives in Florida, and

17 indicated her unwillingness to show up for a trial, or her

18 displeasure at showing up for trial might be a better way.

19       And then Ross Volk is the -- is a former employee of

20 Novartis, one of the customers that cancelled in this case, which

21 is an issue in this case.  We took his deposition with the idea

22 that we would not be calling him at trial.  He lives in New

23 Jersey.

24       THE COURT:  All right.  It's been my experience that --

25 now, are you planning -- are these video depositions, or are

1   they --

2           MS. DICKINSON:  Yes, yes.

3           THE COURT:  All right.  My experience has been video

4   depositions almost never work, and so what you need to be prepared

5   for with the trial, No. 1, is I want those depositions as pared

6   down and tailored as possible --

7           MS. DICKINSON:  Okay.

8           THE COURT:  -- because the difficulty with a witness

9   who's not physically in the courtroom or being presented by a live

10  video presentation is the Court can't control it, and I have found

11  many times, especially in depositions, where there is no court

12  present to sort of move things along, that the questions are often

13  repetitive, unnecessary, etc., and so what I will require you to

14  do is have transcripts edited to be consistent with how you edited

15  your videos, and if I find that the videos are just way too slow,

16  too long, then we will switch to the old-fashioned method, with my

17  law clerk sitting in the box as the witness, reading the witness's

18  answers, and then counsel who ask the questions, you know,

19  plaintiffs' counsel or defense counsel, reading the respective

20  questions.

21          So it mimics to some degree live testimony, but it goes

22  in faster that way.

23          MS. DICKINSON:  Okay.

24          THE COURT:  So just be prepared for that.  Again, if

25  it's a phenomenally well done deposition and it's moving at the

1    right pace and you've edited it appropriately, then you may get a

2    chance to play it.

3            And you need to contact Mr. Bachman, our court AV

4    person, to talk about how -- what equipment is going to be needed

5    to play those depositions.

6            MS. DICKINSON:  Okay.  We'll do that.  Thank you, Your

7    Honor.

8            THE COURT:  All right.  But with a jury trial and the

9    plaintiff having 16 witnesses -- I mean, I can't imagine five

10   depositions by video taking a day.  That will be deadly for the

11   jury, so you need to think about that very creatively.

12           But in any case, it sounds as though this case will

13   probably take about a week to try.  Is that your estimate?

14           MS. DICKINSON:  We were actually thinking that ours

15   would take over a week, just our case.

16           THE COURT:  How much money is involved in this case?

17           MS. DICKINSON:  The amount that exchanged hands was 14

18   million.  As you are aware, we've asked for rescission -- our 14

19   million back, they get the company back.  There are punitive

20   damages at stake here as well.

21           THE COURT:  All right.  I'm not sure it would take that

22   much time, but anyway, we'll give you enough time.

23           All right, have you talked between yourselves about a

24   date?

25           MS. DICKINSON:  We have not.  My calendar is open, Your

1    Honor.

2              THE COURT:  All right.  We could do this --

3              MR. DUNLAP:  And, Judge?

4              THE COURT:  Yeah.

5              MR. DUNLAP:  I'm sorry to interrupt.  I just made a

6    couple of quick notes while Michelle was talking.  Our client says

7    that Barbara Davis will appear for live testimony.  I don't know,

8    that's what he says, so that might not be an issue.  With respect

9    to the others --

10             MS. DICKINSON:  Who?

11             MR. DUNLAP:  Barbara Davis.  That's what he said.  I can

12   talk to you about it afterwards.  I don't have the details.

13             With respect to our case, Your Honor, we believe that

14   our case, with the witnesses we have, between their witness list

15   and our witness list, it looks like there will be about 20 to 24

16   unique witnesses, depending on who's eventually called, so we

17   believe that our side of the case, with the counterclaims we have

18   pending, would take anywhere from three to four days.

19             The total that we came up with in the hallway together

20   was 13 days.  That's a really long time, obviously, but that's

21   kind of what we were thinking generally.

22             THE COURT:  Well, you'll be shocked at how fast things

23   move in this court, so I would expect a significant amount of

24   stipulations or at least a hard effort made to stipulate to facts

25   for which there really is no dispute, and we'll move the case

1  expeditiously, but I'll set enough time for this.

