UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| INTERSECTIONS INC. and | . | Civil Action No. 1:09cv597 |
| NET ENFORCERS, INC., | . | |
| | . | |
| Plaintiffs and | . | |
| Counter-Defendants, | . | |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | September 3, 2010 |
| JOSEPH C. LOOMIS, | . | 10:08 a.m. |
| | . | |
| Defendant and | . | |
| Counter-Plaintiff, | . | |
| | . | |
| and | . | |
| | . | |
| JENNI M. LOOMIS, | . | |
| | . | |
| Defendant. | . | |
| | . | |

. . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

<u>APPEARANCES</u>:

FOR THE PLAINTIFFS/          MICHELLE J. DICKINSON, ESQ.
    COUNTER-DEFENDANTS:      DLA Piper LLP (US)
                            6225 Smith Avenue
                            Baltimore, MD 21209


FOR DEFENDANT/COUNTER-       TIMOTHY J. McEVOY, ESQ.
    PLAINTIFF JOSEPH C.      Cameron McEvoy, PLLC
    LOOMIS:                  11325 Random Hills Road
                            Suite 200
                            Fairfax, VA 22030
                              and
                            EMIL W. HERICH, ESQ.
                            Keats McFarland & Wilson LLP
                            9720 Wilshire Boulevard
                            Penthouse Suite
                            Beverly Hills, CA 90212


(Proceedings recorded by electronic sound recording, transcript
produced by computerized transcription.)

TRANSCRIBER:               ANNELIESE J. THOMSON, RDR, CRR
                                    U.S. District Court, Fifth Floor
                                    401 Courthouse Square
                                    Alexandria, VA 22314
                                    (703)299-8595

P R O C E E D I N G S

1

2          THE CLERK:   Intersections Inc., et al. v. Joseph C.

3   Loomis, et al., Case No. 09cv597.

4          THE COURT:   Good morning.

5          MS. DICKINSON:   Good morning, Your Honor.

6          THE COURT:   Good morning.

7          MR. McEVOY:   Good morning, Your Honor.

8          THE COURT:   Would you-all identify yourselves for the

9   record, please.

10          MS. DICKINSON:   I'm sorry?

11          THE COURT:   Would you identify yourselves for the

12   record, please.

13          MS. DICKINSON:   Michelle Dickinson for the plaintiffs,

14   Intersections Inc. and Net Enforcers, Inc., Your Honor.

15          THE COURT:   Good morning.

16          MR. McEVOY:   I have a feeling of déjà vu.   Your Honor,

17   I'm Tim McEvoy for Mr. Loomis.   With me is Mr. Herich --

18          THE COURT:   Right.

19          MR. McEVOY:   -- who's been admitted by Judge Brinkema

20   pro hac and is apparently the object of today's proceeding.

21          THE COURT:   Right.   Okay.   I've read the pleadings.   Did

22   you have anything to add, Ms. Dickinson?   And I saw the reply.

23          MS. DICKINSON:   Okay.   Your Honor, just for a little bit

24   of context, I just wanted to make sure the Court was -- the Court

25   understands that we were very reluctant to bring this motion

1   today, because we understand that every time Mr. Loomis hires new

2   counsel and that counsel picks up a pen, that further depletes the

3   bankruptcy estate, which is a huge issue for us, because we feel

4   that our client is entitled to it, but there is a conflict of

5   interest here, and it's our clients' conflict of interest to

6   waive, and the plaintiffs in this case are not willing to waive

7   that conflict of interest.

8           With thousands of attorneys in the United States at

9   Mr. Loomis's disposal, it's not clear to us why he has chosen a

10  law firm that is so intricately involved in the underlying issues

11  in this case, having represented Mr. Loomis at the acquisition and

12  having this ongoing business relationship with Net Enforcers even

13  up until today related to certain issues that are in dispute in

14  this case.

15          So we would just ask the Court to disqualify Mr. Herich

16  and his law firm, Keats McFarland.

17          THE COURT:  All right.  Did you have anything to add to

18  your opposition?

