1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

INTERSECTIONS INC. and          .          Civil Action No. 1:09cv597
NET ENFORCERS, INC.,            .
                                .
          Plaintiffs,           .
                                .
     vs.                        .          Alexandria, Virginia
                                .          February 17, 2011
JOSEPH C. LOOMIS and            .          10:49 a.m.
JENNI M. LOOMIS,                .
                                .
          Defendants.           .
                                .
.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE PLAINTIFFS:          MICHELLE J. DICKINSON, ESQ.
                             DLA Piper LLP (US)
                             6225 Smith Avenue
                             Baltimore, MD 21209


FOR DEFENDANT JOSEPH C.      TIMOTHY J. McEVOY, ESQ.
    LOOMIS:                  Cameron McEvoy, PLLC
                             11325 Random Hills Road
                             Suite 200
                             Fairfax, VA 22030


FOR DEFENDANT JENNI M.       EUGENE W. POLICASTRI, ESQ.
    LOOMIS:                  Bromberg Rosenthal LLP
                             401 N. Washington Street, Suite 500
                             Rockville, MD 20850


OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

(Pages 1 - 23)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

P R O C E E D I N G S

1       THE CLERK:  Civil Action 09-597, Intersections Inc., et

al. v. Loomis, et al.  Would counsel please note their appearances

for the record.

     MR. McEVOY:  Good morning, Your Honor.  Tim McEvoy for

Mr. Loomis.  I apologize for being about four minutes late.  I got

stuck in traffic.

     THE COURT:  Well, you paid the price.  I was going to

call your case first, but anyway, I'm glad you're here,

Mr. McEvoy.

     MR. McEVOY:  Thank you.

     MR. POLICASTRI:  Good morning, Your Honor.  Gene

Policastri on behalf of Jenni Loomis.  I was stuck in the same

traffic.

     THE COURT:  And have you asked to withdraw from the

case?

     MR. POLICASTRI:  I did.  I filed a motion yesterday.

     THE COURT:  All right, we'll get with that in a second.

     MR. POLICASTRI:  Thank you.

     MS. DICKINSON:  Good morning, Your Honor.  Michelle

Dickinson for Intersections and Net Enforcers.

     THE COURT:  All right.  Now, this is before the Court on

Joseph Loomis's motion seeking a scheduling conference prior to

the scheduling of any motions, etc., and of course, that's what

this is today.

1          MR. McEVOY:  Yes, Your Honor.

2          THE COURT:  We're having that conference.

3          Mr. McEvoy, you indicated in your motion which was filed

4   on February 10 that you were expecting some clarification about

5   the monetary situation within two weeks.

6          MR. McEVOY:  Yes.

7          THE COURT:  Have you any further --

8          MR. McEVOY:  I am pleased to report actually that there

9   is process.  Yesterday, Gerald Smith of, I believe the firm is

10  Lewis and Roca, a very reputable firm in Phoenix, filed a motion

11  to approve a settlement of a claim that was being brought for -- a

12  preference claim against a third party in California.

13         There's also filed a motion to expedite hearing on that

14  matter, so therefore, I would expect -- and then payment is due

15  within 48 hours under the settlement agreement if the bankruptcy

16  court approves the settlement as I expect, and we've ask the court

17  to approve at least some of those funds to be used to, to

18  replenish the original trial retainer that we consumed in the year

19  of litigation about the settlement agreement.

20         So I believe in less than 15 days or in or about 15

21  days, that issue will be resolved.  You know, I wish it were

22  completely resolved today, but I think the representations in my

23  paper were accurate.

24         THE COURT:  Is the plaintiff Intersections Inc. the only

25  debtor in that bankruptcy?

1          MR. McEVOY:  There is at least one other one, Your

2   Honor, and I'll, I'll confess to not being -- I'm not a bankruptcy

3   guy, so, I mean, you know, Mr. Smith, Gerald Smith is in charge of

4   that.  I know there's at least one other creditor besides the

5   plaintiff.

6          THE COURT:  I'm sure Intersections knows.

7          MS. DICKINSON:  Yes, Your Honor.  There are three or

8   four additional creditors.  They're all related to this case.

