1

1          UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF VIRGINIA
2               ALEXANDRIA DIVISION

3   INTERSECTIONS INC. and        .        Civil Action No. 1:09cv597
    NET ENFORCERS, INC.,          .
4                                 .
              Plaintiffs,         .
5                                 .
         vs.                      .        Alexandria, Virginia
6                                 .        March 4, 2011
    JOSEPH C. LOOMIS and          .        1:57 p.m.
7   JENNI M. LOOMIS,              .
                                  .
8            Defendants.          .
                                  .
9   .   .   .   .   .   .   .   .   .   .

10                TRANSCRIPT OF MOTIONS HEARING
        BEFORE THE HONORABLE THERESA CARROLL BUCHANAN
11              UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  FOR THE PLAINTIFFS:        MICHELLE J. DICKINSON, ESQ.
                               DLA Piper LLP (US)
14                             6225 Smith Avenue
                               Baltimore, MD 21209
15

16  FOR DEFENDANT JOSEPH C.    TIMOTHY J. McEVOY, ESQ.
       LOOMIS:                 Cameron McEvoy, PLLC
17                             11325 Random Hills Road
                               Suite 200
18                             Fairfax, VA 22030

19
    TRANSCRIBER:               ANNELIESE J. THOMSON, RDR, CRR
20                             U.S. District Court, Fifth Floor
                               401 Courthouse Square
21                             Alexandria, VA 22314
                               (703)299-8595
22

23                     (Pages 1 - 59)

24
     (Proceedings recorded by electronic sound recording, transcript
25    produced by computerized transcription.)

P R O C E E D I N G S

1

2          THE CLERK:  Criminal Case No. 09-597, Intersections

3  Inc., et al. v.  Joseph C. Loomis, et al.  Counsel, please state

4  your names for the record.

5          MS. DICKINSON:  Good afternoon, Your Honor.  Michelle

6  Dickinson for the plaintiffs.

7          THE COURT:  Good afternoon.

8          MR. McEVOY:  Good afternoon, Judge Buchanan.

9          THE COURT:  Good morning -- good afternoon.

10         MR. McEVOY:  Tim McEvoy, yes, for Mr. Loomis.

11         THE COURT:  All right, I have granted just so you know

12  the order for sealing that was agreed to, so this comes on the

13  plaintiffs' several motions, and I've, I've read everything.  Do

14  you have anything to add to your motions?

15         MS. DICKINSON:  Your Honor, did you want us to take

16  them -- back up for a second.  The fees, is that before the Court

17  or --

18         THE COURT:  Yes, it is, and, and I'll tell you right now

19  that I'm going to take everything under consideration.

20         MS. DICKINSON:  Okay.

21         THE COURT:  I'm going to have to write a report and

22  recommendation, but if there's anything that you want to address

23  that was not in any of your briefs, go ahead.

24         MS. DICKINSON:  So, Your Honor, if I may address each

25  individually?

1          THE COURT:  Sure, that's fine.

2          MS. DICKINSON:  Thank you, Your Honor.  And I'll try not

3  to cough too much while I'm up here.

4          THE COURT:  That's okay.

5          MS. DICKINSON:  Or sniff too much.

6          THE COURT:  Whatever you think you need to add.

7          MS. DICKINSON:  Okay.  Your Honor, in October -- as far

8  as the motion to vacate the protective order, that's actually

9  their motion.  Do you want me to address that first?  Do you -- or

10  do you want me --

11          THE COURT:  Just address it, you know, along with yours.

12  I mean, I know what the issues are.  I don't think it really

13  matters who goes first.

14          MS. DICKINSON:  Okay.

15          THE COURT:  Okay.

16          MS. DICKINSON:  All right.  In October of 2009, Your

17  Honor, we came before this Court for help.  Joe Loomis was

18  intimidating and harassing witnesses.  He was harassing

19  plaintiffs' employees and, frankly, counsel.  This Court ordered

20  Joe Loomis to stop.  It ordered Loomis to stop contacting

21  plaintiffs, their employees, and their witnesses.

22          Two weeks ago, we brought to this Court's attention what

23  we had just learned, that Joe had -- Joe Loomis had been violating

24  the protective order for several months.  We have since learned

25  that it's been for at least a year.

1          When we brought that to the attention of the Court,

2   Mr. Loomis then filed a motion to vacate the protective order, and

3   that's what we're speaking about now.  The protective order is

4   enforceable, there can be no question, but Mr. Loomis's motion to

5   vacate the protective order is time-barred.  Rule 72(a) provides a

6   14-day limit for filing any objections.  Those objections would

7   have gone to Judge Brinkema for review, and he did not do that.

8          Mr. Loomis is trying to right his wrongs, it seems, by

9   asking this Court to overturn an order so that his conduct in

10  violation of that order will not be sanctionable.  The purpose of

11  the protective order was to protect the witnesses of the

12  plaintiffs' but also to protect the plaintiffs' ability to obtain

13  evidence to prosecute their claims and their defenses against Joe

14  Loomis's claims, and the purpose of rule 65(d) is twofold as well.

15  It is to put the individual, in this case Mr. Loomis and his

16  counsel who are no longer in the case, on notice of the exact

17  contact -- conduct that he is prohibited from doing and then to

18  create a record for the appellate court to the extent that -- in

19  case that the order is, is appealed.

20         Even if this Court were to determine that the protective

21  order needed modification for one reason or another, that would

22  not make the protective order void.  It would still be

23  enforceable, and Mr. Loomis's transgressions and violations of the

24  protective order would not just simply disappear.

25         The prohibited conduct under the protective order was

1    specific.  There's no question that he knew that he could not

2    contact current and former employees, and that's why he used a

3    conduit to get in touch with one of his -- one of the former

4    employees of NEI, Mr. Matt Leberer, and he told Matt LaVelle, who

5    is one of his many attorneys in Arizona, that the protective order

6    covered both Matt Leberer and Sheila Snyder, who are former

7    employees of NEI.

8         Your Honor, I don't think there's any, any question

9    amongst all of us as to what the purpose of the protective order

10   was and who it was designed to keep him from contacting.

11        Now, Mr. Loomis contends that the protective order

12   violates the First Amendment, specifically, his First Amendment

13   right to association.  He says that he's concerned that the

14   protective order somehow makes it so that he cannot contact his

15   family members.  Well, if that was the case, then he was violating

16   it in front of all of us when we were in your chambers with Jenni

17   Loomis and when he was on the phone with his brother that day.  So

18   that, that just doesn't make any sense.

19        He also claims that it violates his First Amendment

20   right to associate with what he says was a former girlfriend,

21   although he testified in his deposition that they were never

22   boyfriend and girlfriend, but that's neither here nor there, and

23   another former friend.

24        Limiting his ability to contact two former friends, I

25   don't think that our forefathers who created the First Amendment,

1   drafted the First Amendment, would have a problem with that in

2   this case.  It's not a forever prohibition.  It was for the

3   pendency of the case, and it was in order to protect the

4   plaintiffs from having their evidence go away or somehow change

5   form.

6        So I believe that -- we believe that this prohibition on

7   conduct -- contact was narrowly tailored to serve an important

8   governmental interest of protecting the sanctity of the legal

9   system and this case.  We believe that this Court should not

10  entertain Joe Loomis's latest tack to get out of trouble.  The

11  protective order is enforceable, and the Court should deny his

12  motion.  That would be No. 1.

13       THE COURT:  Okay.

14       MS. DICKINSON:  We're also here, Your Honor, to talk

15  about Joe Loomis's violation of the protective order.  We call

16  that our witness tampering motion for short.  Apparently, motions

17  or orders, court orders are meaningless to Joe Loomis.  As I said

18  in October of 2009, we came to this Court for help, and the Court

19  ordered Joe Loomis to stop certain conduct.

20       We're back before the Court today because Mr. Loomis has

21  wholly disregarded that order.  He's been in direct contact with

22  two of plaintiffs' witnesses:  Sheila Snyder and Matt Leberer.

23  Now, both of these witnesses have suffered intimidation at his

24  hands.  Sheila Snyder has gotten a, an injunction against

25  harassment against him for threats that he made against her.  Matt

1   Leberer sought the same type of injunction.  So both of them have

2   been intimidated by Joe Loomis, and Joe Loomis has filed a

3   criminal complaint against Sheila Snyder for violating a

4   protective order that he had against her.

5           Interestingly enough, a few days after the settlement

6   conference, about a week or so after the settlement conference,

7   those charges against Sheila Snyder were dismissed, January 29,

8   2010, and since then, Ms. Snyder says in her declaration she and

9   Joe are friends again.  We're not sure exactly how that happened

10  since Joe Loomis should not be in contact with her according to

11  the protective order.

12          Loomis has a -- Mr. Loomis has met with Sheila, is back

13  in her life, has called and texted Mr. Leberer, has attempted to

14  meet with him.  He's entered into an indemnity agreement with both

15  of them using Mr. LaVelle as a conduit, but still he entered into

16  it.  He signed the document and agreed to indemnify them in order

17  to convince them not to talk with plaintiffs, with me specifically

18  according to the declarations that are flying out there, and there

19  certainly are a lot of them.

20          One could argue that Mr. Loomis's signing the indemnity

21  agreement is not direct contact, but I would say that it, it

22  violates the Court -- the spirit of the Court's protective order,

23  but that doesn't really matter, Your Honor, because Joe Loomis

24  absolutely clearly violated the protective order by being in

25  contact, direct contact with, with these two witnesses.

