## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

Intersections Inc. and Net Enforcers, Inc.,

      Plaintiffs,

      v.                                 Civil Action No. 1:09CV597 (LMB/TCB)

Joseph C. Loomis and Jenni M. Loomis,

      Defendants.

### DEFENDANT'S MEMORANDUM IN SUPPORT OF
### MOTION FOR PARTIAL SUMMARY JUDGMENT

Comes now Defendant Joseph C. Loomis ("Mr. Loomis"), by counsel, and moves this Honorable Court for partial summary judgment as to Counts I, III, V and VII of Plaintiffs' Complaint, as well as to Plaintiffs' request for rescission.  Mr. Loomis states as follows in support thereof:

### INTRODUCTION

As this Court knows, Plaintiffs have vigorously attempted to short-circuit the trial process by alleging a multitude of acts of misconduct by Mr. Loomis that they contend are grounds to enter judgment against him.[1]  Among the reasons for this Honorable Court to deny such relief is the fact that Plaintiffs' claims suffer from great infirmity, both as a matter of law and on the actual, underlying facts.  The Court's attention is respectfully directed to the following points and authorities.

---

[1] Magistrate Judge Buchanan, in a Report and Recommendation dated March 17, 2011, has recommended entry of default judgment. Docket No. 264.  Exceptions to this R&R will be forthcoming.

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron/McEvoy

## I. COUNTS AND CLAIMS SUBJECT TO SUMMARY JUDGMENT

*Fraud-Based Claims.*  Count I (federal securities fraud under 15 U.S.C. §78j(b)), Count III (common law fraud) and VII (conspiracy to commit common law fraud) all have a basic set of facts in common.  Thus, if there is no legal fraud as a matter of law, all of these claims fail.

As alleged in ¶2 of the Complaint, Plaintiffs summarize their allegations of fraud as follows:

> In November 2007, Intersections entered into a Stock Purchase Agreement (the "SPA") with NEI [Net Enforcers, Inc.] and Defendant Joseph C. Loomis ("Loomis"), the sole shareholder and then CEO of NEI, to purchase all of NEI's stock.  The acquisition followed several months of due diligence by Intersections into NEI's business and financial condition.  Loomis and Defendant Jenni M. Loomis, his sister, who was NEI's bookkeeper, provided Intersections with financial information indicating that NEI's revenue had increased dramatically each year since its incorporation – a trend that Loomis represented would continue after the acquisition.  Defendants also provided Intersections with a list of NEI's top customers and the amounts of revenue generated by each annually.  Intersections relied upon and based its valuation and purchase price, in large part, on the financial and customer base provided by Defendants.  Loomis agreed to and did make numerous representations and warranties in the SPA regarding NEI's financials, tax liabilities, and significant customers.  *In reliance on Loomis' representations and warranties in the SPA*, Intersections paid Loomis $14 million in cash, stock options, and up to $3.5. million in Earnout Payments, totaling as much as $20 million.  [Cmplt. ¶2; emphasis added]

Plaintiffs rest their fraud claim on the contention that Mr. Loomis' "numerous representations and warranties in the SPA" were false.  However, we show below that recent Virginia Supreme Court precedent negates the ability of a plaintiff to allege and pursue claims of common law fraud where the duties at issue are rooted in a contract.  Here, the duties admittedly and undeniably flow from the SPA (as seen by the italicized language from the Complaint, above).  Furthermore, Intersections' corporate representative admitted in a 30(b)(6) deposition that the company's alleged "reliance" was founded, in material part, on the warranties and representations in the SPA.  Thus, judgment must be entered for Mr. Loomis on Count III

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898  FAX 703.273.8897

Cameron/McEvoy
P.L.L.C.

2

(common law fraud) and Count VII (conspiracy to common law commit fraud) because, at best, there is only an alleged breach of contract under Virginia law.  Moreover, Plaintiffs cannot deny that they had ample opportunity to review all data and information that they claim was material to their purchase of Mr. Loomis' company.  Thus, they cannot establish reasonable reliance as a matter of law.  This mandates judgment on Counts III and VII, again, as well as on Count I (federal securities fraud).

*Breach of Fiduciary Duty.*  In Count V, Plaintiffs allege that Mr. Loomis was employed by Net Enforcers as its CEO following the "Closing Date" whereby Intersections purchased Net Enforcers.  Accordingly, Plaintiffs allege that Mr. Loomis owed Net Enforcers common law duties of loyalty *ex contractu*, or outside of an employment contract.  There is no dispute, however, that Mr. Loomis was only an employee by virtue of a "for-cause" employment contract dated November 30, 2007.  Under Virginia law, there can be no tort for breach of fiduciary duty under these circumstances.

*Rescission.*  Plaintiffs seek rescission as a remedy.  In particular, Plaintiffs seek damages for rescission under the SPA in the amount of $14,000,000.  This claim cannot stand, however, because Plaintiffs have recently sought to enforce the same Stock Purchase Agreement against Mr. Loomis in another federal court.  Because a party cannot affirm a contract and then renounce it later, summary judgment should be granted as to Plaintiffs' claim for rescission.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Mr. Loomis was "the president and sole shareholder of [Net Enforcers, Inc.]" as of June 2007.  Cmplt. ¶18; Exh. B, Loomis Declaration ("L. Dec."), ¶1.

2.  Jenni Loomis, the other Defendant in this case, was a Net Enforcers employee and served as its bookkeeper.  Cmplt. ¶19.; L. Dec. ¶2.

3. On November 9, 2007, Intersections, Net Enforcers and Mr. Loomis entered into a Stock Purchase Agreement (the "SPA"), Exhibit A hereto, whereby Intersections was to purchase the stock of Net Enforcers from Mr. Loomis. Cmplt., ¶2 and Exh. A (SPA); L. Dec. ¶3.