2          MR. DUNLAP:  And, Judge, also, Michelle just reminded me

3  of this as well, there are five experts, I think -- four experts,

4  there are four experts to testify as well, which will, you know,

5  take a significant amount of time probably.

6          THE COURT:  If I let them testify.  I mean, I can't

7  imagine four experts needed in one case.  This is not a patent

8  case.

9          MR. DUNLAP:  It's not, Your Honor, but there are some

10 distinct, discrete issues.  There's an electronic e-mail forgery

11 issue.  There's a damages issue, of course, and so we each have

12 experts for each of those issues, because they are separate

13 fields.

14          So I don't know that there will be substantial testimony

15 about the electronic issue, but, you know, there are four experts

16 just noticed.  That's all, Your Honor.

17          THE COURT:  Well, the e-mail tampering issue, how real

18 is that?

19          MS. DICKINSON:  That is as real as I am standing before

20 you, Your Honor.

21          THE COURT:  I have to tell both sides that if there is

22 any significant issue about tampering with evidence, whichever

23 side is being accused of it, if it's established, you ought to run

24 to the settlement table and resolve the case.  I've had several

25 cases where this issue has come up.  It's devastating if there's

1   any significant evidence that supports the claim.

2            Haven't you tried one effort to settle this case?  Have

3   all the disputes been with --

4            MR. DUNLAP:  We have a mediation scheduled for Monday,

5   Your Honor.

6            THE COURT:  With Judge Buchanan?

7            MS. DICKINSON:  Yes.

8            MR. DUNLAP:  Yes, Your Honor.

9            THE COURT:  Again, this might be the one issue to really

10  focus on, because as I said, it is a smoking gun of amazing

11  proportion, and I've seen some very smart people get themselves

12  into real trouble because they were too clever and they fudged the

13  documents or they fudged the e-mails and it comes back to haunt.

14           I can't prejudge the issue, I don't know what your

15  evidence is, but if it's there, then wise counsel need to sit down

16  with the client and do damage control.

17           Judge Buchanan, I know, has a great deal of familiarity

18  with this case, so I would expect that both parties will take the

19  settlement conference seriously.  I assume the principals will all

20  be present at the conference?

21           MS. DICKINSON:  Yes, Your Honor.

22           MR. DUNLAP:  Yes, Your Honor.

23           THE COURT:  All right.  Well, that's good.

24           All right.  In any case, if the case does not settle, is

25  there an expectation of dispositive motions, or are there too many

1  factual issues in dispute to make sense to try to file --

2         MS. DICKINSON:  Well, Your Honor, you had mentioned the

3  stipulation of facts, and the defendants in this case won't even

4  stipulate to the fact that there was an employment agreement or a

5  stock purchase agreement at this point, so --

6         THE COURT:  I'm sorry?

7         MS. DICKINSON:  Sorry.

8         THE COURT:  Yeah.

9         MS. DICKINSON:  They won't even stipulate to the fact

10  that there was an employment agreement or a stock purchase

11  agreement in this case, even though those are the bases for two of

12  their claims against our clients.  So, you know, our stipulation

13  of facts is about a page and a half/two pages that we filed this

14  morning, as opposed to what I would expect would be more like ten.

15         THE COURT:  All right.  Well -- and again, it's been my

16  experience where there are obvious facts and one side is refusing

17  to stipulate to them, that suggests that there's a real problem

18  with that particular side of the case, but I'm not going to get

19  into the merits of that right now.

20         But the answer is you don't at this point anticipate at

21  least from the plaintiffs' side filing dispositive motions?

22         MS. DICKINSON:  Not a dispositive motion, Your Honor,

23  just because of that fact, but we do expect to be filing a

24  spoliation motion.

25         THE COURT:  All right.  Do you want to respond to that

1  at all yet?

2        MR. DUNLAP:  Sure.  Your Honor, we for our part, and

3  we've been talking to them about this, but we feel there's a

4  spoliation motion on our side as well with respect to their client

5  and a certain e-mail box.

6        Likewise, with respect to the -- I think there's an

7  issue with authenticating the asset purchase agreement.  There are

8  counterclaims that were filed by previous counsel and --

9        THE COURT:  Weren't there problems with previous counsel

10  in this case?

11        MR. DUNLAP:  I believe there were problems with previous

12  counsel.