19          MR. HERICH:  Yes, I do, Your Honor.  Very briefly, Your

20  Honor, it's an honor to be here.  Thank you.

21          THE COURT:  Okay.  Good morning.  Can you pull that

22  microphone just a little closer?

23          MR. HERICH:  Sure.

24          THE COURT:  You're pretty tall.

25          MR. HERICH:  I actually grew up in Falls Church and

1   Bailey's, went to Bailey's Elementary School, Glasgow Junior High,

2   got into J.E.B. Stuart High School.  I almost had the opportunity

3   to practice here.  I was accepted to the University of Virginia

4   Law School.  My dad was a Marine Corps officer, so I ended up in

5   the West Coast, but thank you, Your Honor.

6           THE COURT:  Um-hum.

7           MR. HERICH:  I also want to let the Court know I've been

8   practicing since 1984.  I've never been accused of an ethical

9   violation.  I've never had a motion to disqualify brought against

10  me.

11          Your Honor, I also want to point out that Mr. Loomis has

12  a right to counsel of his choice, and for better or worse, that's

13  me.  In terms of -- in terms of what has been said, Your Honor,

14  much of it isn't true.  There's absolutely no evidence, Your

15  Honor, that Keats McFarland, the firm I'm of counsel to, had an

16  attorney-client relationship with NEI, and when I say that, Your

17  Honor, I mean we have offered declarations from Mr. McFarland of

18  Keats McFarland saying there was no such relationship other than

19  the one case, the lawsuit that was in the Northern District of

20  California, Odesk Corporation, *NEI v. Odesk*, which dealt with a

21  vendor.

22          What happened in that case, Your Honor, NEI had hired a

23  company to develop software for NEI.  It was supposed to be secret

24  software.  That vendor put it on the Internet.  NEI sued the

25  vendor.  The case was transferred from Arizona to California,

1   where KMW acted as local counsel, and the case was settled, the

2   case was dismissed with prejudice.

3          That's the only time KMW has been counsel for NEI, and I

4   have a supplemental declaration from Mr. McFarland.  I also have a

5   copy of the complaint in that case, Your Honor, I'd like to tender

6   to the Court.

7          THE COURT:  All right.  Give it to the courtroom deputy.

8          MR. HERICH:  Moving along, Your Honor, the reply

9   papers -- and I'd like to make a technical objection, Your Honor.

10  Their motion to disqualify was brought two weeks ago.  I asked the

11  Court and I asked -- first I asked counsel to continue it for a

12  week.  They refused to do that.  We had a motion to continue --

13         THE COURT:  Well, I did continue it for a week.

14         MR. HERICH:  You did, Your Honor.  And so the reply

15  paper that's before your Court was filed yesterday, Your Honor,

16  the day I was getting on the plane.

17         THE COURT:  Right.

18         MR. HERICH:  One of the things I'm required to do as pro

19  hac counsel is to read the local rules of the Court.  I've done

20  that.  Local rule 7(F) indicates that their papers were supposed

21  to be filed three days after our papers were filed.  Ours were

22  filed last Wednesday.  Theirs were due on Monday.  They filed them

23  the day before.

24         THE COURT:  It's not exactly that way.  It's a Friday

25  and then the opposition -- you have to have a motion filed by

1  Friday.  The opposition is due by Wednesday.  We usually hear

2  replies on Thursday -- see the replies on Thursday before the

3  Friday motion, but I continued it, and, you know, we move so fast

4  that, frankly, even when I get a reply brief in on Friday morning

5  early or if I get an opposition in Thursday morning, I read it,

6  and that's what I'm doing here, and I think it's not

7  inappropriate.

8           MR. HERICH:  Very good, Your Honor.

9           THE COURT:  I mean, I gave you a week, and I can give

10  them a couple of days to file it and make an additional reply.

11           MR. HERICH:  Well, to be fair, Your Honor, we got three

12  days.  They filed on a Friday.  It was my birthday that weekend.

13  I had my opposition in by Wednesday.  Their reply didn't come in

14  until the following Thursday.