9   It's, I believe, the expert witness in the case, their expert

10  witness or one of them, and then two of the law firms that

11  represented Joe Loomis earlier on.  I think that's right.  But the

12  total amount of claims, I think, are around 200,000.

13         THE COURT:  Of the other claims?

14         MS. DICKINSON:  That's right.  We're talking about

15  nonsecured creditors, yes, Your Honor.

16         THE COURT:  All right.

17         MS. DICKINSON:  And, Your Honor, it's my understanding

18  from bankruptcy counsel (coughing) -- pardon me, I'm going to do

19  this all day -- from Baker --

20         THE COURT:  You won't be here all day.

21         MS. DICKINSON:  I'll be doing it all day by myself.

22         It's our understanding that the motion likely will be

23  granted within the next five days, and so they should have money

24  imminently.

25         THE COURT:  How much is involved in that?

1            MS. DICKINSON:  $500,000.

2            Isn't that right?

3            MR. McEVOY:  It's not my fee, Your Honor.

4            THE COURT:  No, I understand that.  And how much of that

5      is going to attorneys' fees?

6            MR. McEVOY:  He's got another lawyer.  He's also

7      pursuing other claims against third parties or will be doing so.

8      We've asked for $100,000 to cover, you know, some intense

9      proceedings here, so that's what's going on.

10           THE COURT:  All right.  Now, let me have Intersections

11     come back up.

12           MS. DICKINSON:  And, Your Honor, my understanding is

13     that what they've asked for is that -- correct me if I'm wrong --

14     that the first 200 of that 500 go to, I guess, Mr. McEvoy or, or

15     one of the attorneys who is going to be handling this case.  So

16     they should be fully funded right away, within the next week is my

17     understanding.

18           THE COURT:  Why are you, why are you agreeing to having

19     actual cash in hand being wasted on attorneys' fees?  You know, I

20     mean, I understand that the plaintiff feels badly injured in this

21     case, and your representations in the complaint are fairly strong.

22     One thing I wanted to know is how much actual cash did the

23     plaintiff pay the defendant?

24           MS. DICKINSON:  $14 million, Your Honor.

25           THE COURT:  Actual cash?

1          MS. DICKINSON:  Actual cash in hand.

2          THE COURT:  And they've gotten none of that back?

3          MS. DICKINSON:  Nothing.  Not a cent.

4          Your Honor, I feel like I'm --

5          THE COURT:  This case didn't go -- you didn't refer it

6     to the FBI or any criminal prosecutors?  I mean, it sounds like a

7     fraud the way you've pled it, a criminal fraud.

8          MS. DICKINSON:  I believe it is a criminal fraud.  It's

9     certainly something that we've discussed with the client.  It's

10    not somewhere we have gone at this point.

11         My understanding is that before we got into the case,

12    there was some talk -- there were some conversations with the

13    authorities that didn't go beyond that, but the more we look at

14    this case, the more it looks like criminal fraud to us.

15         But, Your Honor, I have to tell you that I feel a little

16    uncomfortable standing up here talking with you about this right

17    now without letting you know what's been going on in this case,

18    what we found out within the last couple of days.  So --

19         THE COURT:  Go ahead, let me hear.

20         MS. DICKINSON:  May I?  What we learned is that Joe

21    Loomis and some of the attorneys that he has hired in this case --

22    and I'm not referring to Mr. McEvoy -- have been tampering with

23    our witnesses, that they have violated the protective order which

24    prohibited Joe Loomis from contacting our witnesses and employees,

25    and that Emil Herich has violated the disqualification order and

1  has, in fact, been practicing in this case.

2       We confirmed this within the last day by talking with

3  one of our witnesses, who we had a terrible time going ahold of

4  after the lift -- the stay was lifted.  We had been told by a

5  witness that we did get ahold of that both he and another witness

6  had flipped and were now in Joe's camp, which I found hard to

7  believe because Joe isn't allowed to contact them.

8       If you'll recall, the whole reason why we had a

9  protective order issued was because Joe Loomis was harassing and

10 intimidating our witnesses because he had -- sorry, my voice is

11 going a little shaky.