1          And we also talked about how it is that Joe claims that

2     the protective order is unenforceable, so I won't go back over

3     that, but it, it seems clear to me, Your Honor, that Mr. Loomis

4     has violated the protective order, that he needs to be sanctioned,

5     that he is -- he seems incapable of following any orders that this

6     Court issues, and that he is bordering on making, if he hasn't

7     already, a mockery of this judicial system, and he can't be

8     allowed to do that any longer.

9          No. 3, the long-awaited spoliation motion.  Your Honor,

10    Mr. Loomis has something to hide; there is no question about that.

11    He has gone to great lengths to destroy evidence in this case.

12    The evidence that he destroyed was on computers that contained Net

13    Enforcers' business information.  No dispute that that's what was

14    on those computers.

15         There is a strong inference here that the data that he

16    destroyed was relevant to the plaintiffs' claims in this case and

17    the plaintiffs' defenses related to Joe Loomis's counterclaims.

18    His scheme to destroy data started hours after he was suspended,

19    and remember, his suspension is a subject of some of the claims in

20    this case.

21         When I was trying to figure out how all of these pieces

22    fit in, because frankly, it's hard for me to keep track of it, and

23    I've been living this case for two years, I, I thought that we

24    needed to look at a timeline, and I wished last night late that I

25    had a huge board that I could put it all up on a timeline, because

1    it really is telling.  I didn't have a huge board, so what I did

2    was I made a little PowerPoint, and if I may?

3             THE COURT:  Um-hum.

4             MS. DICKINSON:  I thought it might be helpful for all of

5    us.

6             The timeline, Your Honor, is telling.  On October 20,

7    2008, Net Enforcers suspended Joe Loomis from his position as CEO

8    of Net Enforcers.  He was notified with a letter.  He received the

9    letter that day.  The letter is in evidence.  That letter put him

10   on notice of the potential of a lawsuit, and it told him that he

11   had a duty not to destroy evidence, to preserve all company data.

12            Mr. Loomis is prolific in computers.  I think that's the

13   right way to put it.  He claims to be very good at using

14   computers, and he uses a lot of them.

15            So what does he do that day?  He's locked out of the

16   computer system, the network system, by Net Enforcers.  He has no

17   way of getting on, and he's locked out of the offices, their

18   secure offices, so he can't go in, so what he does is he contacts

19   a young employee named Matt Leberer, and he coerces him to give

20   him a -- his user name and password.  Matt Leberer is an IT guy,

21   he has admin credentials, so he can get into the server with his

22   user name and password.

23            Mr. Loomis accesses the computer system remotely from

24   his house.

25            THE COURT:  That's all right, go ahead.

1        MS. DICKINSON:  He accesses the computer system from his

2  house, and then what he does is he starts deleting data out of

3  files.  As he's deleting the data, a gentleman named Chris Soyars,

4  who's in Florida, a different state, he's an IT-type guy as well,

5  sees the, the deletion going on and stops it.

6        The company is able to recover that data because they

7  have this backup system that backs up the SVN server, not all the

8  data on all the computers but on this specific server, so they

9  don't lose that data, so everything's okay for the moment.  He's

10  deleted data, but that's not the subject of our spoliation motion,

11  but it's important because it shows the beginning of the scheme.

12        So here's where we go from this scheme:  Seven days

13  later, Intersections sends a guy, an IT guy down to, to Net

14  Enforcers in Arizona to make copies of the two hard drives on Joe

15  Loomis's computer in the office that he's been locked out of.

16  They want to see what's on there.  They've started their

17  investigation.

18        Joe Loomis finds out.  He calls his brother, Chris

19  Loomis, who works in the office down below, has him run upstairs,

20  and while the IT guy is sitting in a conference room with his back

21  to the glass door, waiting for somebody to let him into Joe's

22  physical office to make the copies, Chris Loomis is allowed in by

23  Sheila Snyder, one of the witnesses we've been -- we've talked

24  about today.  She lets him go in and take the computer tower.

25        He just takes -- I'm not real computer savvy, but he

1  just takes the CPU thing that has all the data on it.  He doesn't

2  take all the monitors and all that, and he runs out the door with

3  the computer.

4          IT guy turns around, goes in to make a copy of the data,

5  and it's gone, poof, never to be seen again.

6          Chris Loomis takes the computer back to Joe Loomis's

7  house, his brother.  Joe Loomis then within the next couple of

8  days tells Matt Leberer, that young employee, he's got to get rid

9  of the data.  He has to figure out a way.

10         He says something to the extent of that he, that he

11 can't smash the hard drives to destroy them or throw them away to

12 keep Intersections from seeing the data, because they would find

13 out, because you know what happens.  You look on the computer with

14 some forensic guy who knows what he's doing, and it shows when it

15 was wiped clean, so he couldn't do that.

16         So this is what he decides to do:  He, he tells Matt

17 Leberer he's going to send that computer back to the manufacturer,

18 Breezin Microsystems, and he's going to tell them the hard drives

19 are broken, and he's going to have them swap out new hard drives.

20 Well, Breezin Microsystems is going to get whatever they're going

21 to do with the hard drives, but they'll be gone forever, and so

22 will all of that data, and that's exactly what he does sort of,

23 not exactly what he does.

24         He sends the, the computer back to Breezin Microsystems,

25 but Breezin Microsystems doesn't, doesn't destroy the hard drives.

1    He does tell Breezin Microsystems that the hard drives are messed

2    up.  He says he needs a face lift on the computer, because it's

3    not working right, and Breezin Microsystems tells him:  You need

4    to back up your data.  Save the data.

5         He doesn't save the data.  Breezin Microsystems then

6    wipes the data off of the hard drives, doesn't replace them but

7    wipes them and sends them back to him.  Now, we know that because

8    we have a declaration from Mark Hildebrandt who says, "This is

9    exactly what I did."

10        Now, Joe Loomis got another declaration from him, this

11   is like the war of declarations here, but it doesn't say anything

12   that's concerning or any different really from that.  I think what

13   he says is that the graphics cards were bad.  I don't know a whole

14   lot about computers, but based on the people -- what I've heard

15   from the people I've talked to, you don't have to wipe clean the

16   hard drives in order to fix a graphics card, but even if you did,

17   Joe Loomis could have backed up that data, but we know from what

18   he told Matt Leberer -- sorry.

19        THE COURT:  That's okay.

20        MS. DICKINSON:  That, that he didn't want to back up the

21   data.  He was trying to destroy the data, and that's the thing

22   that we have to keep our eye on in this story, which I'll make a

23   little bit faster because I know I'm taking a long time, is it all

24   kind of comes back to that point there.

25        He told an individual what his plan was, and from that

1   point on, he continued to destroy data at every turn.  November 5,

2   2008, was -- I'm sorry, the day before he sent the computer back

3   to Breezin Microsystems to have the data wiped out, he wiped out

4   all the data on another desktop -- or a laptop computer, a laptop

5   that he admittedly was using for NEI business.

6          We filed suit on May 27, 2009, in this court.  We served

7   document requests on August 4.  Joe Loomis's responses were due

8   about a month later.  September 10, about a month later, what does

9   he do?  He wipes another laptop.  He wipes all the data off of it.

10  And then you know what happens from there:  the harassment and the

11  threats of jail.

12         This is a pretty compelling story here, Your Honor, and

13  I could stand up here for another hour and talk about what all of

14  this means, but I think we all know in this room that Joe Loomis

15  was put on notice that he had to preserve data as early as October

16  20, 2008; that within hours from that point, he concocted and

17  began this scheme to destroy evidence; and that he did destroy

18  evidence; and Joe Loomis can argue until the cows come home that

19  he backed up the data automatically, that now he's filed some new

20  declaration within the last hour and a half, I guess --

21         THE COURT:  I haven't seen that one.

22         MS. DICKINSON:  I haven't seen it, either, but I had

23  somebody call me and tell me basically what it said, that's,

24  that's -- I believe what it says is that there was a, there was a

25  system in place on the SVN server that was set up so that

1    certain -- and the language is specific -- certain of Joe Loomis's

2    files were saved onto the SVN server, certain of them, so Joe

3    Loomis will probably have us believe that those were all his

4    business files, not his personal files.

5           Joe Loomis -- I'm not sure if I should say this or not,

6    but Joe Loomis just can't be believed, Your Honor.  The, the, the

7    tie doesn't go to the winner; is that how that statement goes,

8    that little saying?  Joe Loomis can say he backed up data onto the

9    USB drive and gave it to NEI's employees, but the fact of the

10   matter is that we all know that that employee, as he says in his

11   deposition testimony, picked and chose certain files and that that

12   USB drive was created months before Joe Loomis was terminated.

13          His conduct speaks volumes.  His statement to Matt

14   Leberer is the key.  Joe Loomis was trying to keep data away from

15   NEI and Intersections, and that's exactly what he's done.

16          So we would ask this Court to issue sanctions against

17   Joe Loomis in the form of a default judgment as to all of

18   plaintiffs' claims and Joe Loomis's counterclaims, because coming

19   into this courthouse and having a jury trial with Joe Loomis,

20   well, I think we all know what that would be like.

21          THE COURT:  All right, thank you, Ms. Dickinson.

22          Mr. McEvoy?

23          MR. McEVOY:  Yes, Your Honor.  And first of all, thank

24   you for your attention to the papers and to hearing me out this

25   afternoon.  I do appreciate it.

1          THE COURT:  Of course.

2          MR. McEVOY:  And, you know, I will start by saying that

3   about a year ago, I got a call from Ellis Bennett that the Court

4   probably recalls from this case --

5          THE COURT:  Right.

6          MR. McEVOY:  -- indicating he needed a favor, that they

7   had a conflict and trial would be in six weeks and, you know, it's

8   going to be a challenge and, but I'm, you know, we're in a bind.