4. The Recitals and the first paragraph of the SPA indicate that Intersections "desires to purchase and acquire" from Mr. Loomis all of his stock in Net Enforcers "upon the terms and subject to the conditions set forth in this Agreement and related documents to be executed and delivered." SPA at p. 1; L. Dec. ¶4.

5. The sale did not take place at the same time as the SPA was signed; rather a "Closing Date" was set within 3 business days of 2007. SPA at §1.2; L. Dec. ¶5.

6. The conditions of SPA Section 7 included, among others, several warranties, representations and promises, including the following:

(a) Mr. Loomis agreed in the SPA that "[his] representations and warranties . . . shall be accurate in all material respects . . . *as of the date of this Agreement* and as of the Closing [both of which dates are post-contractual] *"as if made on and as of the Closing* (other than representations and warranties which by their express terms are made as of a specified earlier date, which shall be accurate as of such specified earlier date) [of which there are none that are relevant here]." SPA §7.3(a) (emphasis added).

(b) Intersections insisted that it had a right to complete, before closing, "interviews with the customers of [Net Enforcers] listed on Schedule 7.3(e)(ii) [i.e., including Net Enforcers customers who, Net Enforcers alleges it learned 18 months or more later, were no longer customers]. SPA §7.3(e)(iii).

(c) Mr. Loomis agreed that there would be no "Material Adverse Effect" to the business of Net Enforcers as of Closing, meaning no event had occurred that might negatively Net Enforcers since December 31, 2006. SPA §7.3(f) and p. 60 (definition).

(d) Mr. Loomis had to sign an Employment Agreement at Closing which is at issue in this case. SPA §7.3(j)(1).

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron / McEvoy
P.L.L.C.

4

(e) Mr. Loomis had to "*deliver to Purchaser a complete set of [Net Enforcer's] quick books [sic] application, updated to a date reasonably acceptable to [Intersections]*. SPA §7.3(m) (emphasis added). [These are the very financials which are the basis for the alleged claims of fraud in this case; L. Dec. ¶6.]

7. Before the SPA was signed, Intersections undertook extensive "due diligence" whereby it undertook to investigate all manner of financial, customer and other information provided by Mr. Loomis for Net Enforcers. L. Dec. ¶7; *See* Exh. C, INTX Corp. Depo. 86-87; 89-91; 140-41.

8. Intersections required Mr. Loomis, on behalf of Net Enforcers, to attach all of the paperwork that Intersections considered material to the purchase to the SPA as "Schedules." L. Dec. ¶8; *See generally* SPA.

9. In the SPA, Mr. Loomis had to represent, on behalf of Net Enforcers, that Schedule 2.7 to the SPA contained "complete and correct" financial statements for Net Enforcers for years 2005, 2006 and through September of 2007. SPA §2.7; L. Dec. ¶9.

10. In the SPA, Mr. Loomis also had to represent, on behalf of Net Enforcers, the complete list of contracts that he had with third parties. SPA §2.18; L. Dec. ¶10.

11. In the SPA, Mr. Loomis had to identify, on behalf of Net Enforcers, the "Top 20 Customers by Revenue" for the period ending June 30, 2007. SPA §2.23 and Schedule 2.23. This was the same list of customers that Intersections insisted it had a right to interview. *See* ¶6(b), above.[2] L. Dec. ¶11.

12. In the SPA, Mr. Loomis had to identify, on behalf of Net Enforcers, all of the "Accounts and Notes Receivable" of Intersections. SPA §2.24 and Schedule 2.24. L. Dec. ¶12.

---

[2] Of course, Plaintiffs now contend that this list was intentionally misstated and that certain customers had ceased being customers. While Mr. Loomis denies that any information was intentionally misleading, Plaintiffs could have determined the status of any customer with a phone call.

13. In the SPA, Mr. Loomis had to make warranties and representations about the status of tax matters and to account for a number of key tax transactions. SPA §2.11 and Schedule 2.11; L. Dec. ¶13.

14. Plaintiffs reserved to themselves the right to investigate all of the foregoing data *after the SPA was signed* but before the Closing Date. *See* ¶¶17-18, below. L. Dec. ¶14.

15. In SPA at §2.31, Mr. Loomis also agreed to a "catch-all" provision, on behalf of Net Enforcers, that all of the data he delivered to Plaintiffs in the SPA's schedules was not materially misleading. Nowhere was Mr. Loomis asked to represent or warrant that any data conveyed prior to the date of the SPA was complete and accurate in all material respects. Rather, the SPA sought to bring all data together in the contract and to set benchmark dates – by contract – as to the accuracy of any information so delivered. Indeed, the "catch-all" warranty and representation specifically contemplated that the prior information *might not have been fully complete or accurate* (*see* italicized language, below). Thus, it was in the SPA that Intersections sought assurances that it was complete and accurate:

> No representation or warranty made by [Mr. Loomis or Net Enforcers] contained in this Agreement, and no statement contained in or as any schedule hereto delivered by [Mr. Loomis or Net Enforcers] or in any certificate, list or other writing attached hereto delivered by [Mr. Loomis or Net Enforcers] or delivered by [Mr. Loomis or Net Enforcers] pursuant to Article 7 hereof, contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements herein or therein, in the light of the circumstances under which they were made, not misleading. Seller has delivered to Purchaser all such financial, operating, technical and product data and other information, materials and Books and Records as Purchaser from time to time has requested (as so delivered, the "Delivered Information"), *and Seller has not failed to provide to Purchaser any other financial, operating, technical or product data or other information, materials or Books and Records which is material or otherwise necessary in order to make any of the Delivered Information (or any representation or warranty made by Seller or the Company contained in this Agreement, or any statement contained in or as any schedule hereto delivered by Seller or the Company or in any certificate, list or other writing delivered by Seller or the Company or Delivered by Seller or the Company pursuant to Article*

1325 Random Hills Road, Suite 200, Fairfax, Virginia 22030   TEL 703.273.8898   FAX 703.273.8897

Cameron/McEvoy

*7) not misleading*. Notwithstanding anything herein to the contrary, all financial, operating, technical or product data or other information, materials or Books and Records delivered by Seller or the Company to Purchaser at any time during the period beginning on October 27, 2007 and ending on the date of this Agreement had been delivered to Seller prior to such period. [SPA, ¶2.31; L. Dec. ¶15]

16.  Of like effect is SPA §7.2(a), which states that all "representations and warranties" made in the SPA must "be accurate in all material respects." L. Dec. ¶16.