13        THE COURT:  It might suggest -- I'm not saying it's the

14  case -- it might suggest that you as the counsel of record, you're

15  the one who's on the hook --

16        MR. DUNLAP:  Absolutely, Your Honor.

17        THE COURT:  -- need to review under Rule 11 --

18        MR. DUNLAP:  Judge, I'll tell you this up front and we

19  told counsel this today, that we're withdrawing the counterclaims

20  with respect to the asset -- well, we've advised our client to do

21  that with respect to the asset purchase agreement.

22        MS. DICKINSON:  Stock.

23        MR. DUNLAP:  Stock purchase agreement, I'm sorry, stock

24  purchase agreement.  So --

25        THE COURT:  What would that leave then in terms of the

1   counterclaim?

2        MR. DUNLAP:  There's a wrongful termination claim that's

3   left, Your Honor, so it reduces, I guess, significantly in terms

4   of counterclaim time what we would need, but it's our -- we

5   anticipate that our client will agree to this.

6        We've stepped into a client that I've actually never met

7   yet, because we've only been in the case 30 days, and we were kind

8   of -- I don't know if you read Judge Buchanan's order, but we were

9   kind of put in the position of having to be in the case and

10  originally had just been local counsel, so --

11       THE COURT:  Never use that modifier of only local

12  counsel.

13       MR. DUNLAP:  I understand.  I absolutely understand,

14  Your Honor.

15       THE COURT:  All right.

16       MR. DUNLAP:  And that's why we're here today before you,

17  Your Honor, and smiling, but we anticipate withdrawing those

18  counterclaims, so --

19       THE COURT:  Well, hopefully, your client listens to you,

20  and you listen carefully to particularly Judge Buchanan, who knows

21  this case far better than I.  In any case, the spoliation motions

22  ought to be resolved.  If you don't settle, those motions ought to

23  get docketed quickly --

24       MS. DICKINSON:  Okay.

25       THE COURT:  -- because the resolution of those motions

1  again might put the case in a very different posture pretrial, all

2  right, and/or set it up for a different type of settlement

3  approach.

4          MR. DUNLAP:  All right.

5          THE COURT:  But in any case, you know, perhaps you won't

6  have to get to that point if you can, if you can resolve it.

7          We'll set this case for late February.  I have the week

8  of March 1 and March 8 are completely open, so do those work on

9  your calendars?  We would start on Monday, March 1.

10          MS. DICKINSON:  I'm sorry, Your Honor, I didn't hear the

11  date.

12          THE COURT:  Monday, March 1.

13          MS. DICKINSON:  Okay.

14          THE COURT:  That works well on my calendar because it,

15  the second week is also completely open.

16          MR. DUNLAP:  Your Honor, March 8 would be better for us.

17          MS. DICKINSON:  Your Honor, either works for us,

18  assuming that you have enough time if you started it March 8.  I

19  thought you were saying that you only had --

20          THE COURT:  No, no, March 1 is better for the Court,

21  because I know that I have all of the week of March 8 completely

22  open.

23          MS. DICKINSON:  That's great with us, Your Honor.

24          MR. DUNLAP:  Okay.  Your Honor, March 1 will work.

25          THE COURT:  All right, that's fine.  And that will be at

1  10:00 at this point with a jury.

2          MS. DICKINSON:  Your Honor, how does that work in your

3  courtroom, when you have claims that are being tried to the jury

4  as well as claims that are being tried to Your Honor?

5          THE COURT:  Well, the only claim then -- if the asset

6  purchase agreement counterclaim issue is out, then the only issue,

7  as I understand it, left in the counterclaim is one of wrongful

8  termination; is that right?

9          MR. DUNLAP:  That's correct, Your Honor.

10         THE COURT:  And that's the only issue for which a jury

11 trial has been requested.

12         MS. DICKINSON:  We have a --

13         MR. DUNLAP:  They have a request as well.

14         MS. DICKINSON:  We have a breach of employment agreement

15 claim as well that would be -- if their employment claim is going

16 to be tried before the jury, we would want to do that as well,

17 Your Honor, and we also have conversion and tortious interference

18 claims which would be proper to put in that bailiwick in front of

19 the jury.

20         Then it would be the stock purchase agreement claims,

21 the fraud, the securities fraud, and the breach of contract that

22 would go before your Your Honor.