15           THE COURT:  Right.

16           MR. HERICH:  And, Your Honor, we also object to the

17  documents.  If you look at the documents, they're all hearsay.

18  None of them are authenticated, which goes back to my first point.

19  It would have been very easy for them to submit a declaration from

20  somebody at NEI stating:  NEI and KMW have an attorney-client

21  relationship.  We, NEI, have transmitted confidential information

22  to KMW pursuant to that relationship.

23           No declarations, nothing but unauthenticated hearsay

24  documents, Your Honor.

25           Now, the one document -- they give you numerous

1  documents, and if you look at the dates, which are key, Your

2  Honor, they're all in a period of time prior to November of 2007.

3  Now, what happened in November 2007, all the preliminary

4  discussions about what the relationship between KMW and NEI would

5  be merged into a document, Your Honor.  It merged into a service

6  agreement, a signed service agreement, Your Honor, that sets forth

7  the relationship.  The Court needs to ask itself why haven't they

8  produced that document?

9          It's a confidential document, Your Honor.  I have it

10  here under seal.  I'd like to submit it to the Court, because it

11  sets forth the relationship between NEI and KMW.

12          THE COURT:  Do you have any objection to this being

13  filed under seal?

14          MS. DICKINSON:  I have no objection at all, Your Honor.

15          THE COURT:  Okay.

16          MS. DICKINSON:  Thank you.

17          MR. HERICH:  Thank you, Your Honor.

18          And I'd like the Court, again, because this is my

19  reputation on the line and it's also my ability to come back here,

20  Your Honor, I'd like to -- the Court can peruse it to its heart's

21  content.  I'd like the Court to look at the first page and the

22  signature page, because those are the key parts of the document.

23          THE COURT:  All right, I see it.

24          MR. HERICH:  Your Honor, what's key here, also, and if

25  the Court remembers that ad, it was a cute ad where the three

1    little old ladies would gather around a hamburger and this really

2    small piece of meat and they kept saying, "Where's the beef?

3    Where's the beef?"  It was a very cute ad, Your Honor.  It's

4    pertinent here for this reason:  Everything that they're talking

5    about, all the communications between KMW and NEI were

6    communications with Joe Loomis and KMW.

7           Your Honor, if the Court looks at the signature page of

8    that document, which they've represented sets forth confidential

9    information that warrants my disqualification, the Court's going

10   to see that document was signed by Joe Loomis.  Joe Loomis is my

11   client, Your Honor.

12          There's no risk of confidential information coming from

13   NEI to KMW that would, that would be an unfair relationship,

14   because Mr. Loomis has the information.  Does the Court understand

15   my point on that?

16          THE COURT:  Yes, I do.

17          MR. HERICH:  Okay.  It's -- you know, normally the rule

18   is you don't want to have a former client divulge information to,

19   to a lawyer to assist a new client that doesn't have access to

20   that information, because that's unfair, you shouldn't be allowed

21   to use information, you have a duty of loyalty to that client, you

22   shouldn't be allowed to use confidential information to assist a

23   client, but where the other client you're representing is the

24   client that had the -- was the genesis of the attorney-client

25   relationship, to the extent there was one, there's no risk of

1  confidential information.

2        Joe Loomis -- every document that you see part of the

3  reply Joe Loomis is involved in except for the ones where we

4  don't -- have no idea who created them.

5        THE COURT:  But he was -- this is not a personal

6  contract with Joe Loomis.  This is on behalf of Net Enforcers,

7  Inc.

8        MR. HERICH:  That's right, Your Honor, which leads me to

9  my next point.  If the Court looks at it, I think the Court will

10  see it talks about an independent contractor relationship, Your

11  Honor.  So first of all, there is no attorney-client relationship.

12  How do we know that?  Mr. McFarland has told you that twice now.

13  They have produced no declaration, no evidence saying there was

14  one.

15        No. 2, Mr. McFarland has also provided you with a

16  declaration saying he received no confidential information related

17  to this case from Net Enforcers.  They provided no declaration

18  that says there is -- that such information was passed.