12       THE COURT:  All right.

13       MS. DICKINSON:  He had threatened to have me put in jail

14 if I went to Arizona to take depositions, so the Court issued the

15 protective order and said that he could not contact witnesses or

16 me, because he had contacted me directly, or any of our client's

17 employees, and now what we found is that over the last six to

18 eight months, he has been in direct contact with at least two of

19 our witnesses, that one witness is, is testifying for him, that

20 that witness was so afraid of him a year ago when we were

21 preparing for trial that she had a protective order against him

22 because he had threatened to kill her, and now she's in his camp

23 is what I'm told.

24       The other witness who I have had direct contact with on

25 this issue, he entered into an indemnity agreement, a contract

1   with Joe Loomis where Joe Loomis agreed not to sue him and he

2   agreed to indemnify him if we sued him for breaching his

3   termination agreement, which has a cooperation clause in it

4   related to litigation that was related to his employment.

5          So we've been told and we have a declaration, in fact,

6   that Joe Loomis has called him.  He's texted him.  Joe signed that

7   agreement, and in fact, Emil Herich, who was disqualified by this

8   Court, met with our witness, two of them at least on two

9   occasions.  He told the one witness who signed the indemnification

10  contract that he no longer needed to contact me or our client

11  because he had that indemnity contract in place.

12         So basically, Joe has his back.  If he gets sued, Joe's

13  going to cover his damages and his attorneys' fees.  He had him

14  sign two declarations, Emil Herich did, after he was disqualified,

15  and if there's any question as to whether Emil Herich was

16  practicing in this case, the captions on both of those

17  declarations are this case caption.

18         So, so I told you I felt a little uncomfortable talking

19  with you about these issues in this case.  You know, we're

20  preparing for trial, but to be honest with you, Your Honor, I

21  don't know what else this camp needs to do in order for this Court

22  to issue a default judgment.

23         They've destroyed evidence -- not they, but their client

24  has destroyed evidence in this case, destroyed three computers or

25  the data on them, and that spoliation motion is pending before the

1  Court, and now we find out in the last couple of days that they're

2  tampering with our witnesses.  We've lost one witness.  It's just

3  abominable.

4           THE COURT:  All right.  Some of this is coming before

5  Judge Buchanan, correct?

6           MS. DICKINSON:  The data destruction is, but we just got

7  the declaration yesterday afternoon from the witness.

8           THE COURT:  Do you have the declaration with you?

9           MS. DICKINSON:  I do.

10          THE COURT:  Let me take a look at it.

11          Have you seen it yet, Mr. McEvoy?

12          MR. McEVOY:  This, this -- I haven't seen what's -- I

13  may or may not have seen what's been handed to me, and I feel

14  like -- I feel pretty sort of sideswiped by the, you know, posture

15  of the case, because nobody called me to say that this was going

16  to come up today or discussed this with me.

17          THE COURT:  All right.  Give me a second to read it,

18  please.

19          Now, let me ask you this:  When was the stay lifted in

20  this case, for this case?

21          MS. DICKINSON:  The stay was lifted, I have January 26.

22          THE COURT:  January of 2011?

23          MS. DICKINSON:  Yes, that's correct.

24          THE COURT:  Doesn't the stay prohibit any activity

25  concerning this litigation?

1          MR. McEVOY:  Well, by the, by the creditors, Your Honor,

2    again, I'm not a bankruptcy guy, but my understanding --

3          THE COURT:  By any attorney who's involved in the case

4    as well, right?  Isn't LaVelle, isn't he still of counsel in the

5    bankruptcy proceeding?

6          MR. McEVOY:  You mean Mr. -- well, there's Mr. Herich.

7    Mr. Herich is counsel in the bankruptcy proceeding, and he's -- I

8    mean, there are a number of things I'd like to address.  I

9    just sort of --

10          THE COURT:  Well, all right.  What's LaVelle's

11    relationship to Herich?

12          MS. DICKINSON:  Do you know?

13          MR. McEVOY:  I don't know.  I really don't know the

14    whole, what the details are concerning this Mr. Matt LaVelle, and

15    again, you know, this is the first time I've seen this

16    declaration.

17          MS. DICKINSON:  May I?

18          MR. McEVOY:  Sure.

19          MS. DICKINSON:  Your Honor, we checked the bankruptcy

20    records.  The LaVelle firm is not identified in the bankruptcy

21    court, they're not identified in this case, so we're not sure

22    where they came from.