9   It will be over --

10         THE COURT:  Are you still friends with Mr. Bennett?

11         MR. McEVOY:  We're still friends, yeah.

12         And, you know, I -- the reason that I stay in this

13  sometimes stressful business is because I love what I do, and I

14  really do love this court.  I love the discipline, the

15  professionalism, the ability to, to try cases.  People would

16  probably say you've got to be crazy to take this job as a general

17  matter if you don't really like it or love it in fact.

18         So I said I would do it, and I'm fighting as best I can,

19  Your Honor, to, to try to get that day in court, and I, I'd like

20  to -- to the extent the record won't reflect it because it doesn't

21  take photographs, Mr. Herich is -- Mr. Emil Herich, who this

22  Honorable Court entered a disqualification order --

23         THE COURT:  I remember.

24         MR. McEVOY:  -- is here today, and we can get to him in

25  a bit, but I think I can speak for him in saying that among other

1  things, as a sign of respect for the Court and its order to answer

2  any questions that this Court may have --

3          THE COURT:  I don't have questions.

4          MR. McEVOY:  Okay.

5          THE COURT:  I had understood that you wanted to present

6  testimony.

7          MR. McEVOY:  Well, yes.

8          THE COURT:  If you want to do that, you can go right

9  ahead.

10          MR. McEVOY:  All right, all right.  Well, I just -- I

11  wanted to acknowledge his presence here for that purpose and

12  perhaps among others.  We'll see about the testimony, Your Honor,

13  but -- and I'll get back to Mr. Herich shortly, but in the first

14  instance, Your Honor, I would like to say that Ms. Dickinson

15  closed by saying we, you know, suggesting that Mr. Loomis being in

16  court would be an issue, but, you know, he did testify in front of

17  this Court, I guess, back in August or maybe it was September,

18  and, you know, he comported himself reasonably on the stand, so I

19  don't -- I think of -- and I think about the cases I've had with

20  Judge Brinkema, and I think knowing her and knowing the people

21  involved in various difficult cases that she's had and knowing

22  those lawyers and on both sides from U.S. attorneys and otherwise

23  from civil lawyers, if anybody's prepared to roll up their sleeves

24  and give testimony the weight that, in light of all the things

25  that have been alleged, that it deserves on one side or the other,

1  there's no doubt that Judge Brinkema is, is the person that

2  would -- probably most if not all members of the bar would think

3  of as being perhaps the top qualified to do that.

4          So I think that we've got to keep -- and, and Ms. Roth,

5  who's, who's with us today, pointed out a couple weeks ago that

6  the stock purchase agreement that is at issue in this case has a

7  jury waiver clause as to the bulk of the claims in the case, and

8  we haven't resolved the stipulation as to whether or not the jury

9  waiver is appropriate, but if it were to come down that way, Judge

10  Brinkema would, would hear the evidence or -- some or all or --

11  most or all of the evidence herself.  I think that's a factor

12  here.

13          Another thing I want to tell the Court before I talk

14  about things that are not in my papers is that -- and it's as an

15  aside, I've had discussions and Mr. Herich, who is approved

16  bankruptcy counsel in Arizona, has had discussions or had

17  discussions with Kevin Kobbe, who is Ms. Dickinson's partner, and

18  I told Mr. Kobbe I was going to say this today and I pass this on

19  to Ms. Dickinson that -- what?

20          (Discussion between counsel off the record.)

21          MR. McEVOY:  My understanding is that there's going to

22  be a meeting between the parties next week, and I just, I want the

23  Court to understand that, in Phoenix.

24          As to the allegations that Ms. Dickinson has raised, I

25  think the number one thing that has to be said, and as I, as I --

1   what I said at the outset of this soliloquy was linked to this,

2   that the law favors a trial on the merits clearly.  That's what

3   this courtroom is all about and why we're here, and the Fourth

4   Circuit, the Supreme Court, everybody recognizes that, that

5   dismissing a case for, for anything other than a trial on the

6   merits is an extremely rare and harsh sanction.

7           And I want to talk at the outset and highlight actually

8   just the fact that there really, there was -- the timeline that

9   Ms. Dickinson handed up is very helpful, because it shows, in

10  fact, it underlines the point that the plaintiffs knew about this

11  alleged spoliation literally from the day that Mr. Loomis got

12  suspended, because within 24 hours, they were accusing him of, of

13  tampering with the server.  A week later, they said that his

14  brother came in and, and ran off with the tower computer, which in

15  our papers we show Mr. Loomis owned it and it was excluded from

16  the stock purchase agreement.  Then there were these laptop

17  issues, but the last of the two laptops was returned in September

18  of 2009.  All anybody had to do was turn it on, and according to

19  them, everything had been removed from it, just turn it on and

20  you'd see there was nothing there.

21          So three or four months before discovery closed, they

22  knew and had everything they needed to know in order to bring a

23  spoliation motion, and my problem as an advocate and I think one

24  advantage I do have over Mr. Bennett or anybody else who was in

25  this case before me is that trying -- not having lived through the

1  case like this Honorable Court or Ms. Dickinson, to look at this

2  as a matter of law and to say that to bring a motion for

3  sanctions, especially where you seek a default judgment, after

4  discovery closes, 15 months after the first alleged act of

5  spoliation, three or four months after you knew everything that

6  you wound up putting in your spoliation motion, and therefore, in

7  cancelling Mr. Leberer's deposition that was, I believe, scheduled

8  for the end of November, before the discovery period closed,

9  knowing that you were going to file -- you had already obtained a

10  declaration from him to support a spoliation motion, it does two

11  things.

12          No. 1, it suggests that you, as Madalyn Behneman said in

13  what they say is a draft memorandum, they, in fact, believe they

14  did recover all the information at issue here.  It really begs the

15  question of do they really believe what they're saying, that any

16  information was lost.

17          Mr. Loomis says no, the delay speaks incredible volumes,

18  especially the delay in filing, not even announcing it until after

19  discovery closed.  What does that say?

20          Ms. Dickinson said that there was a war of the

21  declarations.  When I was a young man, I started practicing at

22  Venable, and one of my early mentors was, was Bill Dolan, who the

23  Court probably knows, and another gentleman across, wound up in

24  Baltimore cross-town from where Ms. Dickinson practices now, and I

25  handled a case with a guy named Ron Taylor called, I think it's

1  called *Evans v. Technology Applications & Services Company*.

2            I left and became a prosecutor, but in the meantime, it

3  went to the Fourth Circuit, and I think it's one of the leading

4  cases now, and I regret I don't have the cite, but it stands for

5  the proposition that summary judgment -- and I understand we're

6  not in summary judgment here, but we're in a proceeding like

7  summary judgment -- should almost never be granted without the

8  opportunity for discovery, and that, that principle applies to

9  this situation, Your Honor, because what I -- in thinking about

10  this, what this attempt to get a default judgment means, it's not

11  unlike a party that came in and after the discovery period had

12  closed, they knew they were -- they had this -- they had some

13  other claim that wasn't in the complaint.  They knew it, and they

14  had all the information related to it through the whole discovery

15  period.

16            After discovery closes, they file a, a motion for

17  summary judgment based on a claim that wasn't in the complaint,

18  and they seek basically to, to short-circuit the trial process in

19  that regard, and they said, well, we don't need discovery for

20  that.

21            And Ms. Dickinson said we've got a war --

22            THE COURT:  I really don't understand the analogy.

23            MR. McEVOY:  Well, because in, in a case of summary

24  judgment, you're seeing to get a judgment to end the case, right?

25  And they're seeking --

1      THE COURT:  No, I understand that, but this is not a new

2  issue, and, in fact, his destruction of evidence had been an issue

3  all during discovery.

4      MR. McEVOY:  Well, except for the fact that they didn't

5  say -- they could have filed this spoliation motion in time for

6  people to take discovery related to, for example, Mr. Soyars'

7  declaration.  We've had all of these disputes about Mr. Leberer.

8  I would love to take Mr. Leberer's deposition.  I've tried to call

9  the gentleman.  He won't call me back.

10      I mean, I'd love to take the corporate deposition not

11  to, not to, not to take, just take a deposition, but because we

12  say that the server logs, there's a -- there is clearly genuine

13  disputes about material facts related to whether the server logs

14  would support Mr. Loomis's testimony.  They say no; Mr. Loomis

15  says yes.  You know, who knew what?

16      Look, these are good lawyers over here; that's clear.

17  The DLA folks, they've worded careful declarations.

18      THE COURT:  You know, I really have a hard time

19  understanding why the issue as to whether or not these servers

20  were being backed up, as Mr. Loomis claims, has anything to do

21  with what's presented before me of his -- of the evidence of his

22  intentional destruction of evidence.  Whether they were backed up

23  or not backed up is really not the issue.  The issue is his

24  actions.

25      MR. McEVOY:  I, I think the point -- I'll try to put it

1   succinctly like this, Your Honor:  If I have, if I have -- I've

2   got all these notebooks on my desk here.

3           THE COURT:  Right, okay.  So you think that it's all

4   right to throw those notebooks away because you think that there's

5   a copy -- there might be -- you think maybe there's a copy

6   somewhere else.

7           MR. McEVOY:  Well, he -- I'm sorry.

8           THE COURT:  And even though you've been told by the

9   Court or by, you know, your opposing counsel when they notified

10  you of the possibility of the lawsuit that you had a duty to

11  preserve all evidence, that you thought it would be okay to do

12  that just because there might be another copy of it.