17.  Plaintiffs were also expressly unwilling to rely on Mr. Loomis' word, reserving to themselves a right to conduct due diligence for up to 50+ days *after* the SPA was signed but before the Closing Date.   SPA §1.2; L. Dec. ¶17.

18.  Indeed, Plaintiffs specifically required Mr. Loomis to give them "full access" to all physical facilities of Net Enforcers prior to the Closing Date, and to further allow full access to "all Books and Records," including all financial data of any kind or character.  They also repeated the demand and, indeed, required Mr. Loomis to agree that Plaintiffs could interview any customers or others as Intersections saw fit.  SPA §6.1; L. Dec. ¶18.

19.  All representations and warranties were deemed made as of the contract date.  SPA §8.2(a)(i); L. Dec. ¶19.

20.  Beyond shepherding and cataloging all representations and warranties in one place (the SPA), and making them effective as of the date of the SPA and thereafter (some survived forever and some for a year after the Closing Date, *see* SPA, Art. 8), the SPA contained an integration clause that provided that any prior "agreements or understandings" were of no effect because the SPA was an integrated, final agreement:

This Agreement and the Exhibits and Schedules hereto, including the Non-disclosure Agreement to the extent incorporated herein by reference pursuant to Section 6.3(a) hereof, constitute the entire Agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron/McEvoy
P.L.L.C.

7

subject matter hereof (including the Letter of Intent dated August 20, 2007 between the Company and Purchaser).  SPA §10.2; L. Dec. ¶20.

21.  As noted, the SPA was signed on November 9, 2007.  L. Dec. ¶21.

22.  On or after November 9, 2007, Mr. Loomis sent all of the materials and data required by the SPA to Plaintiff Intersections' headquarters in Chantilly, Virginia.  L. Dec. ¶22.

23.  On or after November 9, 2007, but before the Closing Date, Plaintiff Intersections conducted "due diligence" as to matters concerning customers, equipment, accounts and financial data.  L. Dec. ¶23.

24.  The "Closing Date" occurred on November 30, 2007.  SPA, page following signature pages ("Closing Certificate").  L. Dec. ¶24.

25.  Prior to the Closing Date, Plaintiffs had every opportunity to conduct whatever due diligence they wanted to.  However, they contacted only a handful of customers, and it is not known what, if any, financial due diligence was undertaken with the volumes of data they demanded.  Exh. C, INTX Corp. Dep. at 89 (corporate representative admits that "as part of the SPA we contacted approximately half of those customers or attempted to contact approximately half of those customers as a part of the due diligence"); p. 293 (admitting that four clients who were allegedly no longer clients as of closing were never contacted by Intersections); L. Dec. ¶25.

26.  The SPA provided that Plaintiffs could "reach back" and amend the purchase price up to 90 days after the "Closing Date" if they discovered adverse changes in the Net Enforcers business or its "Assets," a term of art defined to include "accounts" and all other income of Net Enforcers.  SPA §1.4 ("Potential Price Adjustments"); L. Dec. ¶26.

27.  Mr. Loomis was paid the full $14,000,000 purchase price on or about November 30, 2007 less related closing costs and legal expenses.  L. Dec. ¶27.

8

28.  Plaintiffs' Complaint admits that the SPA was the focal point of all "representations and warranties" that have any meaning in this case.  The following paragraph numbers are from the Complaint herein:

a.  ¶2:  "Loomis agreed to and did make numerous representations and warranties in the SPA regarding NEI's financials, tax liabilities, and significant customers.  *In reliance on Loomis' representations and warranties in the SPA,* Intersections paid Loomis $14,000,000 in cash, stock options, and up to $3.5 million in Earnout payments, totally as much as $20 million." [Emphasis added.]

b.  ¶8:  Plaintiffs "learned that Loomis and his sister had conspired to and did knowingly and willfully misrepresent material information regarding NEI's financials and customer base to Intersections pre-Closing."  As noted, "Closing" occurred after formation of the SPA.

c.  ¶8, first bullet point:  Loomis certified four "revenue generating customers" "in the SPA" but it turned out they were no longer customers.

d.  ¶8, second and third bullet points:  Loomis provided documents "pre-Closing" that falsely inflated revenue.  Again, this data was part of the SPA.

e.  ¶8, fourth bullet point:  Loomis breached a tax representation made "in the SPA."

f.  ¶8, fifth bullet point:  Loomis breached another tax representation made "in the SPA."

g.  ¶23:  confirms that the SPA required that the "financials [Mr. Loomis] and Jenni Loomis provided and upon which the purchase price was in large part based [had to be] complete and correct (SPA, Section 2.7)."

h.  ¶24:  confirms that in the SPA, "Loomis provided a list of NEI's top 20 customers by revenue generated (SPA, Schedule 2.23) and represented that none had terminated its contract

9

with NEI or notified Loomis of its intent to terminate its contract with or materially reduce its purchases from NEI (SPA, Section 2.23)."

     i.  ¶25.  Lists various customers cited in "(SPA, Schedule 2.23)."

     j.  ¶26.  Cites the SPA as the basis for misrepresentations about tax forms.

     k.  ¶51.  Cites the SPA as the basis for misrepresentations about customers.

     l.  ¶¶52-55.  Cites specifics to bolster the allegations in ¶¶8 and 23-26 that Mr. Loomis breached representations contained in the SPA.

     m.  ¶67.  Alleges that "Loomis has materially breached the terms of the Stock Purchase Agreement by, among other things, breaching the Representations and Warranties contained therein."