23         THE COURT:  Well, there are two ways of doing it.  I

24 mean, we're not going to bifurcate the case, because there's going

25 to be too much overlap of evidence.  So we would simply try the

1   whole case to the jury basically, and I probably would let the

2   jury do an advisory verdict.  That's what a lot of judges do.

3   And, you know, I can decide the case as well, but since we're

4   going to have a jury here, we can just have them hear the whole

5   thing.

6          MS. DICKINSON:  Okay.

7          THE COURT:  All right?

8          MS. DICKINSON:  Thank you, Your Honor.

9          THE COURT:  And -- so it won't change anything.  In

10  terms of, you know, we'll address the issue about jury

11  instructions and that sort of thing down the road, but it -- so

12  the trial would just go through sort of seamlessly in that

13  respect, all right?

14         MS. DICKINSON:  Thank you.

15         THE COURT:  All right.  So we're set to start this case

16  with a jury on Monday, March 1.  Depending upon how the trial is

17  going, you should expect to be here for those trials days until

18  6:00, and probably we'll start them at 9:30 in the morning after

19  the first day.

20         Whether we hold court on Friday, March 5, is going to

21  depend to some degree where I feel we are on the schedule.

22  Frequently, while evidence is being taken, because we have our

23  motions dockets on Friday, we often don't have our jury trials

24  continued on Fridays.  Sometimes, though, for scheduling reasons,

25  we do, so you just have to keep your calendars open for Fridays as

1  well, although you could count on not having to be here Friday

2  morning, certainly not Friday morning the 5th.

3          If the jury has the case and they're deliberating, they

4  can deliberate while I'm holding a motions docket, so then you

5  might have to be here on the 12th in the morning.  I know that

6  some of you have motions hearings in other courts on Friday

7  mornings here in Virginia especially.

8          So just understand the 5th you can comfortably go

9  someplace in the morning; we might or might not have the trial in

10 the afternoon here; but the 12th you'd better sort of block out,

11 because if the jury is deliberating at that point, you'd have to

12 be here in the morning, all right?

13         Anything further on this case?

14         MR. DUNLAP:  There's nothing further from the defendant,

15 Your Honor.

16         MS. DICKINSON:  Your Honor, two things, I believe.

17         THE COURT:  Yes.

18         MS. DICKINSON:  With respect to the spoliation motion,

19 do you want us to just -- do you want to set a deadline, or we'll

20 just file them as soon as possible?

21         THE COURT:  I'm here all the Fridays between now and

22 that trial, so just you go ahead and work it out in terms of a

23 date that's good for both of you.  I recommend, however, that the

24 earlier that issue gets resolved, it will put the trial in a

25 different context.  So don't push it right up against the trial

1    date, all right?

2            MS. DICKINSON:  Okay.  And my other question, Your

3    Honor, was with respect to jury instructions, do you have -- are

4    there any standard instructions or any format --

5            THE COURT:  We use the standard federal, you know,

6    Sand's or the old -- Sand's or O'Malley.  I don't know, are there

7    any state law issues in this case?  What --

8            MS. DICKINSON:  The employment agreement is under state

9    law.

10           THE COURT:  Which, the law of which state?

11           MS. DICKINSON:  I think it's Delaware.

12           MR. DUNLAP:  I think it's Delaware.

13           MS. DICKINSON:  I'm so sorry that that has slipped my

14   mind.

15           THE COURT:  All right.

16           MS. DICKINSON:  Three hours of sleep, I'm tired.

17           THE COURT:  Yeah.  Just make sure that if there's any

18   issues about which law applies --

19           MS. DICKINSON:  Okay.

20           THE COURT:  I mean, you know, I wouldn't have Delaware

21   instructions here.  I don't know how different, if at all, they

22   are from Virginia instructions, but those issues you need to get

23   resolved, all right?

24           MS. DICKINSON:  We will.  Thank you very much, Your

25   Honor.

1          THE COURT:  All right, very good.

2          MR. DUNLAP:  Thank you, Your Honor.

3                         (Which were all the proceedings

4                          had at this time.)

5

6                    CERTIFICATE OF THE REPORTER

7      I certify that the foregoing is a correct transcript of the

8  record of proceedings in the above-entitled matter.

9

10

11                                      /s/
                               _____
12                               Anneliese J. Thomson

13

14

15

16

17

18

19

20

21

22

23

24

25