19        No. 3, if any confidential information is involved, it's

20  all information that Joe Loomis knows himself, and there's no risk

21  of us obtaining it from Net Enforcers.

22        And finally, Your Honor, I'm going to close on this,

23  Your Honor has been around the block a long time.  It's easy to

24  understand, to figure out if there's an attorney-client

25  relationship.  I mean, how would you prove that, Your Honor, if

1  you wanted to do it?  Well, you would submit the retainer

2  agreement between, between the client and the attorney, right?

3  That would be proof that there was a relationship.  They haven't

4  submitted a retainer agreement.

5      Okay.  Maybe there was a retainer agreement.  You would

6  submit log bills, bills from our firm, from KMW to NEI

7  establishing that legal services were performed.  They haven't

8  submitted one single bill because there were no bills, and KMW

9  never received any money from NEI.

10      Okay.  You would also show work product, wouldn't you,

11  to show that we represented them?  They submitted no work product.

12  All they have is a bunch of e-mails and unauthenticated documents,

13  all that predate the written, signed agreement that defines the

14  relationship as an independent contractor relationship, Your

15  Honor.

16      I thank you for giving me the time to make this

17  argument.

18      THE COURT:  But you represented Intersections Inc. --

19      MR. HERICH:  No.

20      THE COURT:  Well, hold on.  I haven't finished my

21  sentence.

22      MR. HERICH:  I'm sorry, Your Honor.

23      THE COURT:  Prior to the acquisition or sale by Loomis,

24  did you not?

25      MR. HERICH:  No.  We never represented Intersections

1  Inc., Your Honor, never.  And they never claimed that we did.

2  They claim we represented Net Enforcers, which was Mr. Loomis's

3  company.

4            THE COURT:  Sorry.  Right, sorry.

5            MR. HERICH:  No.

6            THE COURT:  I meant to say that, Net Enforcers, rather.

7            MR. HERICH:  Well, I want to be precise.  We represented

8  Net Enforcers in the Odesk Corporation matter, and that's Exhibit

9  A to Mr. McFarland's complaint.  That was the complaint filed in

10  Arizona, transferred to the Northern District of Arizona (sic),

11  and then settled with prejudice.

12            There is no confidential -- the rule comes back and I

13  agree with them on their law, which is if the representations

14  involved substantially the same matters, there's a presumption

15  that confidential information was transferred to the attorney.

16            The Odesk matter, the only time we represented Net

17  Enforcers, there's no relationship to this case.

18            THE COURT:  Okay.

19            MR. HERICH:  And, Your Honor, it even goes deeper than

20  that, because if you look at it, you know, again, their lawsuit

21  has to do with the rescission of, you know, basically what

22  representations were made, securities violations, all sorts of

23  wrongdoing by Mr. Loomis and Jenni Loomis that culminated in the

24  sale of the -- of Net Enforcers.

25            Our agreement with them is dated at or about the time of

1    sale.  I mean, you know, there's no -- you know, we weren't

2    involved any further in that.  Mr. McFarland didn't have any

3    information regarding that.

4              THE COURT:  All right.

5              MR. HERICH:  They also make the argument -- and, Your

6    Honor, this is another point:  One of the documents attached to

7    the reply is a draft -- and it's labeled "Draft" -- checklist that

8    indicates we were supposed to perform some services relevant to

9    the closing, and I think that might have caught Your Honor's

10   attention.

11             If you look at that document, the services that we were

12   performing were to draft fee agreements with our client, Sony, and

13   those sort of things, and to prepare the service agreement which

14   is in front of Your Honor.  We were not involved in the closing of

15   that document.

16             Your Honor, if you go on KMW's Web site, we are an

17   intellectual property law firm.  We are not a corporate law firm.

18   We're not a merger and acquisition firm.  That's not the work we

19   do.

20             We did not have any involvement in that closing, Your

21   Honor, other than to provide at Mr. Loomis's request, provide

22   written fee agreements with Sony and our clients and to prepare

23   the service agreement that's in front of Your Honor.