23          Mr. Leberer, who signed the declaration, told us that

24    they've represented themselves as sort of discovery counsel, that

25    they were a neutral party in all of this, but I've never heard of

1   them before.  It's a father and son.  That's all I know.

2          MR. McEVOY:  Well, here's what I'd like to say, Your

3   Honor, if I may, or if the Court wants to review this in further

4   detail first.  I mean, we've heard a lot of accusations, and I

5   know -- I certainly know a lot about the background of the case,

6   so I'd like to speak to that, but, I mean, I guess this points out

7   the necessity of having a conference like this, because this is an

8   unusual case.

9          It came to me in January of 2010, as I recall.  In fact,

10  it was after the settlement conference in this case.  I know the

11  attorneys who had been local counsel for Mr. Loomis, and they told

12  me they had a conflict of interest, needed to withdraw, would I

13  consider getting in, time was of the essence.  So, you know, I

14  know these guys.  I consider them good guys and, and at least

15  social, loose social acquaintances within the Bar, so I agreed to

16  get in.

17         So I got in, and now I'm in, and obviously, there was

18  a --

19         THE COURT:  And you're stuck.

20         MR. McEVOY:  There was a deep history of this -- in this

21  case before I got in.  I don't -- I do take great issue -- there's

22  been a -- let me address the -- there are several issues related

23  to spoliation.  Then there's an issue with respect to Mr. Herich.

24         THE COURT:  Actually, I'm not going to hear any of that.

25  Here's my concern:  This case went to a final pretrial on December

1   17 of 2009.  We set a trial date at that time for March 1, 2010.

2   All the discovery was over, this case was ready to go to trial,

3   and then in January, serious settlement negotiations began.

4        There is no question that the plaintiff thought it had

5   an agreement, and frankly, but for the fact that I have a

6   philosophical approach to settlements, for which there is case law

7   that supports that approach and that's why we entered the opinion

8   that we did, and I know you've quoted me as saying there clearly

9   was not an agreement, I mean, I stand by that, but I also

10  recognize that another judge with a different philosophy as to

11  what is or is not a binding settlement could have gone the other

12  way.

13       The reality of it is your client at very least had

14  attended a settlement conference and given every initial

15  indication that it was resolved.  Then things happened, and I

16  accepted the position that it was not a binding settlement

17  agreement that could be enforced.

18       However, I am very concerned about the history of this

19  case before you ever got involved in it, and as much respect as I

20  have for you as an attorney, I've known you a long time, and I've

21  never seen you ever do anything that was even close to the line in

22  terms of ethics, this case has about it a very significant odor,

23  going back to original counsel from I think it's Arizona with whom

24  Judge Buchanan had terrible times.

25       MR. McEVOY:  Yes.

1          THE COURT:  This case is fraught with attorneys in and

2    out of the case and attorney conduct that would never be

3    countenanced in this Court.

4          The case needs to get resolved one way or the other

5    dispositively.  Leaving it out there isn't helping.  Witnesses may

6    or may not be getting tampered with.  Evidence may or may not be

7    spoliated.  Lawyers may be running around doing strange things.

8    So I am setting a very early trial date.  It's push or cut bait --

9    fish or cut bait.

10          The plaintiff says they're ready to go to trial?

11          MS. DICKINSON:  Your Honor, we are.  Unfortunately, we

12    have a few scheduling conflicts, but we do have a two-week period,

13    I'm sorry, April 11.

14          THE COURT:  April is impossible for this Court unless

15    something changes, and I won't know about that for a while.  I'm

16    thinking of a March -- well, hold on a second.

17          MS. DICKINSON:  We have a March 18 spoliation motion

18    hearing.

19          THE COURT:  Well, you need to move it up.

20          MS. DICKINSON:  Okay.

21          THE COURT:  All right?  I'm thinking about trying this

22    case -- how many days do you think it's going to take to try the

23    case?