13          MR. McEVOY:  Well --

14          THE COURT:  I don't, I don't understand this argument.

15          MR. McEVOY:  Mr. Loomis obviously isn't a lawyer.  He

16  got a letter that said, "You are suspended.  You have a duty to

17  keep company, company records."

18          Remember that Mr. Loomis has also said that there were

19  discrete and highly confidential photographs, for example, his

20  estate documents, things like that, on the system.  He's also said

21  that he -- it's not that things might have been backed up.  His

22  assertion is that things were backed up, and that's why I say,

23  look, if I had been able to take discovery of these people and --

24          THE COURT:  I don't know what difference it would make

25  whether it was backed up or not.  That's my point.

1          MR. McEVOY:  Well --

2          THE COURT:  And, you know, your right to take discovery

3    as to whether or not the servers were backed up is immaterial.

4          MR. McEVOY:  Except there's no prejudice if the

5    information is there.  And they have a draft report from Madalyn

6    Behneman that says, "We recovered everything," which explains why

7    they waited 15 months to do anything about this.

8          THE COURT:  They recovered what was on there but not

9    what was on his laptops.  There's a difference.  Not everything on

10   the laptop would necessarily be backed up on the server; isn't

11   that correct?

12         MR. McEVOY:  I, I --

13         THE COURT:  And I've got to admit that my understanding

14   of computers is somewhat limited, but just -- the only thing that

15   I would guess would be backed up on the server from a laptop would

16   be something that you are hooked into the system to create, like

17   an e-mail that's hooked into their e-mail system to create or a

18   word processing document perhaps that is hooked into the main word

19   processing program for the company.  I mean, you have to be hooked

20   in through their Web site in order for it to be backed up by their

21   computers, I would think, and you can correct me if I'm wrong.

22         So if you create something else on your laptop that's

23   not going through the servers of the, of the company, it would not

24   be backed up.  If you have a separate e-mail account that doesn't

25   go through the servers, it would not be backed up.  If you have

1    your own word processing program that's not going through the

2    server of the computer, it would not be backed up.  If you have

3    your other documents that you've scanned into your computer, they

4    wouldn't necessarily be backed up.

5            So there's a big difference here.  We've -- I mean,

6    really isn't the issue that they don't know what's on or what was

7    on the laptops that was not going through the company servers?

8            MR. McEVOY:  Yes.  It's, it's clearly not profitable to

9    argue, and I don't want to, so I think I can --

10           THE COURT:  I know.  I mean, I want to understand.  If

11   I'm wrong -- is that wrong?  That's my understanding of the way

12   this sort of thing works.

13           MR. McEVOY:  I'll tell you my understanding, and maybe

14   we'll see if we're speaking the same language.

15           THE COURT:  Okay.

16           MR. McEVOY:  My understanding -- and I'm not a computer

17   professional, either, but the Court, as a general matter, that

18   you're correct.

19           THE COURT:  Okay.

20           MR. McEVOY:  That it's theoretically possible, depending

21   on how you configure a system, that --

22           THE COURT:  Not theoretically.

23           MR. McEVOY:  Well, that if you configure -- depending on

24   how you configure your system and where you keep your information,

25   that some information can be committed to a server and some

1   information isn't or couldn't or, or wouldn't necessarily be when

2   you go through this backup process.

3          That having been said, Mr. Loomis's position is that all

4   of this information was kept in these two folders, I think one was

5   called Joe, I don't remember the names of them, including these

6   compromising or highly personal photographs, for example, and

7   estate documents, and that all of these things were backed up.  I

8   mean, that's where the dispute of fact is, and --

9          THE COURT:  How do they know whether it was backed up or

10  not?  Because they never had a chance to see what was on there.

11         MR. McEVOY:  Yeah.  Well, there are two things about

12  that, Your Honor, and I do have the declaration which I just

13  recently received from a guy named Zack Gilburd I believe is how

14  you pronounce his name.  Mr. Gilburd says that there was something

15  called a batch file program that would automatically back up the

16  tower computer anyway.  He doesn't speak to the two laptops.

17         THE COURT:  Right.

18         MR. McEVOY:  Mr. Loomis's testimony is that every day

19  when he would log into the computer, that he would commit --

20         THE COURT:  Why would you bother stealing a tower if

21  everything is being backed up?

22         MR. McEVOY:  Mr. --

23         THE COURT:  Why would you bother?

24         MR. McEVOY:  Well, remember, there was what I, I can

25  only say was a highly regrettable incident involving Candess

1    Hunter with the threat against Ms. Dickinson that had its genesis

2    in a dispute about people holding a computer too long.

3    Mr. Loomis --

4             THE COURT:  Don't forget Mr. Loomis is the one who filed

5    the criminal complaint or at least was said to have filed a

6    criminal complaint.

7             MR. McEVOY:  I think -- I understand Mr. --

8             THE COURT:  Or went to the police station and swore out

9    a warrant.  Yeah, I don't know what the heck it was he did --

10            MR. McEVOY:  Right.

11            THE COURT:  -- but Mr. Loomis is the one who did that,

12   not his attorney.

13            MR. McEVOY:  Well, when I say "right," I'm just saying I

14   understand that's what the dispute is.  I can't -- I'm not going

15   to sit here and try to make representations about that.  I wasn't

16   involved in the case at that time, and I don't think technically

17   that's why we're here right now.

18            I'm just saying that my understanding is that the, that

19   the tower computer had a batch program that would back it up.

20   Mr. Loomis contends as to all of his computers that --

21            THE COURT:  Then why would he bother stealing it?

22            MR. McEVOY:  Because he was concerned that they were

23   going to hold on to it and that, you know, he wanted to take it

24   home and set it up because he needed a computer.

25            And I spoke to this guy, Mark Hildebrandt -- both sides

1    have put in declarations from Mr. Hildebrandt.  Mr. Hildebrandt

2    has from what I could tell clearly no axe to grind.  I mean, he

3    apparently has talked to DLA Piper; he talked to me.  He says that

4    there was a legitimate problem with the tower computer.  I mean,

5    he -- that -- well --

6               THE COURT:  So it's okay for him to steal it?

7               MR. McEVOY:  Well --

8               THE COURT:  I don't understand this.

9               MR. McEVOY:  Well, but it was, it was Mr. Loomis's

10   computer, though.  It was --

11              THE COURT:  I know, but, you know.

12              MR. McEVOY:  I mean, they're telling him, hey, you're

13   suspended, you're out of here basically, right?  And we, we know

14   there was a dispute later about the laptop, so, I mean, in

15   hindsight, he had a right to his -- he had a right to his

16   computer.  I don't understand how they can say they had a right to

17   detain his computer, and if Mr. Loomis believed that everything

18   was backed up, as he says --

19              THE COURT:  So he happened to have someone come in and

20   steal it just at the moment that someone was about to copy the

21   hard drive.  I mean, he didn't have someone take it earlier.  It

22   was only when he found out someone came from headquarters about to

23   copy the hard drive that he thought it would be prudent to steal

24   it right from behind his back.

25              MR. McEVOY:  Well, you know, respectfully, Your Honor, I

1  have to vehemently disagree with the characterization of stealing.

2  I don't think you can steal your own property.

3          THE COURT:  Okay.  Sneak in and take.

4          MR. McEVOY:  Well -- and I, I don't know what -- I think

5  Mr. Loomis would say that he believed that his computer could be

6  detained for an indeterminate amount of time, and he wanted his

7  computer at home because --

8          THE COURT:  Yeah.

9          MR. McEVOY:  -- apparently he was being fired, and he

10  wanted to, needed to potentially make another living or do

11  whatever --

12          THE COURT:  Gosh, he had a lot of money from the sale of

13  his stock.  I would think he could have afforded to go out and buy

14  one.

15          MR. McEVOY:  Well, I also think it's, it's difficult,

16  Your Honor, to be -- to put one's self in the position of getting

17  fired, and, you know, things happen quickly.

18          THE COURT:  Okay.

19          MR. McEVOY:  So -- but I think I've answered the

20  basic -- to sum it up, my understanding --

21          THE COURT:  I just wanted to make sure that my

22  understanding of how, of, of how it is that other data could have

23  been on the laptop was correct, and you've agreed with that.

24          MR. McEVOY:  I think, I think we've said in our papers

25  even, Your Honor, that there's a question of we don't know what we

1  don't know.

2          THE COURT:  Exactly.

3          MR. McEVOY:  And there's a -- yes.  We don't know what

4  we don't know, but there's also a dispute.  Mr. Loomis says you do

5  know what you know, and they say no, you don't.

6          THE COURT:  All right.

7          MR. McEVOY:  So that's the nub of it.

8          THE COURT:  Okay.

9          MR. McEVOY:  And that's, that's my position about why

10  this can't be decided as a matter of law simply on a war of

11  declarations, and I'm not going to -- I don't need to belabor that

12  further --

13          THE COURT:  Okay.

14          MR. McEVOY:  -- but that was my analogy to the *Evans*

15  case earlier.

16          Excuse me one second.  I'm trying to not discuss things

17  I've already discussed.

18          THE COURT:  Go ahead.

19          MR. McEVOY:  So I think, Your Honor, too, and I, I would

20  ask the Court to look at Ms. Behneman's report, which they've

21  tried to say is a draft.  The plaintiffs say themselves they

22  believe they had recovered everything, and I, and I still have to

23  go back to the fact that Ms. Behneman said that and we had this

24  long delay before, I mean --

25          THE COURT:  That they recovered everything that was on

1   the server.

2           MR. McEVOY:  I think, well, as I understand it,

3   recovered everything, all the data and information.