     29.  After Intersections acquired Net Enforcers, it entered into an employment contract with Mr. Loomis as of the Closing Date (November 30, 2007).  Cmplt. ¶31; L. Dec. ¶28.

     30.  The Employment Contract is attached to the Complaint as Exh. 2.

     31.  The Employment Contract prescribes the conduct that is allowed and not allowed by Mr. Loomis.  *Id.* at Exh. 2.

     32.  After the closing, Mr. Loomis was employed by Net Enforcers, and served as CEO of Net Enforcers, solely by virtue of the Employment Agreement.  *See* Employment Agreement.

     33.  Under the Employment Contract, Mr. Loomis was not an at-will employee.  *Id.*

     34.  Both Mr. Loomis and Jenni Loomis were employed by Net Enforcers at all relevant times, as CEO and bookkeeper, respectively.  L. Dec. ¶29.

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron / McEvoy PLLC

*Facts Related To Rescission Only*

35. The SPA contains a non-competition agreement ("Restrictive Covenant") that

provides as follows:

> For a period commencing upon the Closing and ending on the later of (x) the third
> anniversary of the Closing and (y) the date the final payment of the Earnout is
> made, Seller shall not anywhere in the United States, directly or indirectly,
> without the prior written consent of Purchaser: (i) engage or participate, directly
> or indirectly, either as principal, agent, employee, employer, consultant,
> stockholder, director, officer, partner or in any other individual or representative
> capacity whatsoever, in the conduct or management of, or own any stock or other
> proprietary interest in, any business or enterprise that conducts business or
> operations which are the same as or substantially similar to the Business [of NEI]
> . . . or (ii) solicit, hire or employ, or cause any other Person to solicit, hire or
> employ any employee or contractor then retained or employed by [NEI] or
> [INTX] or retained or employed by [NEI] or [INTX] within the one-year period
> immediately prior to such solicitation, hiring or employment. [*See* Exh. A, p. 35.]

36. On or about May 27, 2009, Plaintiffs filed this action against Mr. Loomis and his

sister, Jenni Loomis.

37. In the Complaint's prayer for relief, Plaintiffs request rescission of the SPA and the

full amount of the initial purchase price of Mr. Loomis' stock: $14,000,000. Cmplt. at p. 23.

38. On or about January 26, 2010, Mr. Loomis filed for bankruptcy in the United States

Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") under Chapter 11 of the

United States Bankruptcy Code (reorganization). *In re: Joseph C. Loomis, Debtor*, Case No.

2:10bk01885, Chapter 11 Voluntary Petition, Exh. D, Bankruptcy Petition; L. Dec. ¶30.

39. On or about April 26, 2010, the automatic stay imposed under the Bankruptcy Code

was lifted for the limited purpose of allowing this Honorable Court to determine whether an

alleged settlement agreement between the parties was enforceable. Plaintiffs contended that it

was enforceable; Mr. Loomis denied that it was enforceable. This Honorable Court found in

favor of Mr. Loomis on this issue. Docket No. 217, Order dated November 3, 2010; L. Dec. ¶31.

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron/McEvoy
PLLC

40. While the settlement question was being briefed by both sides in this Court, Plaintiffs filed a paper that took the position that the Restrictive Covenant was fully enforceable, but that it would expire by its own terms on November 30, 2010. Exh. E, Plaintiffs' Response to Defendants' Objections to Magistrate Judge's Report and Recommendation, p. 19; L. Dec.¶32.

41. On or about October 6, 2010, Mr. Loomis began what is known as an adversarial proceeding in the Bankruptcy Court requesting a declaratory judgment that the Restrictive Covenant in the SPA had expired and/or was non-enforceable. *Joseph C. Loomis v. Intersections, Inc., et al.*, Adversary Pr. 2:10ap1796, Exh. F, Complaint for Declaratory Relief/Judgment; L. Dec. ¶33. On or about December 13, 2010, Mr. Loomis filed a Memorandum in Support of his position. Exh. G, Memorandum of Points and Authorities in Support of Debtor Joseph C. Loomis' Motion for Summary Judgment. L. Dec. ¶33.

42. Specifically, Mr. Loomis took the position that the Restrictive Covenant was unenforceable or, in the alternative, that Plaintiffs had taken the position in this Court that it had expired no later than November 30, 2010. Exh. E; L. Dec. ¶34.

43. Plaintiffs responded to Mr. Loomis by arguing that their statement in this Court about the expiration of the restrictive covenant was *just a typo*. Exh. H, Plaintiffs' Memorandum of Points and Authorities in Opposition to Debtor Joseph C, Loomis' Motion for Summary Judgment dated January 12, 2010, p. 14. L. Dec. ¶35.

44. Not only did Plaintiffs' not refute the SPA, but they went in the complete opposite direction and affirmed it by expressly asking the Bankruptcy Court to hold that the SPA's Restrictive Covenant remained fully valid and binding upon Mr. Loomis. Exh. H, pp. 7-11. They asked the Bankruptcy Court to rule that he could not work in any "competing business"

12

under the SPA's express terms. *See id.* at p. 7. In so doing, they spent several pages vigorously

asserting that the SPA was a binding, existing and valid contract. *Id.* at p. 7-11; L. Dec. ¶36.

45. After the arguments of the parties had been submitted in writing and at argument, the

Bankruptcy Court upheld the validity of the restrictive covenant in the SPA, stating it "accept[ed

Plaintiffs'] argument that the non-compete [in the SPA] is and was valid and enforceable," but

held for other reasons that the Restrictive Covenant expired on November 30, 2010. Exh. I,

Court's Order Granting Motion for Summary Judgment and Denying Motion to Dismiss, dated

January 26, 2011, p. 2; L. Dec. ¶37.