24             Thank you, Your Honor.

25             THE COURT:  All right, thank you.

1          Did you have any, did you have any argument?

2          MR. McEVOY:  No, Your Honor.

3          THE COURT:  All right.  You don't need to, I don't

4    think.

5          Did you have anything to add, Ms. Dickinson?

6          MS. DICKINSON:  Yes, thank you, Your Honor.  Briefly,

7    Your Honor, there are two issues before the Court as I see it.

8    There's the attorney-client relationship that was in place before

9    the acquisition, which I do understand that the principal partner

10   for Keats McFarland has submitted to this Court a sworn

11   declaration saying there was no such thing except for the Odesk

12   matter.

13          I believe that the documents that we have attached as

14   exhibits speak for themselves.  To the extent there's some concern

15   as far as authentication, these documents except for the very

16   first one were produced by Joe Loomis himself, hence, the "JL"

17   Bates stamp at the bottom of the documents.

18          The first document shows that Joe Loomis -- sorry, that

19   Keats McFarland was representing Joe Loomis -- sorry, let me try

20   that again -- that Keats McFarland was representing Net Enforcers

21   at the time that they were shopping Net Enforcers around trying to

22   find a buyer.

23          The second document shows that in a presentation about

24   Net Enforcers to Intersections when they were trying to put

25   together a deal, Keats McFarland was represented by Net Enforcers

1   as being their counsel.  That document was produced by Joe Loomis.

2            In the next document, Exhibit 3, an August 21, 2007

3   e-mail, Joe Loomis specifically refers to Keats McFarland as his

4   general counsel and outside counsel to a prospective client.

5            In Exhibit 4, which I think is the most telling and is

6   the most concerning to me personally and as -- as a member of the

7   bar, it is an e-mail with Mr. McFarland himself advising

8   Intersections that he and his law firm do, in fact, represent Net

9   Enforcers with respect to the acquisition and a cease and desist

10  letter process.

11           Somewhere along the way, somebody is not being truthful

12  to the Court, Your Honor, or they were not being truthful at the

13  time of the acquisition.

14           THE COURT:  All right, thank you.

15           MR. HERICH:  A brief response, Your Honor?

16           THE COURT:  All right, briefly.

17           MR. HERICH:  First, Your Honor, at least in California,

18  the fact that a party -- when you get a request to produce, that

19  requires you to produce all documents in the category being

20  requested.  That doesn't authenticate documents.

21           There's no declaration, no evidence authenticating --

22           THE COURT:  You've got to be kidding me.  Do you dispute

23  these are authentic documents?

24           MR. HERICH:  Yes, Your Honor, some of them to the extent

25  that they're claiming that we produced them.

1          THE COURT:  Which one?  How about No. 4?

2          MR. HERICH:  Well, let's go through them, Your Honor.

3          THE COURT:  No. 4, do you --

4          MR. HERICH:  Well, let's start with No. 1.

5          THE COURT:  Let's start with No. 4.  Do you dispute

6   that?

7          MR. HERICH:  Where is that, Your Honor?

8          THE COURT:  No. 4 to their reply.

9          MR. HERICH:  Your Honor, I'm not -- I can't authenticate

10  that document.  I'm not going to dispute it for the Court --

11         THE COURT:  All right.

12         MR. HERICH:  -- but I will point out that's another

13  document, let's see, it's dated October 12, 2007, and they are

14  talking about the manner in which this is going to be done.  For

15  instance, the e-mail goes, "Larry, I have included John and Neal

16  on this e-mail to confirm a few things so we can proceed with next

17  steps" --

18         THE COURT:  ". . . proceed with next steps with the

19  acquisition of Net Enforcers."

20         MR. HERICH:  Right.  And what happened, Your Honor, is

21  they discussed -- there was discussions of KMW being counsel for

22  NEI in this letter writing service.  It never occurred.  That

23  representation didn't occur.