24          MS. DICKINSON:  We need five, Your Honor.

25          THE COURT:  That's -- I do patent cases in five days.

1  Why do you think you need so much time?  I mean --

2       MS. DICKINSON:  We have 15 witnesses.  It's a, it's a

3  securities fraud case, Your Honor.  You know, it's funny because I

4  was listening to the counsel who were up here before us, and I was

5  thinking those are the cases that we usually handle, and then it

6  occurred to me, well, that is the kind of case that we have.  It

7  is a professional case with legitimate claims, but there's a

8  circus atmosphere around this case.

9       THE COURT:  Well, but look, I mean, your client bought a

10 business based upon certain representations.  Now, I don't know

11 how good your client's due diligence was.  I would assume they did

12 more than just accept Mr. Loomis's representations.

13      MS. DICKINSON:  Absolutely.

14      THE COURT:  But, I mean, you know, here was the deal:

15 We spent this much money based on these representations, and then

16 we found out that, in fact, the representations were false.

17 That's not complicated.  That's not complicated.  Don't make it

18 complicated for the jury.  You've got to keep it simple.

19      MS. DICKINSON:  Okay.  But the story doesn't end there,

20 Your Honor.  The -- we have claims for breach of the stock

21 purchase agreement thereafter, where Joseph Loomis and his sister

22 were double-billing clients, where he was working for another

23 company while he was supposed to be working for us, where he had

24 our, our employees working for that other company when they were

25 supposed to work for us.

1          THE COURT:  That's not complicated testimony.  It may,

2    it may require a bunch of witnesses.  We can run ten witnesses a

3    day in this court.

4          MS. DICKINSON:  Okay.

5          THE COURT:  I mean, the number of witnesses is not what

6    impresses me.

7          Can you be ready Tuesday, March 15?

8          MS. DICKINSON:  We'll make it work, Your Honor.

9          THE COURT:  All right.  Mr. McEvoy, are you available

10   that week?

11         MR. McEVOY:  Your Honor, the only thing that -- it looks

12   like I could be available that week, Your Honor.  The only thing I

13   would say is that there is a serious spoliation motion out there

14   that I need to respond to whether it's moved up or not.  There

15   would be a right to note exceptions to it, which it's not -- as

16   you heard from counsel and I haven't had a chance to rebut all

17   that, look, there were things that were done before I got involved

18   in the case especially with Arizona counsel that never should have

19   happened, and I believe in the bottom of my heart that if I had

20   been involved from the beginning, they never would have happened,

21   but they did, and so that's what we're dealing with now.

22         They are serious, but there are answers, legitimate

23   answers to some of what's, what's been alleged.  Nobody can deny

24   that there was this, frankly, hair-brained threat to -- by counsel

25   to have my colleague here arrested if she went to Arizona over a

1   property dispute.   That was ridiculous.

2           So there is fall-out from that, but there are other

3   issues to which there are legitimate answers, and whatever Judge

4   Buchanan does, there are likely to be exceptions noted, so we have

5   that briefing.   There are legitimate grounds for -- and it's still

6   work product at this point, but for one or more counts to go out

7   on summary judgment of the plaintiff's claims as a matter of law.

8   So there's that issue.

9           I had proposed -- and all that briefing and all that

10  prep for me, Your Honor, who came in literally after all this

11  stuff was done, I had no institutional knowledge of the case, I

12  hope the Court appreciates through my many appearances in this

13  court that I try to be judicious with fees, with funds.   I've

14  tried very hard not to squander money on work that didn't need to

15  be done until I knew what the bankruptcy court was going to do.

16          I do have some start-up time that I'm in an

17  extraordinary disadvantage vis-a-vis the other participants in the

18  case just because of that and because I had to, I had to be

19  careful to spend my money on the issues at hand rather than

20  reading the 30-some or whatever it was deposition transcripts and

21  so forth.   So that does put an extreme hardship on me, and, you

22  know, I guess April is unavailable for the Court.

23          I would with as much as I've ever asked for anything, if

24  there's some time in May, at the beginning of May, anytime in May,

25  I'll make it happen, but I do feel that there's legitimate

1   briefing that's going to happen, and in light of, look, what

2   counsel represents, you know, there could be, there could be,

3   there could be critical issues that are just dealt with on the

4   papers by the Court, and that needs to have serious -- there needs

5   to be time for serious consideration, serious briefing, without

6   the pressure on my side anyway of having to interview many, many,

7   many witnesses and undertake those types of efforts under that

8   time pressure.