4           THE COURT:  On the server.

5           MR. McEVOY:  Well, my understanding is to the contrary.

6   I mean --

7           THE COURT:  How would they have gotten other data that

8   was not on the server?

9           MR. McEVOY:  Well, I apologize to you, yes, in the sense

10  that, that all of the data from the various, like, the various

11  computers were the tentacles, if you will, and the server is the,

12  you know, octopus or what have you, the core, you know, the center

13  of it.  So yes, it went all to the server; that's right.

14          THE COURT:  So your argument is that they would have

15  recovered or that they have recovered all of the documents that

16  were on the server --

17          MR. McEVOY:  Yes.

18          THE COURT:  -- at one point.

19          MR. McEVOY:  Yes, that's right.

20          THE COURT:  Not other documents that were never on the

21  server.

22          MR. McEVOY:  And that they've never denied that they

23  recovered, for example, all of these personal things like wills

24  and personal photographs and things.  I mean, why would Mr. Loomis

25  put those, you know, why would those be on the server, those kinds

1   of things be on the server but other things that were highly

2   personal or not company-oriented not be?  That doesn't make sense.

3        I -- you know, so otherwise, Your Honor, I would rest on

4   the papers, but I think as a matter of law, we are entitled to --

5   in summary, two points on this.

6        THE COURT:  Okay.

7        MR. McEVOY:  As a matter of law, this should have been

8   brought before -- during the discovery period, when we could have

9   deposed these people.  They knew no later than September

10  everything they needed to know about any of these computers, so a

11  harsh sanction of any kind would be inappropriate, and we say no

12  sanctions are appropriate, but particularly a default, which is

13  what they're seeking.

14       The other thing is, Your Honor, the idea that they say

15  they recovered everything on the server and we don't know what we

16  don't know is not sufficient to warrant taking the, at least

17  short-circuiting this from the trial process or from someone like

18  Judge Brinkema if it's a bench trial.  She can surely take that

19  into account in weighing testimony and so forth.  That's what,

20  that's what courts do.

21       So that's my summary on the spoliation argument.

22       THE COURT:  Okay.

23       MR. McEVOY:  On the protective order issue, Your Honor,

24  the -- you know, look, on October 30, 2009, and on the 23rd and

25  somewhere in between, when the Court first read the papers that

1  were filed about this business of Candess Hunter or whoever it was

2  at the HH&Y firm who threatened arrest, I understand why emotions

3  were high.  I've called that a gaffe in my papers.  I've called it

4  ridiculous.  I'll call it a gaffe and ridiculous today,

5  unacceptable, threatening to arrest somebody in a, in a case like

6  that.

7          In fact, Mr. Herich, who's employed in the bankruptcy

8  court, is in the process, as I understand it, of once the dust

9  settles, bringing a malpractice action against the HH&Y firm.  So

10  I'm not here to even think about trying to defend something like

11  that, but the order, the order and for reasons in my papers is

12  among other things, Your Honor -- well, before I deal with the

13  order itself, it's not true, it's absolutely not true that the

14  failure to appeal that by prior counsel means that it's -- can't

15  be rechallenged or challenged or looked at now, and the reason is

16  this:  because when this Honorable Court issues orders, sometimes

17  people take appeals under Rule 72 to the district court.  If they

18  don't do -- when a district court issues an order in a case,

19  that's the order on that subject in the case unless and until the

20  district court at any point in the proceedings decides for -- by

21  motion or sua sponte to modify it.  Even if it goes to the Fourth

22  Circuit and comes back on a mandate of some kind, the district

23  court can always revisit its orders by motion or by -- or sua

24  sponte.

25          What happens when this Honorable Court issues an order

1    and nobody appeals it is that this Honorable Court's order becomes

2    the order of the district court as well.  So the failure of prior

3    counsel to appeal it doesn't mean that, that any order of a, of

4    this Honorable Court that never gets appealed becomes unmodifiable

5    even by someone like Judge Brinkema.  It just means that this

6    Court's order becomes the order of the court.

7            So the fact that they didn't appeal it just meant that

8    this order became the order of the court, but it doesn't mean that

9    you can find someone in contempt, for example, if the order

10   doesn't in the case of Ms. Snyder and Mr. Leberer in particular

11   rest on individualized findings instead of what we say and I think

12   the record shows were these general proffers, and I think -- I'm

13   not going to revisit what I said in the papers, but I am going to

14   point out that what my, my, my opponents, my friends, colleagues

15   in the bar have said in their papers, they've now argued that

16   former employees are encompassed by this order, which how can that

17   be?

18           THE COURT:  Well, is there some reason if he was

19   concerned or confused about this order that he didn't bring a

20   motion for clarification or a motion to reconsider based on

21   specific people that he was concerned about not being able to

22   contact?

23           MR. McEVOY:  I can't speak to why it wasn't appealed or

24   why --

25           THE COURT:  No, I'm not asking about the appeal.  I'm

1   asking about a motion to clarify brought back before me that said,

2   you know, we understand why you issued this order, but we're

3   concerned about these specific people and our inability to contact

4   these specific people, and here's why.  That was never done, and

5   is there any reason why that was never done?

6           MR. McEVOY:  Well, there was, there was a stay for a

7   long period of time, and I think when the stay wasn't --

8           THE COURT:  Don't you think that, that perhaps you could

9   have gotten permission to come back to court and ask for that?

10          MR. McEVOY:  I think, I think certainly permission could

11  have been sought; yes, I do.

12          THE COURT:  Because permission was sought for -- and

13  given for other motions, including, well, not including this --

14          MR. McEVOY:  Yes.

15          THE COURT:  -- but including the other motions.

16          MR. McEVOY:  I think that's true, Your Honor, but it,

17  but it doesn't speak to the issue of whether someone can be held

18  in contempt on -- I mean, the order is what it is.  It is, you

19  know, and it either is enforceable or it isn't, and I'm

20  comfortable that under all Fourth Circuit precedent, it's not for

21  the reasons I've said in my papers.

22          And I want to say something about Mr. Loomis in this

23  regard:  Part of the reason that my, my other colleague here,

24  Mr. Herich, has even been dragged into these papers is because

25  Mr. Loomis was not running around contacting everyone possible

1   whether the order was enforceable or not.  I mean, there's --

2   that's the thing.  We have two people -- and by the way, I want

3   to -- Ms. Snyder and Mr. Leberer, and I will say as to Ms. Snyder,

4   there's a reference to her being a girlfriend.  I specifically

5   directed that that phrase not be in the final brief.  I don't know

6   how it --

7           THE COURT:  I don't care whether she was a friend who

8   was a girl or a girlfriend.

9           MR. McEVOY:  But it was important to Mr. Loomis, so I

10  wanted to bring that to your attention.  I understand it's not an

11  issue that's probably material here, but I did want to clarify

12  that for his sake.  That's on my office.  So it shouldn't have

13  been in the brief.

14          But Ms. Snyder is a close friend.  Mr. Leberer was or is

15  a close friend.  They were all friends and, indeed, close friends

16  throughout the period in question, have known each other for

17  years.

18          So, you know, Mr. Loomis's alleged contacts with

19  Mr. Leberer are one text message about some ski clothing and one

20  voice mail about the same subject that he didn't respond to

21  apparently.  Ms. Snyder, it is what it is, and we can say that for

22  Mr. Loomis, too:  The papers came in, they said, oh, he's been in

23  contact with Ms. Snyder.  We didn't come in and say, well, it's --

24  you know, try to limit it just to what was alleged in the papers.

25          The Court was informed for better or for worse what

1   those contacts were, how long they had been going on, and that's

2   now before the Court.   That's not, that is not -- there was no

3   attempt to minimize that.   So that is what it is, and we also

4   have, you know, we have all of these other people that are

5   potentially subject to the order that clearly he -- nobody

6   contacted at all or the contacts that did occur occurred through

7   Mr. LaVelle or through Mr. Herich.

8           And briefly, I know I've said about -- something about

9   both of those gentlemen in my papers, but, you know, to emphasize

10  with respect to Mr. LaVelle, I mean, in light of the HH&Y

11  incident, when I thought I was going to Arizona potentially to be

12  involved in this case, it wasn't clear whether I would or not, but

13  I called the guy and I talked to Mr. Lewis -- Mr. Smith of the

14  Lewis & Roca firm, because there was no way I was going to get

15  involved in a situation where there were attorneys running around

16  threatening to arrest people.   I didn't -- I don't want anything

17  to do with that.

18          So I've talked to Mr. LaVelle.   The guy is an

19  upstanding, he's from an AB-rated firm.   I have no doubt in my

20  mind that he tried to be a professional and upstanding at all

21  times.

22          My understanding of Mr. -- in working with Mr. Herich,

23  too, I take umbrage at the things that have been said about him,

24  because I can't, I can't get into privileged matters, but I can

25  also represent at least to the extent that was in the papers, I

1   mean, real efforts -- he's admitted to practice in that court in

2   what's the same case, and lines have been drawn, and there's been

3   a real effort to, to hew to what's a relatively novel situation in

4   terms of his not being involved here but he is involved out there.

5   Even Ms. Dickinson's partner, Mr. Kobbe, has to deal with

6   Mr. Herich all the time.  It is what it is.

7           I have to deal with Mr. Herich because he's the lawyer

8   there, just like Mr. Kobbe does, but in terms of the work product

9   and things, my name is on it here and for good reason, and if

10  anybody wants to look at my time sheets, you know I've worked very

11  hard -- very, very hard to discharge my duties as counsel here.