## III. ARGUMENT

### A. Standard of Review.

Pursuant to Fed. R. Civ. P. 56, summary judgment should be granted as to some or all of

a parties' claims when the record reveals that there are no genuine issues as to any material facts

such that the moving party is entitled to judgment as a matter of law. *Ross v. Communications

Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985). To defeat summary judgment, Plaintiffs "must

identify an error of law or a genuine issue of material fact; [Plaintiffs] cannot create a material

fact by reliance on conclusory allegations or bare denials." *Erwin v. United States*, 591 F.3d

313, 320 (4th Cir. 2010). *See* Fed. R. Civ. P. 56(c), (e); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256, (1986); *see also Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522

(4th Cir. 2003). In this regard, a material fact is one "that might affect the outcome of the suit

[or the issue] under the governing law." *Anderson*, 477 U.S. at 248. "[I]n the absence of

disputed material facts, summary judgment represents a favored mechanism to secure the 'just,

speedy, and inexpensive determination' of such issues." *Plett v. United States*, 185 F.3d 216,

223 (4th Cir. 1999) (quoting Fed. R. Civ. P. 1). Summary judgment "does not become

1325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron/McEvoy
PLLC

disfavored simply because a case is complex" or because there are some disputed facts.

*Thompson Everett, Inc. v. National Cable Adver., L.P.*, 57 F.3d 1317, 1322-23 (4th Cir. 1995).

> **B. Plaintiffs' Claims For Common Law Fraud (Counts III and VII) Fail As A Matter Of Law Because The Only Source Of Duty At Issue Flows From The SPA.**

In *Augusta Mutual Insurance Co. v. Mason*, 274 Va. 199, 645 S.E.2d 290 (2007), the

Virginia Supreme Court continued a clear trend of limiting a plaintiff's ability to sue for fraud

where the alleged duties are, in fact, subsumed in a contract. In that case, an insurance agent

applied for insurance on behalf of a client. In the application, the agent misstated the nature of a

chimney flue, claiming that it was tile-lined when it was not. Augusta Mutual Insurance

Company issued a policy in reliance on the representation that the client's chimney flue was tile-

lined. When the house burned to the ground, it turned out that the flue was not tile-lined and the

company refused to pay the client's claim.

When the client sued the insurance company, the insurance company filed a third-party

complaint against the agent alleging breach of contract, fraud and breach of fiduciary duty. The

Supreme Court rejected both the fraud and breach of fiduciary duty claims. In doing so, the

Court expanded upon principles that it has been developing steadily since the 1980s. In essence,

the Court held that if the parties have defined their relationship contractually, and if the duties

that constitute the alleged fraud are intertwined with the alleged fraud, the contract will govern

the cause of action. *Augusta*, 274 Va. at 207-08 (explaining that if resort to a contract must be

had for proof under a cause of action, the action sounds in contract, not tort). For example, even

though the agents' conduct in making a false application for the client was clearly fraudulent,

and though fraud claims could have survived against the client, the agent's relationship to the

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030   TEL 703.273.8898   FAX 703.273.8897

insurance company had been defined by a contract, *i.e.,* the underlying agency agreement.  Thus,

there could be no fraud claims between the insurance company and the agent:

> The duties that [the agent] allegedly violated by making fraudulent
> representations about the condition of the clients' flue and by signing [another's]
> name on the Report arose solely by virtue of the Agency Agreement between
> Augusta Mutual and [the agency].

*Augusta,* 274 Va. at 206.

The *Augusta* court cited its prior decision in *Richmond Metropolitan Authority v.*

*McDevitt Street Bovis, Inc.*, 256 Va. 553, 507 S.E.2d 344 (1998).  In that case, a municipal

authority and a contractor entered into an agreement to build a stadium.  The contractor

submitted sworn statements for payment indicating that it had performed its work according to

the plans provided by the authority.  In reality, however, the contractor cut corners and the

statements it made to induce payment were fraudulent.  However, the Virginia Supreme Court

refused to permit the authority to proceed on a fraud theory even though the authority alleged

that fraudulent conduct was inherently outside the four corners of the parties' contract.  The

Court noted that the contract defined the basic duties of the contractor and the rights of the

parties.  Accordingly, the action sounded in contract:

> The determination whether a cause of action sounds in contract or tort *depends on*
> *the source of the duty violated.* Because 'each particular misrepresentation by [the
> contractor] related to a duty or an obligation that was specifically required by the . .
> . [c]ontract,' we conclude that the contractor's misrepresentations did not give
> rise to a cause of action for actual fraud.

*Augusta,* 274 Va. at 205 (emphasis added).

Since *Augusta,* the Court has repeated the foregoing principles at least twice.  *Dunn*

*Construction Co. v. Cloney,* 278 Va. 260, 682 S.E.2d 943 (2009) (where contractual duties were

the basis for the parties' relationship, statements made after formation of the contract could not

be legal fraud even though they arguably related to work that arose after initial performance had

15

been completed); *Abi-Najm v. Concord Condominium, LLC*, 280 Va. 350, 699 S.E.2d. 483

(2010).

In *Abi-Najm*, the Virginia Supreme Court "recapitulated" the foregoing principles yet

again:

> Tort law is not designed to compensate parties for losses suffered as a result of a breach
> of duties assumed only by agreement. That type of compensation necessitates an analysis
> of the damages which were within the contemplation of the parties when framing their
> agreement. It remains the particular province of the law of contracts.

*Abi-Najm,* 280 Va. at 360.

In all of these cases, the Court has not abrogated the principle that a "single act or

occurrence can, in certain circumstances, support cause of action both for breach of contract and

for breach of a duty arising in tort." *Augusta,* 274 Va. at 205. The key question, in all cases,

however, is whether any duties exist "independent of any duties assumed . . . pursuant to"

contract. *Abi-Najm*, 280 Va. at 361. The teaching of these cases is straightforward. If the

source of the duty allegedly violated stems from a contract, then there can be no independent

claim for fraud. It is obvious that the analysis must include a reading of the contract at issue,

plus the source of any duties allegedly breached.