24         THE COURT:  Well, it says "the acquisition."

25         MR. HERICH:  Your Honor, I'm sorry, it says, "I have

1   included John and Neal on this e-mail" so we can confirm -- "so we

2   can proceed with next steps with the acquisition of Net

3   Enforcers," okay?

4           Then it says, "KMW is retained outside counsel for Net

5   Enforcers."

6           Apparently, that was being contemplated as of October

7   12, 2007, and then in the document in front of Your Honor, the

8   November 2007 letter, it specifies what the relationship was, and

9   I've already told the Court and Mr. McFarland could come out here

10  and testify to the same thing, the only involvement KMW had in the

11  closing or in the acquisition was to come forward with client

12  letters with its clients, which were Sony, which were the various

13  companies, Your Honor.

14          THE COURT:  Um-hum.

15          MR. HERICH:  Not with Net Enforcers.  There's no

16  document indicating -- Your Honor, these are all sophisticated

17  attorneys, sophisticated clients.  There would have been a

18  retainer agreement -- I have one with my clients; I'm sure they

19  have one with their clients -- indicating that we were

20  representing them.

21          Where's the retainer agreement, Your Honor?  Where's the

22  bill?  Where's the evidence that we performed work?

23          All these are e-mails discussing work to be done in the

24  future.

25          THE COURT:  Okay.

1          MR. HERICH:  And it still is hearsay, Your Honor.

2          THE COURT:  All right.  Well, let me lay a few things to

3   rest.  First as to whether or not I can even hear this motion,

4   either you can't enter your appearance, or I can't hear the

5   motion.  You can't have it both ways.  So I find that I can hear

6   this motion.

7          I don't think that the -- especially when I still have

8   an R&R that's outstanding there, the case is ongoing for those

9   purposes, and for a hearing to disqualify counsel, it is

10  appropriate that I hear that despite the bankruptcy stay.

11         I also find that there is no distinction between being

12  of counsel to a firm or being a partner or an associate or

13  anything else.  I don't think that that's a material difference in

14  terms of disqualification.

15         Now, I -- there are a number of factors that I think

16  persuade me to rule as I'm going to:  first, that you are on the

17  defendant's witness list for trial purposes, the fact that these

18  documents -- and I, I understand that you say you dispute some of

19  them, but No. 4 you say you don't know, but you don't have any

20  reason to think it's a false document, as I understand it, but I

21  don't see any reason to think that these documents that have been

22  presented by counsel as a member of the bar of this Court are

23  anything but true documents and that they were produced by Joe

24  Loomis, and there's no reason to think that they'd be accurate

25  documents.  I think there's just no reason to think that it's not.

1        And I think that the Keats McFarland's representation of

2    NEI and, obviously, the business relationship between Keats

3    McFarland and NEI/Intersections Inc., although it may have been

4    limited in recent years, there was substantial involvement, I

5    think, by the firm prior to that, and although the documents may

6    have been signed on behalf of Joe Loomis, he was not signing them

7    for his personal representation.  This was on behalf of the

8    company and around the time of and it seemed to be involved with

9    the acquisition, and I don't see how the information that, that

10   Keats McFarland or you got from NEI would not pose a conflict

11   here.  I think it does, and I think that the conflict here is the

12   plaintiffs' to waive, and they obviously do not waive it.

13       So I think there's a conflict, and I don't think there's

14   any way to get around it, and I'm going to grant the motion to

15   disqualify.  You'll get an order today.

16       MS. DICKINSON:  Thank you, Your Honor.

17       THE COURT:  All right.  Now, the R&R is ongoing.  I'm

18   hoping it will be out in a week or so, or so.  It may be in about

19   ten days, all right?

20       MR. McEVOY:  Have a nice weekend.

21       MS. DICKINSON:  Thank you, Your Honor.

22       THE COURT:  Thank you.

23       MR. HERICH:  Thank you, Your Honor.

24                    (Which were all the proceedings

25                     had at this time.)

1                    CERTIFICATE OF THE TRANSCRIBER

2          I certify that the foregoing is a correct transcript from the

3     official electronic sound recording of the proceedings in the

4     above-entitled matter.

5

6                                        _____
                                                    /s/
7                                             Anneliese J. Thomson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25