9           THE COURT:  All right, I am looking at my calendar, and

10  I realize that that date I just mentioned in March is going to

11  bump into something.  What about Monday, May 2?

12          MR. McEVOY:  I'll make, I'll make whatever the Court --

13  if I can get any date in May, I'll make it happen.

14          THE COURT:  Counsel?  Because you're right, the

15  motion -- some of these preliminary motions especially for

16  sanctions may totally change the posture of this case, and I don't

17  know what sanctions, if any, Judge Buchanan might impose, and they

18  can be as strict as -- is it under Rule 37?  What's your legal

19  basis?

20          MR. McEVOY:  I believe they've moved -- they've asked

21  for what amounts to a default judgment.

22          THE COURT:  Yeah.  So maybe we ought to let it go and

23  then see what happens in that respect.

24          MR. McEVOY:  And if it please the Court, actually what

25  I, what I came in here, what I was speaking to Ms. Dickinson about

1  in the hall was I think it makes sense regardless of my position

2  as an advocate if we do it at the beginning of May, because if we

3  leave the sanctions motion where it is, my exceptions would be due

4  at the beginning of April.  They're going to respond to that.

5  Then this Court presumably will adjudicate whatever Judge Buchanan

6  decides, and at the same time, we could do any motions for summary

7  judgment and --

8           THE COURT:  I want the sanctions issue pushed up, all

9  right?  You-all get together with Judge Buchanan's chambers and

10  let her know that I wanted that issue teed up and resolved

11  earlier, because --

12           MS. DICKINSON:  The sanctions issues?

13           THE COURT:  All sanctions motions.  Let's get them done

14  quickly.

15           Now, I still have pending before me the appeal of the

16  decision to --

17           MR. McEVOY:  Mr. Herich.

18           THE COURT:  Herich, yeah.  And I want to get that

19  resolved.  It's been briefed, as I recall.  We just didn't address

20  it because we thought it was moot because you-all had represented

21  that the case had settled.

22           What we're going to do on that is if there's any

23  additional evidence that the plaintiff has as to Herich's behavior

24  in this case, to give you a chance to bring that to our attention.

25  That needs to be filed within a week of today, and I'll give you,

1   Mr. McEvoy, one week to respond.  If nothing new comes in, then

2   I'm just going to go ahead seven days from now and start looking

3   at that motion.

4            MR. McEVOY:  And just so the Court understands,

5   Mr. Herich is approved counsel, bankruptcy counsel for Mr. Loomis

6   in Arizona.  My understanding is that the, that the ethical

7   rules -- and counsel tried go get him unemployed, if you will,

8   through the bankruptcy procedures and brought to the bankruptcy

9   court's attention that he had been disqualified in this court.

10  The bankruptcy court under the standards that prevail out there

11  said, "No, you can stay in."

12           THE COURT:  Well, I'll tell you this:  If Judge Buchanan

13  and/or I from the evidence we've now seen draw the inference that

14  Herich has been working in any respect on this case in what I

15  think would be a violation of Judge Buchanan's order, he's out,

16  and he may very well have earned a complaint to the Arizona Bar,

17  which I wouldn't do but counsel would certainly be free to do

18  that, but I don't know what the evidence is yet sufficiently to be

19  able to resolve that, but that's just a signal.  I'm letting you

20  know right now.

21           MR. McEVOY:  Okay.

22           THE COURT:  All right?  All right.  So we've set this

23  case then for trial by jury Monday, May 2, at ten.

24           MS. DICKINSON:  I'm sorry, Your Honor, I didn't get a

25  chance to address that.

 1          THE COURT:  Does that not work for you?

 2          MS. DICKINSON:  Unfortunately, it doesn't.  So the --

 3          THE COURT:  What does work that week?

 4          MS. DICKINSON:  The lead counsel on this trial is

 5  getting married April 29 and will be in Europe the month of May.

 6          THE COURT:  Well, can you get another attorney?

 7          MS. DICKINSON:  Me.

 8          THE COURT:  I mean, you know this case.  You've been

 9  here.