12          THE COURT:  And I believe you have, Mr. McEvoy.

13          MR. McEVOY:  So with respect to Mr. Herich, you know, we

14  went -- when I was in law school, there was Geoffrey Hazard, you

15  know, he wrote our ethics textbook and probably maybe the Court's

16  and a lot of people's, and he's a, he's a nice, knowledgeable guy.

17  What we're faced with with the indemnification agreement that is

18  the root of this alleged witness tampering is this:  The

19  plaintiffs have included as an exhibit with their papers a

20  severance agreement that contractually requires Mr. Leberer and, I

21  believe, Ms. Snyder to cooperate, whatever that means, and if they

22  don't cooperate, they can be sued for breach -- in this litigation

23  for five years, and if they don't cooperate, they can be sued and

24  have to return their severance.

25          One can easily make the argument that that's

1  inappropriate, and especially someone in my shoes coming into the

2  case after the fact and, okay, and forget about Candess Hunter,

3  HH&Y, or whatever, we just look at that contract and compare it to

4  the indemnification agreement, which by the way at the end says

5  you can talk to anybody you want to, you know, we don't care if

6  you testify or not, we have two instruments -- we have one

7  instrument that says you must cooperate, or we're going to sue

8  you.  The other instrument says if you -- basically, don't worry

9  about getting sued, because you'll be indemnified.

10        The evidence that's in the record shows that at least

11  Mr. Leberer expressed legitimate concern as to whether he would be

12  sued if he talked to Mr. Herich or Mr. LaVelle, and Mr. --

13  Professor Hazard has opined that this is a, within the acceptable

14  range of professional choices that a lawyer had in these

15  circumstances to put a witness at ease.

16        And the point to be made there is that I am not entitled

17  to a particular version of anybody's testimony.  The plaintiffs

18  are not entitled to a particular version of anybody's testimony,

19  and it's almost as if the plaintiffs because of these contracts

20  and because of all the stuff that happened before in the case have

21  taken the position they're entitled to a particular version of the

22  truth, and that's just not the case.

23        They're entitled to whatever these folks are willing to

24  say under oath, because that's on them, and, you know, I have

25  spoken to Ms. Snyder, I'm not prohibited from doing that, and I

1    said, "Are you coming to trial?  Are you willing to come to

2    trial?"

3            She said, "Yes."

4            As far as I know, no one's ever suggested that

5    Mr. Leberer is not willing to, quote-unquote, cooperate and come

6    to trial.  So, you know, whether we'd like it or not, Mr. Herich

7    is the lawyer in Arizona.  All the things that they say about him

8    occurred in Arizona.  He was trying to be -- and this case easily

9    could have been tried in Arizona.  Nobody knew, for example, in

10   November whether, whether this case would, in fact, be tried in

11   Arizona or be tried here.  So to suggest that he was trying to

12   make people disappear or go away, first of all, Mr. Kobbe could

13   depose those people in their bankruptcy case today, so could

14   Mr. Herich as far as I know, and at that time, the trial on the

15   merits might have been in Arizona.

16           So to suggest that somebody believed that they were

17   going to make somebody disappear when there was just as much of a

18   chance that the case would be tried basically down the street just

19   isn't -- doesn't ring true, and part of the reason Mr. Herich's

20   here, and I don't at this point intend to have him testify but as

21   I will proffer, is because he is extremely upset at the allegation

22   that he was witness tampering.

23           That's frankly, I find that to be in the same league --

24   I mean, that's a, that's a crime.  That's a pretty serious

25   allegation, and Mr. Herich's got a 27-year history of not even

1   having been accused of ethical violations, and it's been extremely

2   upsetting to him, and I don't need to put him on the stand to tell

3   the Court that it's extremely upsetting, but I think we have

4   Professor Hazard to say that that was a reasonable choice, and I

5   think that's a side show, Your Honor.  That whole thing is a side

6   show, especially where Ms. Snyder -- and there's no evidence that

7   Ms. Snyder, neither Ms. Snyder nor Mr. Leberer will, in fact,

8   refuse to appear for trial.

9           All we're entitled to, all anybody is entitled to is for

10  someone to put their hand on the Bible and swear or affirm or

11  declare that they're going to tell the truth, and that's what it

12  boils down to, and anybody -- I'll cross-examine all these people

13  about these contracts, severance agreements, they'll

14  cross-examine people about indemnification agreements, and Judge

15  Brinkema will give it the weight that it deserves, and I'll be

16  delighted with that.

17          In terms of the order, Your Honor, like I said, I think

18  that, you know, the plaintiffs also say, well, of course, it

19  didn't apply to some family members.  Well, some family members

20  were according to them plaintiffs' witnesses, so it's just --

21          THE COURT:  Well, again, he could have asked for a

22  clarification if he really and truly thought he couldn't talk to

23  his family members.  I mean, this is sort of ridiculous, isn't it?

24  I can't quite buy the argument that because he thought it was too

25  broad or because he thought it was imprecise, that therefore it

1   was, in effect, void and he could just go ahead and file it.

2         MR. McEVOY:  Well, except, Your Honor, it still is what

3   it is.  It either is enforceable or it isn't.  That's the

4   threshold question.  He can either be held in contempt or not, and

5   there's a whole separate set of questions associated --

6         THE COURT:  That's one issue --

7         MR. McEVOY:  Yes.

8         THE COURT:  -- but I'm having -- if I find perhaps that

9   my order was validly issued and if Judge Brinkema thinks that it

10  was validly issued, then how is that an excuse for him to violate

11  it when -- I mean, how is his perception that it was too broad or,

12  you know, or not enforceable license to violate it?

13        MR. McEVOY:  Well, I would beg the Court, I mean, that's

14  probably the right word, not to, not to -- my duty to be a zealous

15  advocate requires me to argue, I think, correctly in this case

16  that the order is not enforceable, but Mr. Loomis --

17        THE COURT:  I know, but I'm asking you a question.  Just

18  humor me --

19        MR. McEVOY:  Yes.

20        THE COURT:  -- and say that it's enforceable.

21        How is it that Mr. Loomis thought it would be okay to

22  violate it just because he had questions as to, as to its

23  enforceability?

24        MR. McEVOY:  I can't speak for why Mr. Loomis, other

25  than knows that they're close friends with Ms. Snyder --

1           THE COURT:  Okay.

2           MR. McEVOY:  -- why they associated other than that

3  they're close friends.

4           And look, we've acknowledged the contacts, Your Honor.

5  If we, if we, if we assume that the order is valid --

6           THE COURT:  And I understand you've got a tough job up

7  there, Mr. McEvoy.

8           MR. McEVOY:  And we acknowledged the contacts, but we

9  also, we also hasten to point out again the whole reason

10 Mr. Herich is even in this thing today in the courtroom is because

11 he went and talked to other people, because Mr. Loomis otherwise,

12 you know, wasn't running around talking to people, and I think

13 that, that is a factor that should weigh in the Court's analysis.

14 I mean, clearly, I'm sure that, that my colleagues from DLA Piper

15 would have 30 declarations if Mr. Loomis was running around

16 talking to all kinds of people.

17           I think -- and I think clearly, Your Honor, whatever the

18 Court decides about the order and, and Ms. Snyder, Mr. Leberer --

19 and one text message in a voice mail about ski clothes is not,

20 certainly not -- it's laughable to suggest that that would support

21 by itself, you know, a default judgment.

22           And I think even if Ms. Snyder, given her nature as the

23 close friend, is that sufficient to, to support the harsh

24 sanctions that plaintiffs are seeking, or, you know, again,

25 with -- when Judge Brinkema tries this case, for her to know all

1   these things and give it the weight that it deserves, whatever

2   that may be.

3           I think I've -- I would also like to just say with

4   Mr. Herich, you know, there is a legitimate question of law again

5   that I have to raise and do and I think rightly so, the, the order

6   that disqualified him during the period he was getting these

7   declarations, Judge Brinkema, you know, we appealed, Your Honor,

8   with all due respect.

9           THE COURT:  Right.

10          MR. McEVOY:  She said it was moot, and it was moot

11  during a stay.  And he's -- it wasn't like he wasn't legitimately

12  employed by the bankruptcy court out there at the time.  He was.

13  And we've explained why all -- in his application for employment

14  and they tried to disqualify him and it didn't work, a legitimate

15  conflict of law.  And he wasn't running around in Alexandria, you

16  know, taking depositions or things like that.  He was --

17          THE COURT:  But it was contact related to this suit, not

18  the bankruptcy.

19          MR. McEVOY:  But, but the -- but if you look at the

20  proof of claim that they filed in the Arizona court, it is this

21  case.  It -- literally, it's this case.

22          THE COURT:  I see.

23          MR. McEVOY:  And the claims that flow from it, there's

24  no distinction, because remember, on November 8, they filed their

25  amended proof of claim seeking 14 million for the same reasons

1   that they sued him here.  It is this case.  The declarations were

2   obtained on the 12th of November.  The case -- this case and this

3   motion could be argued in Phoenix today had Judge Haines made a

4   different ruling.  So that's, that's a critical fact.

5             THE COURT:  Okay.

6             MR. McEVOY:  So, Your Honor, I don't, I don't think I

7   have more to add than what's in the papers and what I've said

8   today other than to just reiterate that, that, you know, clearly a

9   trial on the merits is favored, and we -- you know, who knows what

10  will happen with this case the next week or two, but, you know,

11  there just isn't the evidence other than proffers, which we

12  challenge, to support the type of relief that's being sought, and

13  I'll get -- in closing, you know, when, when counsel has to make

14  a, preserve an issue for appeal, for example, at trial, they have

15  to -- and the court rules against someone who's trying to admit

16  evidence, there are two ways to preserve it.  You either have to

17  put the evidence on outside the presence of the jury for the

18  record, or you have to have an agreed-upon proffer.