In this case, there are at least five key facts before the Court related to the foregoing

issues.

*First,* Plaintiffs have expressly admitted, in the "Introduction" to this entire lawsuit, that

"in reliance on Loomis' representations and warranties in the SPA, Intersections paid $14 million

in cash, stock options, and up to $3.5 million in Earnout payments, totaling as much as $20

million." Cmplt. ¶2. This foundational allegation says it all, and it is dispositive. The SPA

could not make it plainer that it was designed to gather all data related to the transaction that had

allegedly been "investigated" by Intersections, attach it in an updated form to the SPA as

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

CAMERON/McEVOY
P.L.L.C.

Schedules, and then have Mr. Loomis "warrant and represent" that this data was true, accurate and complete as of the contract date.  Plaintiffs were so skeptical that they reserved to themselves a post-contractual right, of more than 50 days if necessary, to conduct unrestricted additional due diligence.

*Second,* Plaintiffs have little choice but to acknowledge the contractual nature of their claims.  As set forth in detail above, the structure of the SPA is obvious.  Nowhere is there any affirmation, representation or warranty that any prior provision of data by Mr. Loomis was warranted to be complete and correct, and part of the obvious purpose of the SPA was to bring updated data together in one place and cause Mr. Loomis to bind himself to it.  Indeed, the structure of the SPA shows that it is intended to be the focal point for all data disclosures, and accordingly all warranties and representations made by Mr. Loomis – for himself and Net Enforcers – were expressly made in the SPA itself.  The SPA even recognizes that updated information was necessary, thereby showing an awareness on the part of Intersections that it needed such updated data in order to evaluate whether to complete the transaction.

Beyond the many admissions in the Complaint that the SPA is the source of the alleged misrepresentations, Intersections' corporate representative pointed to the SPA repeatedly when asked for the source of duties by Mr. Loomis not to misrepresent facts.  Exh. C, INTX Corp. Dep. at p. 71 (pointing to the "stock purchase agreement" as the basis for claim of misrepresentations about tax matters); p. 141 (noting that deal was entered into because of confirmatory nature of "representations and warranties and indemnifications" made in the SPA); 192 ("prior to closing, we reviewed the financial statements provided by Mr. Loomis . . . in the schedules and attachments to the SPA"); p. 292-93 (discussing fact that clients were identified in schedules attached to the SPA so Intersections could contact them for interviews prior to

closing); p. 54 (stating that Schedule 2.23 of the SPA was intended to cause Mr. Loomis to identify active clients so Intersections could interview them).

*Third,* the *coup de grace* of this situation is that Intersections expressly went to great lengths to provide itself time to *verify* the data provided to it by Mr. Loomis.  Intersections reserved the specific right to interview top accounts, check financials, tour facilities, and demand any and all manner of data and information.  It set a Closing Date as late as 52 days after the execution of the SPA in order to have time to conduct its post-disclosure review, and then it could either back out of the deal or adjust the purchase price.  It did neither.

*Fourth,* and true to the admission in paragraph 2 of the Complaint, the body of the Complaint repeats – time and again – what is obvious from the SPA itself; *i.e.,* that Mr. Loomis' "warranties and representations" are contained in the SPA.

*Fifth,* the SPA contains an integration clause that states that all pre-SPA "agreements and understandings" concerning the deal were to be disregarded in favor of the matters expressly set forth in the SPA itself.  This is consistent with everything that has been pointed out above, and with Plaintiffs' admission that its alleged damages flow from the SPA only.  The SPA (with its attached Schedules) was designed to be a representation clearinghouse.[3]

*Fifth,* Intersections' corporate representative admitted that the decision to buy Net Enforcers depended upon several factors:

---

[3]  In this regard, the integration clause could cut both ways.  One the one hand, it could prevent Mr. Loomis from defending against any claim that the SPA contained an inaccuracy by arguing that he had made prior, contrary disclosures.  On the other hand, what was good for Mr. Loomis was also good for Intersections:  it could not contend that something that had been said before the SPA was signed constituted grounds for legal action since the SPA purported to be the clearinghouse for all data transfers, and since it was only in the SPA that Intersections caused Mr. Loomis to make any particular representations or warranties.

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030   TEL 703.273.8898   FAX 703.273.8897

Cameron/McEvoy
PLLC

> The due diligence [allegedly performed by Intersections], the negotiation of the SPA, the representations and warranties and indemnifications made by Mr. Loomis [in the SPA] confirmed for us that we could go ahead with the transaction as it was originally described.

Exh. C; INTX Corp. Dep. at p.141.  The important point is that Intersections had control over its own due diligence.  Indeed, it had a duty to investigate under Virginia law.  *Harris v. Dunham,* 203 Va. 760, 767, 127 S.E.2d 65 (1962); *DeJarnette v. Brooks Lumber Co.,* 199 Va. 18, 29-30, 97 S.E.2d 750 (1957).  Beyond that, the record is clear that it was the "representations and warranties and indemnifications" made in the SPA that pushed the deal from the "possible" into the "actual" as far as Intersections was concerned; *i.e.,* but-for the "representations and warranties and indemnifications" in the SPA there, would have been no transaction.  Therefore, because Intersections' Complaint must necessarily rely on the SPA as proof for Mr. Loomis' alleged "omission[s] or non-feasance," (*Augusta,* 274 Va. at 207-08), the matter collapses into nothing more than a claim for breach of contract.

For all these reasons, there can be no fraud claims that survive the reality that this case is, at best, a breach of contract action.  Thus, Counts III (fraud) and VII (conspiracy to commit fraud) must be removed from this case and judgment entered for Mr. Loomis.[4]

### C. Judgment Must Be Entered On Counts I, III and VII Because There Was No Causation Between Any Alleged Fraud And Any Damages.