10          MS. DICKINSON:  Absolutely.

11          THE COURT:  Can't you try the case?

12          MS. DICKINSON:  Yep.

13          THE COURT:  Yes?

14          MS. DICKINSON:  Yes.

15          THE COURT:  All right, May 2 at 10:00.

16          I'm going to advise Judge Buchanan that I want the

17  sanctions issue heard as soon as possible and that I've given

18  you-all that -- the schedule, all right?

19          MR. McEVOY:  Yes.  And, Your Honor, I haven't filed an

20  opposition.  My opposition was due March, I believe it was 4th, so

21  I just -- I am going to need some time -- you know, these are

22  substantial matters, and I'm going to need time to respond.

23          THE COURT:  Well, you need to work that out, but I'm

24  going to let her know to be looking for it.  I don't want you-all

25  to have a lot of time.  This issue needs to get resolved one way

1   or the other, because if, in fact, the sanctions are -- there's a

2   foundation for the sanctions and if she's recommending that the

3   case be considered in default, that is, the defendant has just

4   defaulted on the right to defend this case, we'll have to look at

5   that carefully, but that would, of course, affect the trial

6   significantly.

7           MR. McEVOY:  Sure.

8           THE COURT:  All right?

9           MR. McEVOY:  Okay.

10          THE COURT:  Anything further on this case?

11          Oh, yes, we need to address the issue.

12          MR. POLICASTRI:  You were going to address --

13          THE COURT:  Yeah.  What -- has Ms. Loomis agreed to have

14   you withdraw from the case?

15          MR. POLICASTRI:  Yes.

16          THE COURT:  Do you have that in writing?

17          MR. POLICASTRI:  Yes.

18          THE COURT:  Was that submitted with the motion?

19          MR. POLICASTRI:  It was not, but I can send it as an

20   attachment.  I wrote her a letter, asked me to sign it and send it

21   to me.  She was away and sent me an e-mail that said, "Please

22   accept this as my consent."

23          THE COURT:  Are you sure it came from her?

24          MR. POLICASTRI:  You know, I want to get away from the

25   odor of this case as well.

1          THE COURT:  You want, you want a wet signature, all

2    right?  E-mail is too easy for other people to have done.  Just to

3    make sure that we're covered.

4          I have no problem letting counsel out.  She needs to

5    understand she'll then either have to retain new counsel who can

6    appear here or she's going to proceed pro se, and you need to

7    alert her, I mean, that's your ethical obligation, that if she

8    doesn't respond to things, she can be held in default on those

9    issues.

10          MR. POLICASTRI:  Right.  I will do that.

11          THE COURT:  Do you expect her to hire counsel?

12          MR. POLICASTRI:  I expect her to appear pro se.

13          THE COURT:  All right.

14          MR. POLICASTRI:  She has indicated to me that she only

15    has about $500 per month to devote to attorneys' fees.  I doubt an

16    attorney is going to get involved at that level.

17          THE COURT:  All right.

18          MR. POLICASTRI:  I could be wrong, but I doubt it.

19          THE COURT:  That's fine.  All right.

20          Well, again, as soon as you provide the Court with

21    something that has her actual signature on it, which I think is

22    appropriate to be looking for in this case, and if you're

23    comfortable that that's her signature, so get it to us as soon as

24    you can, all right?

25          MR. POLICASTRI:  I will.

1           THE COURT:  And -- yeah.

2           MR. POLICASTRI:  The motions were deferred -- or

3    referred to Magistrate Buchanan.

4           THE COURT:  I'll let her know I took care of that for

5    her.

6           MR. POLICASTRI:  Thank you.

7           THE COURT:  All right?  So the motion is at this point

8    held in abeyance to await proof that the defendant has, in fact,

9    agreed to your withdrawal, and once we get that, then I will give

10   you leave to withdraw.

11          MR. POLICASTRI:  Thank you very much, Your Honor.

12          THE COURT:  All right, thank you.

13          Anything further?  If not, we'll recess for the morning.

14          MS. DICKINSON:  Nothing further, Your Honor.

15          THE COURT:  All right.

16                          (Which were all the proceedings

17                           had at this time.)

18

19              CERTIFICATE OF THE REPORTER

20      I certify that the foregoing is a correct transcript of the

21   record of proceedings in the above-entitled matter.

22

23

24              _____
                         /s/
                Anneliese J. Thomson

25