19            THE COURT:  Okay.

20            MR. McEVOY:  And here they're proffering all kinds of

21  things.  I don't agree with them, and there 's no evidence.

22            THE COURT:  What, what about their proffers exactly do

23  you not agree with?  He's admitted to the contact with Ms. Snyder

24  and Mr. Leberer.

25            MR. McEVOY:  Yes -- right.

1        THE COURT:  Okay.  And we agree that there could have

2   been data on the laptops that was not backed up by the servers

3   and --

4        MR. McEVOY:  But Mr. Loomis denies it, but they say

5   there could have been and --

6        THE COURT:  Well, you agree that there could have been.

7   I just asked you that a little while ago to make sure that our

8   understanding of how these computers worked is the same, and that

9   is that unless the laptop is going through the server to create

10  data or download data, that there would be other data on a laptop

11  that would not necessarily be backed up by a server.

12       MR. McEVOY:  Well, I want -- if it was any laptop, but I

13  want to be clear, Mr. Loomis says that his lap- -- all of the data

14  on his laptops was backed up.  I don't agree that his position is

15  that it wasn't -- that wasn't the case.  His position is that

16  there was a batch server program that, that automatically backed

17  up everything on his desktop.

18       THE COURT:  If it went through the server.  If it didn't

19  go through the server and it was on the laptop, it wouldn't have

20  been backed up.

21       MR. McEVOY:  But he's saying -- but his position is that

22  it did go through -- everything went through the server.

23       THE COURT:  That's his position.

24       MR. McEVOY:  That's his position; that's right.

25       THE COURT:  But you agreed with me that if it did not go

1  through the server, it would not be backed up, correct?

2          MR. McEVOY:  If, if the Court rejected his version of

3  events --

4          THE COURT:  No, I'm saying that he said that his

5  information, the only information that he had on the computer went

6  through the server.  That could be.  It might be; it might not be.

7  We don't know because they never got to look at the, at the

8  laptop.

9          My point is -- and I thought you agreed with me -- was

10  that if there were other documents that did not go through the

11  server, that did not go through, for instance, e-mail on the

12  server, then we don't know -- then they would not have been backed

13  up by the server, and if they were destroyed, we don't know.

14          MR. McEVOY:  I think we added somewhat of a disconnect.

15  What I'm saying is that if we went across the street to company

16  XYZ and they had similar computers there, that they could be

17  configured or, or, or someone could manually not commit everything

18  to a server, that as a general matter in the world, that's a true

19  statement.

20          I'm saying that Mr. Loomis says everything was committed

21  to the server, and that's set forth in his declarations.

22          THE COURT:  But we don't know because they never got a

23  chance to see his laptop.

24          MR. McEVOY:  Well, I certainly am not going to agree or

25  acknowledge that Mr. Loomis isn't being forthright when he says

1   everything was.

2          THE COURT:  Okay.  I understand.

3          MR. McEVOY:  I can't.  I can't.  I'm not going to.

4          THE COURT:  That's Mr. Loomis's position.

5          MR. McEVOY:  Yes.

6          THE COURT:  Okay.  I understand.  And then so what else

7   would you not agree with in their declarations?

8          MR. McEVOY:  Well, Your Honor, I mean, there are all

9   kinds of -- for example, back to the original protective order,

10  all these lists of things that were -- that he did that were

11  horrible, all that kind of stuff, it's all by way of -- it's

12  always been by way of proffer.

13         THE COURT:  Wait a minute.  His attorney was here and

14  admitted that they threatened counsel with being arrested if they

15  stepped foot in the state.

16         MR. McEVOY:  I exclude that.  I exclude that.  I'm just

17  saying that there are many, many things in the current set of

18  papers that Mr. Loomis allegedly did or didn't do that aren't

19  backed up by an admission like the one Your, Your Honor just said.

20         THE COURT:  What else is there exactly?

21         MR. McEVOY:  Well, it's in their papers, Your Honor, and

22  I can't -- I didn't commit that list to memory, but it's in --

23         THE COURT:  Well, what is it specifically that he

24  disputes?

25         MR. McEVOY:  Your Honor, I'm -- I can't agree to, to --

1   for example, on the -- if you look at the motion to vacate

2   protective order and the opposition thereto, they talk about the

3   reasons why the protective order was granted, and there has --

4           THE COURT:  I know why it was granted.  I was here.  I

5   was the one who granted it.

6           MR. McEVOY:  I know, Your Honor, but, for example, there

7   were no particularized findings as to Ms. Snyder, no

8   particularized findings as to Mr. Leberer or really anybody else

9   other than the acknowledged threat against Ms. Dickinson for

10  example.  So I'm just saying as a general matter I can't, I can't

11  agree --

12          THE COURT:  Okay.  That has to do with the protective

13  order.

14          MR. McEVOY:  Yes.

15          THE COURT:  As to the motion for sanctions and as to the

16  motion for sanctions for the intentional destruction of evidence,

17  those two motions --

18          MR. McEVOY:  Yes.

19          THE COURT:  -- what in the declarations besides what

20  we've just covered does he disagree with?

21          MR. McEVOY:  Well, Your Honor, I, I think that's a tall

22  order, because there's so many declarations, at this point for me

23  to stand here and say I think it's encompassed by the papers --

24          THE COURT:  Fine.  I'll look back at the papers then and

25  I'll --

1        MR. McEVOY:  And what I've said -- and what I've said

2  about, our colloquy about these servers and so forth.

3        THE COURT:  Okay.  I understand.

4        MR. McEVOY:  I mean, I apologize to you, but there's so

5  much there now.

6        THE COURT:  I'll assume that whatever it is is covered

7  in your briefs otherwise.

8        MR. McEVOY:  And to the extent I haven't been able to

9  specifically tell you as I stand here now.

10        THE COURT:  I understand.

11        MR. McEVOY:  All right.

12        THE COURT:  And I didn't mean to put you on the spot.

13        MR. McEVOY:  All right.  Well, Your Honor, like I said

14  at the outset, you know, Mr. Bennett called me.  I thought I was

15  getting involved in a trial on the merits.  You know, I think that

16  a trial on the merits is still warranted.

17        The Court will do what it's going to do.  You know,

18  we'll see how the thing plays out, but, but it's -- for the

19  reasons I've stated and especially with my colleagues, you know,

20  on both sides of the table but in particular I feel for

21  Mr. Herich, I don't feel that these allegations of misconduct are

22  warranted at all, and not with Mr. LaVelle, either.  I appreciate

23  your time today and --

24        THE COURT:  Okay.  Thank you, Mr. McEvoy.

25        MR. McEVOY:  Yes, thank you.

1          THE COURT:  Did you have anything to add, Ms. Dickinson?

2          MS. DICKINSON:  I do, Your Honor.  I'd just like to

3     clarify a few things.

4          THE COURT:  Okay.

5          MS. DICKINSON:  Your Honor, when I said that trial would

6     be -- I'm not sure exactly what I said, but what I intended to say

7     was that trial would be somewhat of a circus if we were here

8     before the Court with Mr. Loomis and a jury, I didn't mean because

9     he would be crazy on the stand.  I meant because Mr. Loomis can't

10    follow orders.  That's what I meant.  I have no concern that Judge

11    Brinkema can't control her courtroom.  That wasn't the issue.

12         THE COURT:  And I'm sure court security officers like

13    the one sitting here could, too.

14         MS. DICKINSON:  As well.  So no offense to any of the

15    security in here or to Judge Brinkema --

16         THE COURT:  Yeah.

17         MS. DICKINSON:  -- but what I really meant was that Joe

18    Loomis has forfeited his right to try this case in front of a jury

19    or a judge, because he has violated the Court's orders and because

20    he has tampered with witnesses and destroyed a whole host of

21    evidence, but I have some specific responses, if I may --

22         THE COURT:  Sure.

23         MS. DICKINSON:  -- to my colleague here.

24         Mr. McEvoy and I have a little bit of a difference of

25    opinion as to whether we were going to bring to the Court's

1   attention the fact that the bankruptcy folks are going to be

2   potentially having a meeting next week.

3            THE COURT:  Oh, I wasn't sure who was meeting next week.

4   It's the bankruptcy that may have a meeting next week?

5            MS. DICKINSON:  Yes.

6            THE COURT:  The bankruptcy attorneys are tangentially

7   involved in the bankruptcy, I guess.

8            MS. DICKINSON:  Yes, Your Honor.  I just want to make

9   sure that it's clear to the Court that we want a decision on these

10  issues, on these orders.  We are not here asking you to listen to

11  us and then to hold -- or to put the brakes on until maybe

12  somebody else sits in at chambers like we did and tries to map out

13  a settlement that may or may not go through.  We very much want

14  this Court's opinion.

15           THE COURT:  Okay.  I'm glad you made that clear.

16           MS. DICKINSON:  As far as the individual issues that --

17  Mr. McEvoy made a few of them.  As far as our knowledge of the

18  spoliation goes, we did not know about the fate of that desktop

19  computer that was in his office that he had his brother take a few

20  days -- a week, I guess, after he was suspended, we did not know

21  about the fate of the two laptops, the one that he wiped clean

22  right after he was suspended and the other one that he wiped clean

23  during discovery, until discovery.