There must be causation between alleged fraudulent misrepresentations and damages.  *Richmond Metropolitan Authority v. McDevitt Street Bovis, Inc.,* 256 Va. 553, 557-58, 507 S.E.2d 344 (1998); *Myers v. Finkle,* 950 F.2d 165, 167 (4th Cir. 1991) (federal securities act, setting forth elements of fraud to include causation).  As explained above, Intersections admitted that it relied upon the contractual representations set forth in the SPA and that it would not have done the deal with Mr. Loomis without them.  It

---

[4]  Count I, while alleging federal securities fraud, does not fare better than the common law fraud claims.

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron/McEvoy

also alleged in its Complaint that "*in reliance on Loomis' representations and warranties in the SPA*, Intersections paid Loomis $14 million in cash, stock options, and up to $3.5 million in Earnout Payments, totaling as much as $20 million. Cmplt. ¶2; emphasis added. This illustrates, clearly, that the matter at hand is (at best) simply a breach of contract case and not a fraud case.

### D. Judgment Must Be Entered On Counts I, III and VII Because No Party Can Show Reasonable Reliance Where They Had Ample Opportunity To Investigate.

Common to all claims of fraud in this case is the requirement that a Plaintiff prove that it reasonably relied on any alleged misrepresentations. *Harris v. Dunham,* 203 Va. 760, 767, 127 S.E.2d 65 (1962); *DeJarnette v. Brooks Lumber Co.*, 199 Va. 18, 29-30, 97 S.E.2d 750 (1957); *Costello v. Larsen*, 182 Va. 567, 571-72, 29 S.E.2d 856 (1944); *Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir. 1991) (federal securities act); *see also Banca Cremi v. Alex Brown & Sons, Inc.*, 132 F.3d 1017, 1027 (4th Cir. 1997) (federal securities act). The rule is well-settled that a plaintiff who, after an alleged misrepresentation has been made, undertakes a full investigation of the misrepresented information cannot claim justifiable reliance. *E.g., Harris, supra; DeJarnette, supra; Costello, supra.* Indeed, a party is also unable to claim reasonable reliance where it makes a *partial inquiry, with a full opportunity for complete investigation,* and elects to act upon the knowledge obtained from the partial inquiry. *Harris v. Dunham,* 203 Va. 760, 127 S.E.2d 65 (1962). As stated in *Harris*:

> It may be true that [the purchaser] did not conduct a complete investigation; that, although he examined the corporate books, records and reports, he did not explore the situation presented thereby and talk to the operators and make an inspection of the stores. He is, nonetheless, by virtue of the fact that he investigated partially, **bound by all that a complete investigation would have disclosed.**

*Harris*, 203 Va. at 767 (emphasis added). *Accord DeJarnette,* 199 Va. at 29-30; *Costello,* 182 Va. at 571-72.

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

CAMERON / McEVOY

In this case, Plaintiffs were unwilling to rely solely on representations and warranties from Mr. Loomis.  This is obvious from the fact that they secured to themselves the right to look at all of Net Enforcers' books and records and to interview Net Enforcers' clients for up to 52 days before actually closing.  In this regard, and by way of example, Intersections admits looking at financial records attached to the SPA and admits that it only called half of the clients identified in the SPA to see if they were still active clients.  Exh. C; INTX Corp. Dep., p. 192 ("prior to closing, we reviewed the financial statements provided by Mr. Loomis . . . in the schedules and attachments to the SPA"); p. 89 (corporate representative admits that "as part of the SPA we contacted approximately half of those customers or attempted to contact approximately half of those customers as a part of the due diligence"); p. 293 (admitting that four clients who were allegedly no longer clients as of closing were never contacted by Intersections).

Accordingly, it cannot be the case that, as a matter of law, Plaintiffs are entitled to any judgment for fraud, and judgment should be entered for Mr. Loomis on Counts I, III and VII.

### E.  Judgment Must Be Entered On Count V Under Virginia Law Because All Of Mr. Loomis' Duties To Net Enforcers, After The Closing Date, Were Rooted In His Employment Agreement.

Count V alleges breach of fiduciary duty by Mr. Loomis in connection with acts he allegedly undertook as CEO of Net Enforcers after that company was purchased by Intersections. In *Augusta Mutual Insurance, supra*, the Virginia Supreme Court stated that where a party's relationship with its principal flows from a contract, there can be no independent breach of fiduciary duty claim:

> The law of torts provides redress only for the violation of certain common law
> and statutory duties involving the safety of persons and property, which are
> imposed to protect the broad interests of society. *Filak v. George*, 267 Va. 612,
> 618, 594 S.E.2d 610, 613 (2004). Any fiduciary duty allegedly breached in this
> case existed solely because of the contractual relationship between Augusta
> Mutual and [the agency], and in turn, its employee, [the agent]. Therefore, we
> hold that Augusta Mutual failed to assert a valid claim for breach of fiduciary
> duties.

*August Mutual,* 280 Va. at 208.

In this case, there would have been no employer/employee or other agency relationship between Mr. Loomis and Net Enforcers but-for his employment agreement, which incidentally provides for all manner of duties and obligations under the law of contracts. Under *Augusta Mutual,* therefore, Count V must be dismissed.[5]

### F.  Count VII Must Be Dismissed Under The Intracorporate Immunity Doctrine.

While Count VII fails because the underlying fraud claim fails, it also fails because Mr. Loomis was CEO of Net Enforcers and his sister Jenni was an employee of the same company. These two individuals, therefore, could not possibly conspire together and Count VII must be dismissed. *Secureinfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 616-17 (E.D. Va. 2005). The doctrine of intracorporate immunity recognizes that a conspiracy requires two or more persons, and that because a corporation and its agents acting in the scope of their employment comprise a single legal entity, they are legally incapable of conspiracy. *Bowman v. State Bank of Keysville*, 229 Va. 534, 540-41, 331 S.E.2d 797, 801 (1985); *see also Selman v. American Sports Underwriters, Inc.*, 697 F. Supp. 225, 238 (W.D. Va. 1988) (noting that conspiracy between a corporation and its agents is legally impossible).