24           Now, there is a, a draft memo from Madalyn Behneman that

25  is an exhibit, and she says -- it's dated March 9, 2009.  She says

1   that the company believes that their process to grab back the

2   network data that Mr. Loomis had tried to destroy was effective in

3   capturing all of the available e-mails and network files.

4           Now, Your Honor made the right point, I believe, that

5   that was talking about network data and that there could have and

6   indeed I think everybody's pretty confident that there was based

7   on Joe Loomis's conduct in his statements to Matt Leberer, other

8   data on the desktop computer that had two hard drives, the laptop

9   computer that he wiped clean right after he was suspended, and the

10  other one that he wiped clean in August of 2009.  We certainly

11  didn't know about the destruction of the data in those computers

12  when she wrote this memo, so this memo is just irrelevant on that

13  point.

14          As for the timing of our motion, Judge Brinkema told us

15  to file this motion before trial.  She told us that during the, I

16  think it was December 15th-ish, 14th -- 17th, sorry, my dates are

17  off -- pretrial conference.  We did that in plenty of time for

18  this Court to decide it before the hearing.  There's no prejudice.

19          As this, this Court pointed out, there was a long

20  history of talks between the parties about whether data had been

21  destroyed or not since the beginning of discovery.  He -- Joe

22  Loomis had ample opportunity to ask in depositions questions about

23  the destruction of evidence, and in fact, he did do that.  There

24  were 20 or so depositions in this case, and I can think off the

25  top of my head of at least two individuals that he asked questions

1  of, and they cite to, to one of the depositions, Jason Wood, where

2  they asked questions about that.  So there's no prejudice there,

3  Your Honor.

4          As far as the, the deposition -- or, I'm sorry, the

5  declaration of Matt Leberer, we produced that in discovery within,

6  I guess, a week and a half/two weeks of that being obtained.

7  Again, no prejudice.

8          I, I take some issue with the downplaying of what

9  happened before the protective order was issued.  There, there's a

10  lot of effort, it seems, by Mr. Loomis to push off the

11  responsibility for what happened, for the conduct that caused the

12  protective order to be issued, and lest everybody forgets, and not

13  to personalize this, but Joe Loomis sent me an e-mail.  That's in

14  the record.  He sent me an e-mail personally where he forwarded an

15  e-mail to his counsel saying, I don't know it verbatim, but the

16  idea was I've hired or I'm about to hire criminal counsel, and a

17  complaint will be filed -- a criminal complaint will be filed

18  against Dickinson and Intersections something like within the next

19  couple of days.

20          He e-mailed me directly.  Joe Loomis -- it's not just

21  HHY, the Arizona attorneys, who were doing harassment in this case

22  that caused the protective order to be issued.  We need not -- we

23  should not forget that.

24          As far as this declaration of Zack Gilburd that I just

25  skimmed real quick, Zack Gilburd in paragraph 3 says that he set

1   up this SVN server so that -- he says that Joseph Loomis requested

2   that I create a batch file or script that would automatically

3   commit selected files and folders on his computer to the SVN

4   server -- and I'm going to paraphrase a little bit -- so that when

5   the computer was paired up, it would sync, commit, and refresh the

6   SVN folders residing on the computer with the SVN server with

7   NEI's IT infrastructure.

8          What's key to me when I look at that is "selected files

9   and folders."  Even this gentleman here, Mr. Gilburd, does not

10  testify or declare under perjury that Joe Loomis was backing up

11  all of his files, and if there is any question about that at all,

12  in interrogatory No. 16 -- and I have a copy for you if you'd like

13  one, Your Honor, but I suspect you don't --

14         THE COURT:  Do you have it as an exhibit?

15         MS. DICKINSON:  I do.

16         THE COURT:  Oh, you have it, okay.

17         MS. DICKINSON:  It is an exhibit already, but I can give

18  it to you if you'd like to look at it.

19         THE COURT:  It might be easier rather than me trying to

20  dig through.

21         MS. DICKINSON:  I'm just going to flip it open so it

22  will be easier.

23         MR. McEVOY:  Your Honor, I can, I can hand

24  Mr. Tolliver --

25         MS. DICKINSON:  I've got it, thanks.

1          THE COURT:  I've got it.  Thank you.

2          MS. DICKINSON:  So, Your Honor, what I've, I've handed

3   you -- or -- thank you -- has been handed to you is a copy of

4   defendant Joseph C. Loomis's responses to plaintiff Intersections,

5   Intersections Inc.'s first set of interrogatories, and as you'll

6   see --

7          THE COURT:  Oh, yeah, I see, the first paragraph.

8          MS. DICKINSON:  Yeah, right.  And he -- right.  He says,

9   "These files were not stored on NEI's server, only on my personal

10  computer."

11         THE COURT:  Um-hum.  Okay.

12         MS. DICKINSON:  So that right there shows that Joe

13  Loomis was not storing everything on the SVN server automatically

14  or otherwise, as, as he suggests, as he would like this Court to

15  believe.

16         THE COURT:  Okay.

17         MS. DICKINSON:  And those are sworn to the extent he

18  wants to try to walk away from them.

19         With respect to the protective order, Joe Loomis

20  violated the protective order.  He didn't have to run around and

21  meet with all of our witnesses.  It could have been one meeting

22  with a witness, and that would have violated the protective order,

23  but the fact is that he has established a relationship with one of

24  our witnesses who he was prohibited from contacting and, and he

25  has sought to contact.  He has contacted by e-mail and text

1    another one of our witnesses, but I think that, that -- I'm not

2    sure where is the outrage?

3          Joe Loomis entered into indemnity agreements with these

4    folks.  He signed them, and what, and what he basically said was

5    you -- he wasn't trying to level the playing field.  Joe Loomis

6    doesn't try to level the playing field.  He was saying:  It's

7    okay, you guys.  You don't have to contact Michelle Dickinson, and

8    that's what it says in the papers.

9          So if he's not contacting me, I'm the lead counsel on

10   this case, then how are we going to use him as a witness, and how

11   are we going to use Sheila as a witness if they're no longer going

12   to contact us?  That was the purpose of the indemnity agreement.

13         Mr. Hazard, very well respected, I'm sure, I respect his

14   opinion except that his opinion is about something else.  His, his

15   opinion about this, this indemnity agreement is that it was okay

16   for Emil Herich to enter into an indemnity agreement with

17   witnesses.

18         Well, that's not what happened here.  Joe Loomis, that

19   guy who wasn't supposed to be contacting witnesses, he entered

20   into an indemnity agreement with these guys.  He entered into an

21   indemnity agreement with two people who have been so afraid of him

22   that they've gone to the court in the past and gotten restraining

23   orders against him.  I'm not sure, but I don't think that

24   Mr. Hazard would think that was okay.

25         Now, Your Honor, this Court may decide that the

1  protective order needs to be modified.  That's not going to change

2  the enforceability of the protective order.  The Court could add

3  to the four corners of the document the reasons that the

4  protective order was issued.  The Court could clarify that

5  plaintiffs' witnesses meant current and former employees since we

6  didn't have witness lists out there yet, but that's not going to

7  change Joe Loomis's conduct.  It's not going to change the fact

8  that he violated the protective order and that he should be

9  sanctioned.

10         THE COURT:  Okay.

11         MS. DICKINSON:  Thank you.

12         THE COURT:  Thank you.

13         All right, as I said, I'm going to have to issue a

14  report and recommendation and take it under consideration.  I, I

15  can tell you right now it's not going to come out next week.  I've

16  got another big opinion that I'm trying to get out the door, and

17  it's just not going to happen.  It's going to be next in line.

18         So the earliest would be two weeks.  It may be a little

19  longer.  It could be three weeks from now just so you know.

20         MR. McEVOY:  Your Honor, I begged your indulgence enough

21  today, and I appreciate it.  Just may I say one thing?

22         THE COURT:  Sure.

23         MR. McEVOY:  The e-mail that was referenced, two things:

24  I understand that the e-mail that was referenced about the threat

25  to, quote-unquote, Dickinson may have been a Reply All to

1   whatever, whatever weight that may have with respect to the Court,

2   and Mr. Leberer's declaration, I've looked -- I mean, if you guys

3   produced it and there's a Bates number on it, I mean, I'll

4   acknowledge that.

5           Leberer's deposition, I thought you said it was produced

6   during discovery.  I mean, if you have one with the Bates number,

7   I can -- well, I'm just saying we can do this off the record, but

8   I'll file something to say indeed we got it if we got it, but I

9   don't think we did, but --

10          MS. DICKINSON:  You got it.

11          MR. McEVOY:  We don't have to argue about it.  Just show

12   me, and I'll acknowledge it.

13          All right, that's it, Your Honor.  I appreciate it,

14   and --

15          THE COURT:  Okay.

16          MR. McEVOY:  -- and I don't think anybody -- I don't

17   think Professor Hazard, by the way, thought Mr. Herich was going

18   to pay indemnity to anybody.  I think it was obvious that it would

19   be the client.

20          Thank you very much.

21          THE COURT:  All right, thank you.

22          MS. DICKINSON:  Oh, Your Honor, you just have to indulge

23   me just one second, please.  That e-mail, it was not a Reply All,

24   all right?  There's no way -- it was to his counsel.  How would he

25   ever have my e-mail address on -- it just doesn't make any sense.

1   It was not a Reply All.

2           THE COURT:  Okay.  Court stands in recess.

3                       (Which were all the proceedings

4                        had at this time.)

5

6               CERTIFICATE OF THE TRANSCRIBER

7      I certify that the foregoing is a correct transcript from the

8   official electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11                              _____/s/_____

12                              Anneliese J. Thomson

13

14

15

16

17

18

19

20

21

22

23

24

25