---

[5]  Virginia recognizes, outside of contract, a general duty of loyalty owed by an employee to an employer in an at-will setting. However, *Augusta* has obviously delimited those duties when, as here, there is an employment contract.

**G. There Can Be No Claim For Rescission In This Case Since Plaintiffs Have Affirmed The Very Contract (The SPA) They Seek To Rescind.**

Courts are reluctant to rescind contracts, as doing so is an extreme remedy. *See Bonsal v. Camp,* 111 Va. 595, 69 S.E. 978, 979 (1911). While parties may certainly plead remedies in the alternative when alleging fraud and breach of contract, rescission is unavailable once a party elects to affirm the underlying contract. *McLeskey v. Ocean Park Investors, LTD,* 242 Va. 51, 55, 405 S.E.2d 846, 849 (1991); *Campbell v. Eastern Bldg. & Loan Ass'n of New York,* 98 Va. 729, 37 S.E. 350, 352 (1900); *Durham v. New Amsterdam Cas. Co.,* 208 F.2d 342, 344 (4th Cir. 1954) ("The law is well settled that one who complains of fraud and deceit has the right either to rescind what was done as a result of the fraud and deceit, or to affirm what had been done and sue for damages caused by such fraud. He can choose either course, but he cannot choose both. The two are inconsistent."). In other words, the "[e]xercise of acts of ownership over the subject matter of the contract will validate the transaction and terminate the power of avoidance, regardless of whether the other party has suffered any prejudice." *Gannett Co., Inc. v. Register Pub. Co.,* 428 F. Supp. 818, 826 (D. Conn. 1977).

A party's "election may be manifested by acts as well as by words, and, when once made, is final, and cannot be retracted." *Trammell v. Ashworth,* 99 Va. 646, 39 S.E. 593, 595 (1901); *see also Campbell,* 98 Va. 729, 37 S.E. at 352. Therefore, if a party "treats the contract as a subsisting one, he will be deemed to have waived his right of repudiation." *Trammell,* 99 Va. 646, 39 S.E. at 595; *see also McLeskey v. Ocean Park Investors, LTD,* 242 Va. at 55, 405 S.E.2d at 849 ("If a party, after discovering facts which would justify rescission, continues to treat the contract as a subsisting obligation, leading the other party to believe that it is still in effect, the right to rescind is waived."); *Finch v. Garrett,* 109 Va. 114, 63 S.E. 417, 418 (1909) ("If after the

discovery of the fraud he treats the contract as a subsisting obligation, he will be deemed to have waived his right of repudiation.").

To cite but one example, in *Finch v. Garrett* the plaintiff continued to enjoy the benefits of the contract that he claimed he had been fraudulently induced to enter into, even after he discovered the alleged fraud. *See Finch v. Garrett, supra*, 109 Va. 114, 63 S.E. at 418. The Supreme Court of Virginia, in admonishing the plaintiff for benefiting from the same contract he was attempting to rescind, noted that plaintiff's actions were "wholly inconsistent with a purpose or intention of refusing to abide by it." *Id.* Thus, rescission was not possible. *See id.*

Exactly like the situation in *Finch*, Plaintiffs have sought to benefit from the provisions of the SPA. Indeed, Plaintiffs attempted to keep Mr. Loomis from working in his chosen field under the Restrictive Covenant contained in that agreement. In arguing to a federal court that the SPA was valid and still enforceable, even after seeking rescission in this Court, Plaintiffs made an unmistakable election to stand on the SPA and to abandon rescission. *See, e.g., McLeskey*, 242 Va. at 55, 405 S.E.2d at 849 (holding that a party who "maintained the position that [a] contract was valid, subsisting, and should be enforced" in one action, but then attempted to rescind that contract in another action, could not attempt to obtain a rescission on the contract).

## IV. CONCLUSION.

WHEREFORE, the foregoing premises considered, Defendant Joseph C. Loomis hereby moves for partial summary judgment as to Counts I, III, V and VII and on the claim for relief by Plaintiffs for rescission, and in all cases he seeks such other and further relief as justice may require.

11325 Random Hills Road, Suite 200, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897
Cameron/McEvoy

Respectfully submitted,


/s/
Timothy J. McEvoy, VSB No. 33277
CAMERON McEVOY, PLLC
11325 Random Hills Road, Suite 200
Fairfax, Virginia 22030
(703) 460-9341 (Direct)
(703) 273-8898
(703) 273-8897 (Facsimile)
tmcevoy@cameronmcevoy.com

Counsel for Defendant, Joseph C. Loomis

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2011, I have filed a true and correct copy of the foregoing with the Clerk of Court via the CM/ECF efiling system which will send notification of this filing to the following counsel of record:

Tara Lee, Esquire
Ryan C. Berry, Esquire
DLA Piper LLP
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
Counsel for Plaintiffs

David Clarke, Esquire
Michelle J. Dickinson, Esquire
Melissa R. Roth, Esquire
DLA Piper LLP
6225 Smith Avenue
Baltimore, Maryland 21209
Counsel for Plaintiffs

**And via electronic mail to:**
Ms. Jenni Loomis
212 Esquire Lane
Cary, North Carolina 27513
(919) 280-8251
jloomis13@hotmail.com
Defendant *Pro Se*

/s/
Timothy J. McEvoy, VSB No. 33277
CAMERON McEVOY, PLLC
11325 Random Hills Road, Suite 200
Fairfax, Virginia 22030
(703) 273-8898
(703) 273-8897 (Facsimile)
tmcevoy@cameronmcevoy.com
Counsel for Defendant, Joseph C. Loomis

26